POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
Justin D. D'Aloia (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 610-1100
jpafiti@pomlaw.com
jdaloia@pomlaw.com

*Counsel for Lead Plaintiffs and Lead*
*Counsel for the Proposed Class*

—additional counsel on signature page—

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ST. JOHN FAMILY TRUST, PAYAL DAVE, and JEAN LUZINCOURT, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SOUNDHOUND AI, INC., KEYVAN MOHAJER, and NITESH SHARAN,<br><br>Defendants. | Case No. 3:25-cv-02915-RFL<br><br>CLASS ACTION<br><br>AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

AMENDED CLASS ACTION COMPLAINT: Case No. 3:25-cv-02915-RFL

# <u>TABLE OF CONTENTS</u>

NATURE OF THE ACTION ........................................................................................... 1

JURISDICTION AND VENUE .................................................................................... 3

PARTIES ......................................................................................................................... 3

THE CONFIDENTIAL WITNESSES ........................................................................ 4

RELEVANT BACKGROUND .................................................................................... 5

    A.    Voice Recognition and Artificial Intelligence ............................... 5

    B.    Relevant Accounting Concepts ........................................................ 6

SUBSTANTIVE ALLEGATIONS .............................................................................. 9

    A.    SoundHound Experiences Explosive Growth as Interest in AI Snowballs ..................... 9

        1.    SoundHound Enters the Competitive Voice AI Market ........................... 9

        2.    SoundHound Goes Public and Begins Reporting as a Public Company .............. 9

    B.    SoundHound Struggles to Manage Growth ................................. 11

        1.    SoundHound's Hype Proves Unsustainable ............................. 11

        2.    A Breakthrough in AI Technology Raises Expectations and Intensifies Competitive Pressure ................................................. 12

    C.    SoundHound Reassures Investors as Its Struggles to Operate as a Public Company ...... 13

        1.    SoundHound Completes Several Acquisitions to Bring Revenues Back on Track ............. 13

        2.    SoundHound Downplays Material Weaknesses in ICFR by Assuring That It Was Taking Necessary Steps to Remediate the Issue ................... 16

    D.    Behind The Scenes, the Material Weaknesses in ICFR Persisted ................ 20

        1.    Contrary to Its Investor Disclosures, SoundHound Lacked the Controls that It Reported as Implemented ................... 20

        2.    Amelia Suffered from Many of the Same Material Weaknesses in ICFR that SoundHound Assured the Market it Was Tackling Internally ............. 21

        3.    Far From Merely Excluding Amelia from Its ICFR Assessment, SoundHound Changed Its ICFR to Leave Amelia Siloed and Weakened Its Internal Controls ................... 22

    E.    The Public Learns that SoundHound Did Not Implement the Remediation Efforts that It Reported as Completed .................... 24

        1.    SoundHound Fails to Timely File its Form 10-K and Admits that the Promised Remediation Efforts Were Never Implemented During 2024 ............. 24

        2.    SoundHound Admits It Misstated Its Q3 2024 Financial Statements as a Result of Errors Accounting for the Amelia Acquisition ................ 26

DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ........... 28

    A.    SoundHound's Completed Remediation Efforts ............................. 28

    B.    Accounting for Amelia .................................................. 34

THE TRUTH EMERGES .................................................................................................. 38

ADDITIONAL FACTS PROBATIVE OF SCIENTER ............................................................. 39

    A.     Mohajer and Sharan Were Personally Involved in the ICFR Remediation Efforts ......... 39

    B.     Mohajer Made Himself the Centerpiece of SoundHound's Purported ICFR .................. 40

    C.     SoundHound and Individual Defendants Cashed in on Their Misstatements Shortly Before Revealing the Truth ........................................................................................... 41

    D.     SoundHound Reduced its Outlay on the Amelia Acquisition by Using Inflated Stock as Consideration ..................................................................................................... 45

    E.     Amelia Was a Critical Acquisition at the Core of SoundHound's Business and Future Prospects ................................................................................................................... 46

    F.     Defendant's Decision Not to Restate Financials Bolsters the Inference of Scienter ....... 47

LOSS CAUSATION ..................................................................................................... 49

PRESUMPTION OF RELIANCE .................................................................................... 49

NO SAFE HARBOR .................................................................................................... 51

CLASS ACTION ALLEGATIONS .................................................................................. 52

CLAIMS FOR RELIEF ................................................................................................ 53

PRAYER FOR RELIEF ................................................................................................ 56

DEMAND FOR TRIAL BY JURY .................................................................................. 56

AMENDED CLASS ACTION COMPLAINT: Case No. 3:25-cv-02915-RFL

Lead Plaintiffs St. John Family Trust U/A DTD 08/19/1991 (the "**Trust**") and Payal Dave ("**Dave**," together with the Trust, "**Lead Plaintiffs**") and additional plaintiff Jean Luzincourt ("**Luzincourt**, "collectively, with Lead Plaintiffs, "**Plaintiffs**"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants SoundHound AI, Inc. ("**SoundHound**" or the "**Company**"), Keyvan Mohajer, and Nitesh Sharan (together, the "**Individual Defendants**" and, collectively, with SoundHound, "**Defendants**") allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon the investigation conducted by Plaintiffs' attorneys, which investigation has included, among other things, a review and analysis of regulatory filings made with the U.S. Securities and Exchange Commission ("**SEC**"), securities analyst research reports, press releases, media reports, and other publicly available information issued by or about SoundHound, interviews with former employees of SoundHound and/or its business partners, and consultations with experts. Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action against SoundHound and certain of its officers for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "**Exchange Act**"), codified at 15 U.S.C. §§ 78j(b) & 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, codified at 17 C.F.R. § 240.10b-5, on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired SoundHound securities between March 1, 2024 and March 11, 2025, both dates inclusive (the "**Class Period**"), and were damaged thereby (the "**Class**").

2.      SoundHound is tech company that sells products combining artificial intelligence ("**AI**") with voice recognition ("**Voice AI**") to perform advanced tasks. For example, products using SoundHound technology can be told to change the radio station, order lunch at nearby restaurants, or determine what TV shows are trending.

3.      Capitalizing on increased interest and demand for AI and Voice AI companies, SoundHound went public in 2022, but soon ran into serious headwinds: they were burning cash faster than they could increase revenues, forced to raise money in a market growingly skeptical of their

1

1  valuation and potential.

2      4.    After laying off more than half of the Company and struggling through a poor 2022 and

3  2023, SoundHound shifted strategy to growing revenue through a series of key acquisitions of other AI

4  companies, seeking to break into new markets and, hopefully, stem the negative cash burn.

5      5.    Just as SoundHound pivoted into this spate of acquisitions, however, it faced a serious

6  credibility issue: it was forced to disclose material weaknesses of internal controls over financial

7  reporting ("**ICFR**").  To paper over these issues, SoundHound immediately began regularly reporting

8  on specific steps it had completed to reduce address these issues.

9      6.    At the same time, SoundHound made its most significant acquisition, of an AI company

10 called Amelia.  This acquisition (the "**Amelia Acquisition**") promised to open doors to lucrative

11 enterprise customers and accelerate SoundHound's path to profitability.

12     7.    What the market didn't know, however, was that SoundHound failed to implement the

13 ICFR remediation steps that it said it had.  Worse still, Amelia was plagued with similar ICFR

14 weaknesses at the time of the acquisition, which SoundHound made worse by siloing Amelia's ICFR

15 function, removing all employees experienced with its reporting processes, and blindly relying on its

16 financial reporting with no further scrutiny.

17     8.    Throughout the Class Period, Defendants repeatedly represented that it supposedly

18 "complete" and "implemented" various remediation efforts to fix its ICFR issues and that there had

19 been no material changes in its ICFR, including as a result of the Amelia transaction.  Yet, in early 2025,

20 SoundHound was forced to admit that it could not file the annual report required by the SEC on time.

21 The market reacted sharply to this disclosure, and SoundHound's stock price declined by 5.86% that

22 day.  A few days later, SoundHound admitted that the remediation steps that it "completed" and

23 "implemented" had not been and, as a result, the Company materially misstated the accounting for the

24 Amelia Acquisition.  On the news, SoundHound's stock price declined even more.

25     9.    As a result of Defendants' wrongful acts and omissions causing a precipitous decline in

26 the market value of the Company's securities, Plaintiffs and other Class members have suffered

27 significant losses and damages.  This suit seeks to hold Defendants accountable.

28

AMENDED CLASS ACTION COMPLAINT: Case No. 3:25-cv-02915-RFL

**JURISDICTION AND VENUE**

10.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, codified at 15 U.S.C. §§ 78j(b), 78t(a), and pursuant to the rules and regulations duly promulgated thereunder, including SEC Rule 10b-5, codified at 17 C.F.R. § 240.10b-5.  Accordingly, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27(a) of the Exchange Act, codified at 15 U.S.C. § 78aa(a).

11.    Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and Section 27(a) of the Exchange Act, codified at 15 U.S.C. § 78aa(a).  SoundHound's principal executive offices are located in this judicial district.  Defendants conduct business in this judicial district, and a substantial part of the events or omissions giving rise to the claims asserted herein, including the dissemination of materially false or misleading statements to the public, took place in this judicial district.

12.    In connection with the acts and omissions alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, the facilities of a national securities market, and interstate telephonic and digital communications systems.

**PARTIES**

13.    Lead Plaintiffs purchased or otherwise acquired SoundHound securities at artificially inflated prices during the Class Period, as set forth in the certifications they previously filed with the Court (ECF No. 18-5), and were damaged upon the revelation of the true facts, as set forth more fully herein.

14.    Additional plaintiff Jean Luzincourt purchased or otherwise acquired SoundHound securities at artificially inflated prices during the Class Period, as set forth in his accompanying certification, and was damaged upon the revelation of the true facts, as set forth more fully herein.

15.    Defendant SoundHound is a corporation formed under Delaware law with its principal executive offices located at 5400 Betsy Ross Drive, Santa Clara, California.  SoundHound's common stock trades on the Nasdaq Global Market ("**NASDAQ**") under the ticker symbol "SOUN."

16.    Defendant Keyvan Mohajer ("**Mohajer**") has served as SoundHound's Chief Executive Officer ("**CEO**") and as a member of its board of directors since its formation in April 2022.  He

3

1    previously served as CEO and a member of the board of directors of Legacy SoundHound (defined

2    below) since he co-founded it in 2005.

3    17.    Defendant Nitesh Sharan ("**Sharan**") has served as SoundHound's Chief Financial

4    Officer ("**CFO**") since its formation in April 2022.  He previously held several executive positions at

5    Nike, including Treasurer, Head of Investor Relations, and CFO of Global Operations.

6    <u>**THE CONFIDENTIAL WITNESSES**</u>

7    18.    Confidential Witness ("**CW**") CW1 worked for SoundHound as a Merchant Operations

8    Manager from June 2023 to August 2024, and then Senior Manager of Operations Support Systems and

9    Process from August 2024 to May 2025.  In the latter role, CW1 was responsible for supporting

10   operations of all SoundHound products and support operations across five different verticals.  Prior to

11   SoundHound's acquisition of Synq3, Inc. ("**Synq3**") in December 2023, CW1 reported to Associate

12   Director of Restaurants Sidou Ai, who in turn reported to Co-Founder and Chief Product Officer James

13   Hom.  After the Synq3 Acquisition (defined below), CW1 reported to Synq3's VP of IT Aaron Turnbull,

14   who reported to Senior VP of Product and Operations Clinton Coleman, who had previously been

15   Synq3's President.

16   19.    CW2 worked in the accounting organization at Amelia from March 2018 to August 2024,

17   and after the Amelia Acquisition, worked in the same role at SoundHound from August 2024 to March

18   2025.  Prior to the acquisition, CW2 reported to Accounting Manager Evelina Adomaityte, who reported

19   first to VP of Finance Patrycja Karasewicz and then to VP of Accounting Norma Contreras.  After the

20   acquisition, CW2 reported to SoundHound Senior Accounting Manager Bhuwan Paudel, who reported

21   to SVP/Controller Raminta Krizenauskiene.

22   20.    CW3 worked for Amelia as an accountant from May 2024 to August 2025, when

23   SoundHound acquired Amelia.  After the acquisition, CW3 continued working as an accountant until

24   April 2025.  Both before and after the acquisition, CW3 reported to Accounting Manager Brian

25   Dephillis, who in turn reported to Amelia CFO Tom Wilkinson.  CW3's responsibilities included

26   booking entries and accounting reconciliation.

27

28

4

AMENDED CLASS ACTION COMPLAINT: Case No. 3:25-cv-02915-RFL

1

## RELEVANT BACKGROUND

2

**A.      Voice Recognition and Artificial Intelligence**

3

4

5

21.     Although early computers accepted input first through punch cards, then keyboards and mice, and most recently touch screens, computer engineers have been seeking to enable users to interact with technology using their voice.

6

7

8

9

10

11

22.     Beginning with computers recognizing a few basic words in the 1950s and 1960s, voice recognition capabilities have grown alongside the development of the computer.  In 1990, Dragon Systems introduced the first voice recognition technology sold to consumers, a dictation software that could record up to 100 words per minute of natural speech.  In 1997, BellSouth introduced VAL, an interactive system that could respond to questions over the phone, laying the groundwork for voice-activated phone menus.

12

13

14

15

16

17

23.     In parallel, computer engineers also sought to push the ability of computers to perform increasingly sophisticated tasks.  Early computers could execute tasks pre-coded by computer programmers but were limited to those tasks.  The term "AI," coined by computer scientist John McCarthy in 1955, broadly describes any method for creating machines able to learn to perform new tasks or solve problems on their own.  In the 1960s and 1970s, early AI used various mathematical models to approximate how human minds reason or learn, known as "neural networks."

18

19

20

24.     Given the complexities of human language, developing the capabilities of voice recognition soon came to rely on applying neural networks to improve technology's ability to recognize and respond to voice inputs.

21

22

23

24

25

26

27

25.     By the end of the 2000s, a major revolution in artificial intelligence unleashed a wave of voice recognition technology.  Processes harnessing complex webs of neural networks, known as "Deep Learning," triggered a huge leap forward in AI's capabilities and brought them to the everyday consumer.  In 2011, powered by Deep Learning, Google introduced Google Voice Search and Apple introduced Siri, and in 2014 Amazon followed with Amazon Alexa.  These products used Voice AI to understand more complex instructions and perform a wider array of tasks, such as playing music, setting reminders, sending emails, and accessing information.

28

AMENDED CLASS ACTION COMPLAINT: Case No. 3:25-cv-02915-RFL

26.     Because Voice AI can be utilized for innumerable functions, the market potential is vast. While consumers pursue Voice AI products like Siri or Alexa to interface with their home tools, enterprises look to Voice AI as a major efficiency, replacing call centers full of employees with efficient, automated Voice AI tools.  Much as the ATM reduced the need for bank tellers, in recent years Voice AI has often been seen as capable of generating the next big advancement in efficiency.

### B.     Relevant Accounting Concepts

27.     In accordance with 15 U.S.C. §§ 78m(a) and 78o(d), the SEC has promulgated rules which require domestic issuers with registered securities to file annual reports on SEC Form 10-K at the end of each fiscal year and quarterly reports on SEC Form 10-Q at the end of the first three quarters of the fiscal year on an ongoing basis.  Among other things, every Form 10-K or Form 10-Q filed with the SEC must contain a "financial statement" for the period covered by the filing that meets the requirements of Regulation S-X, codified in 17 C.F.R. § 210 *et seq*.  The financial information reported in each of these various components of the financial statement is important to investors because it offers insight on the performance and financial position of the filing entity.

28.     Notably, Regulation S-X requires that all financial statements filed with the SEC must be prepared in accordance with Generally Accepted Accounting Principles ("**GAAP**").  17 C.F.R. § 210.4-01(a)(1).  Regulation S-X makes clear that interim financial statements, *i.e.*, those included in quarterly reports filed on Form 10-Q, must follow GAAP as well.  17 C.F.R § 210.10-01(a).  Any financial statement filed with the SEC that is not presented in accordance with GAAP is presumed to be misleading, despite any footnotes or other disclosures to the contrary.  17 C.F.R. § 210.4-01(a)(1).

29.     GAAP refers to those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time, promulgated by the Financial Accounting Standards Board ("**FASB**").  The FASB has codified GAAP into a numbered scheme called the Accounting Standards Codification ("**ASC**").  ASC and SEC rules and interpretive releases represent authoritative sources of GAAP for SEC registrants.  ASC 105-10-05-1.  The Public Company Accounting Oversight Board ("**PCAOB**") provides additional guidance to public companies through its published Auditing Standards ("**AS**").  Where industry conventions conflict with definitive standards, such as ASC, the definitive standards prevail.

30.     Regulation S-X also requires financial statements to include balance sheets for the company and its subsidiaries on a consolidated basis ("**Consolidated Financials**").  17 C.F.R. § 210.3-01.  According to ASC 810-10-10-1, "[t]he purpose of consolidated financial statements is to present . . . the results of operations and the financial position of a parent and all its subsidiaries as if the consolidated group were a single economic entity."  ASC 810-10-10-1 also creates a presumption that Consolidated Financials "are more meaningful than separate financial statements" and "usually necessary for a fair presentation" of the consolidated group.  Therefore, GAAP generally requires reporting entities to consolidate all subsidiaries in which it has a controlling financial interest.  ASC 810-10-25-1.  A company with subsidiaries must therefore determine the financial position, results of operations, and cash flows for each subsidiary and then combine them to create the Consolidated Financials.  Errors in the balance sheet for any subsidiary, if not corrected by the parent during consolidation, flow through into the overall Consolidated Financials for the reporting company.

31.     Following a series of high-profile financial scandals that occurred in the early 2000s at large public companies, Congress enacted the Sarbanes-Oxley Act of 2002 ("**SOX**") to protect investors by improving the accuracy and reliability of corporate disclosures.

32.     Among other things, Section 404 of SOX directed the SEC to prescribe rules that effectively required all public companies to establish and maintain a system of ICFR, and to assess the effectiveness of those controls on a periodic basis.  Such ICFR can include standard processes, hiring appropriate personnel, implementing technological controls, or other activities and policies.  As provided in Rules 13a-15 and 15d-15 of the Exchange Act, management must not only maintain ICFR but also evaluate the effectiveness of ICFR annually and evaluate any change that is reasonably likely to materially affect ICFR each quarter.  Other provisions of SOX require the CEO and CFO of any such company to file certifications of compliance with SOX in each annual and quarterly report filed with the SEC on Form 10-K or Form 10-Q, including that it complies with GAAP ("**SOX Certifications**").

33.     The SEC has also promulgated rules requiring qualitative, non-financial disclosures concerning ICFR.  For example, Item 307 of Regulation S-K, codified in 17 C.F.R. § 229.307 ("**Item 307**"), mandates these qualitative disclosures, and specifically requires registrants to "[d]isclose the conclusions of the registrant's principal executive and principal financial officers . . . regarding the

effectiveness of the registrant's disclosure control and procedures" for the period covered by the filing. Item 308 of Regulation S-K, codified in 17 C.F.R. § 229.308 ("**Item 308**"), also requires a report on the registrants' ICFR including "management's responsibility for establishing and maintaining adequate [ICFR]," "management's assessment of the effectiveness of the registrant's [ICFR]," and "any change in the registrant's [ICFR]. . . that has materially affected, or is reasonably likely to materially affect, the registrants [ICFR]." The SEC offers further guidance on interpretation of Regulation S-K, including Items 307 and 308, through Compliance and Disclosure Interpretations (each a "**C&DI**").

34. A deficiency in ICFR exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent or detect misstatements on a timely basis. AS 1305.01. A material weakness in ICFR, on the other hand, is defined by the SEC as a deficiency or a combination of deficiencies in ICFR, creates a reasonable possibility that a material misstatement of financial statements will not be prevented or detected on a timely basis. 17 CFR § 210.1-02(a)(4). Therefore, the existence of a material weakness matters, even if it does not result in an error in a financial statement. Investors rely on the financial statements produced by issuers in deciding where and how much to invest, and the risk of investing in a security that may not report accurate financial information may discourage investors and depress the security's valuation.

35. Furthermore, material weaknesses in ICFR are important to avoid because they can invite enforcement action: for example, on January 20, 2019, the SEC announced settlement actions against four companies that had failed to maintain effective ICFR for multiple years, even though those weaknesses were disclosed. Then-Associate Director in the SEC Division of Enforcement Melissa Hodgman stated in the press release that "[c]ompanies cannot hide behind disclosures as a way to meet their ICFR obligations. . . . We are committed to holding corporations accountable for failing to timely remediate material weaknesses."

36. One key ICFR is segregation of duties. Segregation of duties refers to assigning different people the responsibilities of authorizing transactions, recording transactions, and maintaining custody of the effected assets. Segregation of duties is intended to prevent fraud, theft, and errors in financial reporting. For example, separating the business stakeholder who initiates transactions from the

stakeholder (or levels of stakeholders) who approve such transactions ensures that multiple eyes verify any transaction, reducing the risk that the single person could either exploit the process or introduce key errors into the company's accounting.

## SUBSTANTIVE ALLEGATIONS

**A.     SoundHound Experiences Explosive Growth as Interest in AI Snowballs**

**1.     SoundHound Enters the Competitive Voice AI Market**

37.     In 2005, Mohajer founded Melodis Corporation, later renamed SoundHound, Inc. ("**Legacy SoundHound**"), to explore Voice AI applications.  Legacy SoundHound's initial product was a consumer tool named Midomi (also later rebranded as SoundHound), which could hear the user hum or sing and identify the song.

38.     In 2015, Legacy SoundHound struck a deal with Hyundai to ship its music recognition services in their Genesis line of cars, opening the Company's first big market: the automotive industry.

39.      Later that year, Legacy SoundHound announced a general Voice AI platform, Houndify, promising to "add voice-enabled conversational interface to anything."  Rather than performing a specific task, Houndify would be a tool that could use voice to trigger various tasks, depending on its application.

40.     In 2018, Legacy SoundHound announced a series of strategic partnerships with car companies to bring the Houndify platform as the primary voice-enabled interface of the in-car infotainment system, including with Hyundai, Mercedes-Benz, and Honda.  With Houndify, users in those automobiles could turn on the lights, play a song, get the score on a football game, or ask for directions home.  In short, Legacy SoundHound had developed a niche in the auto industry for bringing an Alexa or Siri-like voice assistant into the car.

**2.     SoundHound Goes Public and Begins Reporting as a Public Company**

41.     In the 2020s, Defendants sought to broaden Legacy SoundHound's application.  Indeed, Mohajer has described being inspired by the voice-activated, intelligent computers of Star Trek, which can perform any task by speaking to them, and is a proponent of the idea that the future of user interfaces lies in voice, not keyboards, mice, or touchscreens.  To propel growth and operations, Defendants sought to expand Legacy SoundHound's access to financing.  Accordingly, on November 16, 2021, Legacy

AMENDED CLASS ACTION COMPLAINT: Case No. 3:25-cv-02915-RFL

1    SoundHound announced that it would become a publicly traded company through a merger with a

2    special purpose acquisition company ("**SPAC**").

3        42.    SPACs, also known as "blank check companies," are shell corporations listed on a public

4    exchange for the purpose of acquiring a private operating company and taking it public (a "**de-SPAC**

5    **Transaction**"). Prior to the de-SPAC transaction, shareholders in the SPAC deposit money into a trust

6    account. If the SPAC shareholders do not redeem their shares in connection with the de-SPAC

7    transaction, the money in the SPAC trust account becomes the property of the combined company for

8    the use and benefit of the SPAC's target's operations.  Additionally, contemporaneous with de-SPAC

9    transactions, firms commonly generate additional proceeds from Private Investment in Public Entity

10    ("**PIPE**") financing.

11        43.    Legacy SoundHound's de-SPAC transaction (the "**SoundHound de-SPAC**") involved

12    a business combination with Archimedes Tech SPAC Partners Co. ("**Archimedes**"). Archimedes's trust

13    account had raised $133,000,000 from public investment in its initial public offering process ("**IPO**")

14    and a partially exercised underwriter option to purchase additional Archimedes securities to sell.

15    Moreover, in connection with the de-SPAC, Archimedes entered into agreements that raised

16    $111,000,000 in PIPE financing for the combined company. Accordingly, SoundHound generated

17    approximately $234,000,000 in connection with its de-SPAC transaction. Furthermore, by becoming a

18    publicly listed company, SoundHound has had the opportunity to raise funding by selling additional

19    securities directly to public investors, which it has done.

20        44.    Under the terms of the SoundHound de-SPAC, Legacy SoundHound was valued at ***$2.1***

21    ***billion dollars***.  An investor presentation touting the SoundHound de-SPAC touted a $160 billion total

22    addressable market for Voice AI.  It also placed itself alongside Microsoft, Google, Apple, and Amazon,

23    technology leaders who disrupted major markets.  In addition to automotive success, the presentation

24    noted SoundHound's move into the restaurant space, taking drive-thru orders at some locations of chains

25    like White Castle and Sonic.

26        45.    On April 28, 2022, the merger was completed, and the resulting company was rebranded

27    as SoundHound AI, Inc., trading on NASDAQ at an opening price of $9.89.  Once public, the new entity

28    became subject to the SEC's quarterly and annual reporting requirements.

B.    **SoundHound Struggles to Manage Growth**

1.    **SoundHound's Hype Proves Unsustainable**

46.    Almost immediately after becoming a public company, however, SoundHound struggled to meet the lofty goals set.  By the end of the first day of trading, it closed at $8.18, 14.9% below the trading price of the pre-merger SPAC.  With only a day of trading under its belt, analysts were already quick to discount the Company as another over-hyped SPAC.  *Market Realist* wrote that SoundHound "has joined a long list of de-SPACs trading well below their IPO price."

47.    Like many start-ups, SoundHound's revenues were nowhere near its costs, leading to a steady cash burn.  As SoundHound wrote in its filings, "SoundHound has generated substantial net losses and negative operating cash flows since its inception and expects to continue to do so for the foreseeable future."  In 2021, the company had a net cash burn of $22 million; in 2022, the burn was $13 million.  On January 13, 2023, tech publication *Gizmodo* disclosed an internal email from Mohajer who described how "companies like SoundHound were the darlings of the investor community" but the Company had been forced to re-evaluate its financials and accelerate its path to profitability.  One SoundHound employee told *Gizmodo*, "While the outcome of going public was not easily foreseen when the process was begun, as it became clear that far less cash would be raised than anticipated steps should have been taken to preserve cashflow rather than the unbridled hiring which took place."

48.    Under pressure, SoundHound announced on November 10, 2022, a layoff of ten percent of its entire workforce – forty-five of its 450 employees.  Additionally, as reported by *Gizmodo*, some members of staff received salary cuts as high as twenty percent.  SoundHound employees also told reporters from *Gizmodo* that they had only been offered two weeks severance and no healthcare, contingent on SoundHound's ability to raise additional capital.  On January 5, 2023, SoundHound filed a current report with the SEC on Form 8-K disclosing a forty percent reduction in workforce—another 200 employees—"to reduce operating costs, improve operating margins, improve cash flows and accelerate the Company's plan to profitability."

49.    Thus, in the span of a few months, the Company had laid off *more than half* its workforce.

50.     Through 2023, SoundHound repeatedly tapped investors and creditors to ensure it could continue to survive.  With these pressures, on January 24, 2023, SoundHound issued a press release announcing another $25 million in equity financing, which it described as "steps to strengthen its balance sheet and fully fund its business plan in anticipation of being GAAP operating cash flow positive by the end of 2023."  In April 2023, SoundHound issued a press release announcing $100 million in strategic financing to refinance its existing $30 million in debt.  In July 2023, SoundHound filed a shelf registration statement with the SEC on Form S-3, allowing it to raise additional capital from the market over the next three years.  Yet, even as SoundHound kept raising money, the Voice AI market was becoming even more competitive for funders.  From 2020 onward, at least 90 Voice AI companies were funded by the famed start-up venture capital firm Y Combinator alone.

51.     Given SoundHound's persistent failure to support itself by its own revenues, the Company's survival remained dependent on its ability to convince investors to continue pouring in equity to keep it from collapsing.  As such, there was intense pressure on Defendants to ensure that investors continued to view the Company as worth the risks.

### 2.     A Breakthrough in AI Technology Raises Expectations and Intensifies Competitive Pressure

52.     As SoundHound was struggling to grow, the next wave in artificial intelligence was about to massively shift the ground beneath its feet: generative artificial intelligence ("**Generative AI**").

53.     Generative AI uses yet more complex neural networks not only to perform useful tasks, but to generate new content.  Early Generative AI could generate realistic-sounding human speech or write new paragraphs of content.

54.     In November 2022, OpenAI announced the release of a consumer Generative AI, ChatGPT, accessible to anyone on the internet.  With a simple, plain-language written prompt, ChatGPT could perform a variety of tasks: write a poem, summarize a document, produce ad copy.  ChatGPT reached one million users within *five days*.  Popular excitement over the potential of AI was widespread.

55.     In addition to consumer fascination, corporations were racing to find uses for Generative AI in their organization.  According to the McKinsey Global Survey on AI, conducted between April

AMENDED CLASS ACTION COMPLAINT: Case No. 3:25-cv-02915-RFL

11 and 21, 2023, one-third of respondents reported that their organization was already using Generative AI in at least one function.

56.    This hype created an enormous opportunity for AI companies: data collected by *CrunchBase* indicated that AI startups collected investments of a jaw-dropping $35 billion *in the first half of 2024 alone*.  A Goldman Sachs report published in June 2024 estimated that companies would invest $1 trillion in Generative AI—meaning a massive addressable market for companies like SoundHound.

57.    While GenerativeAI created an enormous opportunity for some companies, it also posed a substantial risk for others, like SoundHound.  SoundHound's technology, which predated the Generative AI wave, would need to become more powerful to stay relevant.  While some companies chose to skip development by licensing ChatGPT or other tools to power their products, SoundHound insisted on using only the technology it had developed itself.  By early 2023, SoundHound was touting its own generative Voice AI product.

58.    However, bigger names would soon enter the market.  In May 2024, OpenAI added Voice AI capabilities to ChatGPT, soon followed by Apple, Amazon, Meta, and Google.  According to a report by Andreessen Horowitz, the Voice AI market reached $5.4 billion in 2024, a 25% increase from the previous year.  The report noted that larger enterprises were already beginning to shift significant amounts of customer interactions from human agents to generative Voice AI products.

59.    Thus, through the Class Period, SoundHound was under pressure to forge ahead quickly, rather than being left in the dust of bigger, more famous companies with deeper pockets.

**C.    SoundHound Reassures Investors as Its Struggles to Operate as a Public Company**

   **1.    SoundHound Completes Several Acquisitions to Bring Revenues Back on Track**

60.    After a disastrous end to 2022, SoundHound shifted strategies, turning its attention to acquiring other companies to expand its market and grow its revenue more quickly.

61.    On December 7, 2023, SoundHound released a press release announcing it would acquire Synq3, a Voice AI company focused on solutions for the restaurant industry (the "**Synq3 Acquisition**").  Synq3, founded by a former McDonald's operator, boasted products that promised to take orders from

customers at drive-thru windows and over the phone. Because Synq3's products work fully autonomously—that is, without any human intervention required—restaurants could reach far more customers without increasing investment in human capital. According to the press release announcing the merger, the Snyq3 acquisition would "make SoundHound the preeminent U.S. provider of voice AI for restaurants, extending its market reach by an order of magnitude to over 10,000 signed locations and accelerating the deployment of leading-edge generative AI capabilities to the industry." The acquisition, which cost SoundHound approximately $25 million, closed on January 3, 2024.

62.     On June 20, 2024, SoundHound released a press release announcing it would acquire another Voice AI company focused on the restaurant industry, Allset, further bolstering its move into that vertical.

63.     On August 8, 2024, SoundHound surprised the market with the swift and unexpected acquisition of Amelia. Founded in 1998 as IPsoft, Inc. and rebranded in 2020, Amelia was a Voice AI company that developed digital assistants focused on larger enterprises. Amelia was also a complex corporate entity, consisting of fifteen subsidiary entities.

64.     The press release announcing the Amelia Acquisition reported that it closed the business combination on the same day. As with the Synq3 Acquisition, SoundHound justified the Amelia Acquisition as an opportunity to enter new markets and expand its reach. In the Q3 2024 Form 10-Q, the Company touted how Amelia would "allow the Company to enter new industries such as healthcare, insurance, financial services, and retail, expanding its market reach." At the time of the acquisition, Amelia boasted nearly two hundred customers, including top fifteen global banks and Fortune 500 multinational brands. As Mohajer told *TechCrunch*, "Some of their customers are highly regulated and, as such, those integration requirements are significant and complex. Incubating these types of relationships and developing the associated product capabilities would take us years."

65.     SoundHound disclosed it had paid approximately $80 million to acquire Amelia, as well as taking on all of Amelia's debts totaling $125.1 million. The transaction was paid by issuing 3,809,520 shares of SoundHound Class A common stock to sellers, as well as an additional 2,149,530 shares in escrow to secure indemnification for the sellers, and $8.4 million of cash to cover seller transaction expenses.

66.     The Amelia Acquisition drove excitement for SoundHound.  As *StockInvest.US* noted, SoundHound stock closed on August 8, 2024, with a significant increase of 21.16%, "driven largely by the news of its acquisition of Amelia" on high trading volume.

67.     After closing the Amelia Acquisition, SoundHound began reporting Amelia's financial position, results of operations, and cash flows as part of its own Consolidated Financials, beginning with a quarterly report filed by SoundHound on Form 10-Q for the quarterly period ended September 30, 2024 (the "**Q3 2024 Form 10-Q**"), signed by Mohajer and Sharan and accompanied by SOX certifications from both.  Therefore, it would be impossible for SoundHound to fairly present its financial condition without ensuring that Amelia's ICFR was effective as well, as any in Amelia's financial statements would flow through in SoundHound's Consolidated Financials.

68.     The SEC has issued guidelines on how ICFR for an acquired subsidiary should be disclosed shortly after an acquisition.  In a CD&I titled "Management's Report on Internal Control Over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports: Frequently Asked Questions," ("**Acquisition CD&I**")  revised on September 24, 2007, the SEC that while "we would typically expect management's report on internal control over financial reporting to include controls at all consolidated entities," in the first year, the SEC "would not object" to the registrant excluding the acquired business from disclosures regarding its assessment of its internal controls.

69.     However, even if the registrant chooses to exclude the acquired business from its assessment of internal controls, "a registrant must disclose any material change to its [ICFR] due to the acquisition pursuant to Exchange Act Rule 13a-15(d) or 15d-15(D)."  The Acquisition CD&I also notes that Item 308 requires filers to "identify and disclose any material changes in the registrant's [ICFR] in each quarterly and annual report" which "would encompass disclosing a change . . . that was not necessarily in response to an identified material weakness . . . if it materially affected the registrant's [ICFR]."  This disclosure requirement "includes disclosing a change to internal control over financial reporting related to a business combination for which the acquired entity that has been or will be excluded from an annual management report on internal control over financial reporting."

70.     In another CD&I titled "Regulation S-K" (the "**Regulation S-K CD&I**"), in a section titled "Section 215. Items 308 and 308T – Internal Control over Financial Reporting" revised on April

24, 2009, the SEC reiterated the same guidance as the Acquisition CD&I, and clarified that the registrant "should disclose why management's assessment has not been included in the report, specifically addressing the effect of the transaction on management's ability to conduct an assessment and the scope of the assessment if one were to be conducted."

71.    SoundHound purported to follow these SEC guidelines in its SEC filings following the Amelia Acquisition.  For example, the Q3 2024 Form 10-Q stated as follows:

> In accordance with the Compliance and Disclosure Interpretations issued by SEC staff, companies are allowed to exclude acquired businesses from the assessment of internal control over financial reporting during the first year after completion of an acquisition and from the assessment of disclosure controls and procedures that are subsumed in the internal control over financial reporting.  Based on this guidance, our assessment of the effectiveness of the Company's disclosure controls and procedures as of September 30, 2024 excluded the portion of disclosure controls and procedures that are subsumed by internal control over financial reporting of acquired entities [Synq3 and Amelia].

72.    In short, while SoundHound elected to exclude Amelia from its mandatory assessment of ICFR during the first year following the acquisition, investors understood that SoundHound remained responsible for ensuring that its Consolidated Financials were accurate and was required to disclose any material changes to its own ICFR due to the acquisition in any of its quarterly or annual reports.

### 2.    SoundHound Downplays Material Weaknesses in ICFR by Assuring That It Was Taking Necessary Steps to Remediate the Issue

73.    Near the end of 2023, investors learned for the first time that SoundHound's ICFR contained deficiencies, although the Company spun these issues as minor and subject to ongoing remediation.  On November 9, 2023, SoundHound released its preliminary financial results for the period ending September 30, 2023.  On that day, the Company hosted a conference call to announce those results.  At the end of his opening remarks, Mohajer stated:

> One final note before I close, in our upcoming 10-Q, you will see certain revisions to financial information from prior periods.  These changes relate to the accounting for completing – for the completed financial transactions we had and these revisions will impct line items, including other income and expense and certain balance sheet metrics, but will have no impact on the results related to reported revenue, gross margins, operating margins, adjusted EBITDA or cash balances.  Again, specifics will be detailed in our 10-Q.

74.    Then, on November 15, 2023, SoundHound filed a notification of late filing with the SEC on Form 12b-25 (the "**Q3 2023 Form NT**"), which disclosed that the quarterly report required to be filed with the SEC on Form 10-Q for the period ended September 30, 2023 could not be timely filed "without unreasonable effort or expense." The Q3 2023 Form NT, signed by Mohajer, attributed the late filing to "immaterial accounting errors related to historical financing transactions for certain prior periods, which will be revised in the Form 10-Q." The Q3 2023 Form NT also warned that the Company would disclose "material weaknesses in its internal control over financial reporting."

75.    Later on November 15, 2023, SoundHound filed a quarterly report on Form 10-Q for the quarterly period ended September 30, 2023 (the "**Q3 2023 Form 10-Q**"), which was signed by Mohajer and Sharan and certified pursuant to SOX (the "**Q3 2023 SOX Certifications**") by Mohajer and Sharan. The Q3 2023 Form 10-Q disclosed that "[m]anagement performed, with the participation of the Chief Executive Officer (CEO) and the Chief Financial Officer (CFO), an evaluation of the effectiveness of the Company's disclosure controls," and that, based on that evaluation, both Mohajer and Sharan "concluded that the Company's disclosure controls and procedures were not effective at the reasonable assurance level of September 30, 2023 due to the material weaknesses in its internal control over financial reporting." Specifically, the Q3 2023 Form 10-Q disclosed that SoundHound "did not design and maintain effective controls in response to the risks of material misstatement." This weakness "contributed to the following additional material weaknesses as of September 30, 2023:"

• The Company did not design and maintain effective controls to verify appropriate accounting for complex financing transactions.

• The Company did not design and maintain effective controls to verify appropriate segregation of duties, including assessment of incompatible duties, identification of instances where incompatible duties were assigned to an individual, and addressing conflicts on a timely basis.

• The Company did not design and maintain effective controls over certain information technology (IT) general controls over information systems that are relevant to the preparation of the Company's financial statements. Specifically, the Company did not design and maintain: (i) user access controls to ensure appropriate segregation of duties and to adequately restrict user and privileged access to appropriate personnel; (ii) program change management controls to ensure that program and data changes are identified, tested, authorized and implemented appropriately; and (iii) computer operations controls to ensure that processing and transfer of data, and data backups and recovery are monitored.

AMENDED CLASS ACTION COMPLAINT: Case No. 3:25-cv-02915-RFL

These weaknesses prompted revisions to reports for quarterly and annual reports filed with the SEC covering reporting periods between September 30, 2022, and June 30, 2023.

76.     However, the Q3 2023 Form 10-Q provided assurance that the weaknesses did not have a material impact on SoundHound's reported financial results, and it was taking necessary steps to remediate the issues.  For example, the Q3 2023 Form 10-Q reported that after "giving full consideration to the material weaknesses," SoundHound's "management has concluded that its condensed financial statements present fairly, in all material respects, its financial position."  In addition, directly after the disclosure describing the various deficiencies in ICFR, the Company outlined its Remediation Efforts for the Material Weaknesses (the "**Remediation Efforts**").  Specifically, the Q3 2023 Form 10-Q stated, in relevant part:

> **Remediation Efforts for the Material Weaknesses**
> We are in the process of designing and implementing controls and taking other actions to remediate the material weaknesses described above. Specifically, during the current quarter, we implemented measures designed to improve our internal control over financial reporting to remediate the material weaknesses, including the following:
>
> • Engaging a third party to perform a risk assessment that includes the identification and walkthrough of key business processes and conducting design and operational control testing to address key risks.
>
> • Completing a segregation of duties assessment identifying key conflicts and mitigating controls.
>
> • As of September 2023, the Company has begun implementing a Segregation of Duties automated tool for our Enterprise Resource Planning (ERP) system. We will also design and implement similar controls for the remaining financially relevant applications.
>
> • Designing and implementing controls related to user access reviews and the review of Service Organization Control reports, which cover program change management and computer operations for many of the applications that we rely on for financial reporting.

77.     In short, despite admitting some internal control deficiencies, the Company indicated that it had diagnosed the issue—a failure to segregate duties and enforce them within IT systems—and advised that the Remediation Efforts had already begun as of September 2023.  Given the purportedly minor impact and claims of an already underway remediation plan, these disclosures did not negatively affect the stock or generate serious criticism from analysts or investors.

78.     On March 1, 2024, SoundHound again filed a notification of late filing on Form 12b-25 (the "**2023 Form NT**"), which disclosed that the annual report required to be filed with the SEC on Form 10-K for the year ended December 31, 2023 could not be timely filed.  The 2023 Form NT, signed by Mohajer, attributed the late filing to the fact that "the Company is now a large accelerated filer and required an additional day to file," while also warning that the Company would again report material weaknesses in its ICFR.

79.     Later on March 1, 2024, SoundHound filed an annual report on Form 10-K for the year ended December 31, 2023 (the "**2023 Form 10-K**"), signed by Mohajer and Sharan and accompanied by SOX certifications from both (the "**2023 SOX Certifications**").  The 2023 Form 10-K disclosed for the first time that the lack of effective ICFR was also due, in part, to a lack of personnel with appropriate "experience and training" in financial reporting.  These findings were again based on an "evaluation" of the Company's ICFR performed by management, including Mohajer and Sharan.  Indeed, the 2023 Form 10-K disclosed that, based on that evaluation, both Mohajer and Sharan concluded that the Company's ICFR was not effective as of December 31, 2023.  Directly following these disclosures, the 2023 Form 10-K provided an updated disclosure on the Remediation Efforts, which informed investors that the Company had, in fact, "*[c]ompleted* a segregation of duties assessment identifying key conflicts and mitigating controls" and "*[c]ompleted* the implementation of an automated month and quarter-end accounting close" tool and process.  These claims of specific, completed Remediation Efforts would later be revealed to be false.

80.     On May 10, 2024, SoundHound filed a quarterly report on Form 10-Q for the quarterly period ended March 31, 2024 (the "**Q1 2024 Form 10-Q**"), signed by Mohajer and Sharan and accompanied by SOX certifications from both (the "**Q1 2024 SOX Certifications**").  The Q1 2024 Form 10-Q reported that there was another "evaluation" of the Company's ICFR during the reporting period performed by management, including Mohajer and Sharan and, based on that evaluation, both Mohajer and Sharan concluded that SoundHound's ICFR was not effective.  However, the filing updated the Remediation Efforts disclosure to inform investors that "[i]mprovements *have been implemented* in tool utilization to strengthen the segregation of duties," and that the Company had

"*implemented* the quarterly user access review for one design cycle." These claims of specific, completed Remediation Efforts would later be revealed to be false.

81. On August 9, 2024, SoundHound filed a quarterly report on Form 10-Q for the quarterly period ended June 30, 2024 (the "**Q2 2024 Form 10-Q**"), signed by Mohajer and Sharan and accompanied by SOX certifications from both (the "**Q2 2024 SOX Certifications**"). The Q2 2024 Form 10-Q reported that there was another "evaluation" of the Company's ICFR during the reporting period performed by management, including Mohajer and Sharan and, based on that evaluation, both Mohajer and Sharan concluded that SoundHound's ICFR was not effective. The Remediation Efforts disclosure again represented that "[i]mprovements *have been implemented* in tool utilization to strengthen the segregation of duties," and that the Company had "*implemented* the quarterly user access review for one design cycle." These claims of specific, completed Remediation Efforts would later be revealed to be false.

82. On November 12, 2024, SoundHound filed the Q3 2024 Form 10-Q, signed by Mohajer and Sharan and accompanied by SOX certifications from both (the "**Q3 2024 SOX Certifications**"). The Q3 2024 Form 10-Q reported that there was another "evaluation" of the Company's ICFR during the reporting period performed by management, including Mohajer and Sharan and, based on that evaluation, both Mohajer and Sharan concluded that SoundHound's ICFR was not effective. The Q3 2024 Form 10-Q updated the Remediation Efforts disclosures to inform investors that "[t]he Company *hired* personnel with expertise in risk management and internal controls." This claim of a specific, completed Remediation Effort would later be revealed to be false.

**D. Behind The Scenes, the Material Weaknesses in ICFR Persisted**

**1. Contrary to Its Investor Disclosures, SoundHound Lacked the Controls that It Reported as Implemented**

83. Throughout the Class Period, however, the controls that SoundHound's filings described as "complete" had not been implemented at all. Indeed, the Company lacked the most basic segregation of duties and had not, in fact, set an automated process for month-end or quarter-end reporting.

84. CW1 described the messy lack of any internal segregation of duties during CW1's tenure at SoundHound.CW1, who had responsibility to budget for CW1's team, described how "I would have

issues with our finance team a lot, whether getting something approved or delays." The reason for these delays was that "all approval of everything through finance has to go through the CEO to get his approval." As CW1 explained: "anything from our vendor being paid off, finance had to wait for him to look over. I remember them saying that to me too, 'Keyvan has to give approval for this invoice.'" CW1 recalled questioning, "Then why do you have a whole finance team and directors? Once you grow and once you're past your IPO, why are you still doing this?" As a result, CW1 was aware that the Company was frequently late in paying its vendors invoices. "I was always waiting for [Mohajer] to pay it, and then I'm trying to fix the relationship with the vendor. . . [i]t would happen again the next month and the next month." As just one representative example, CW1 reported that "there were definitely a lot of missed payments to our [call center] vendor in Mexico."

85.    Furthermore, despite claiming to have automated month- or quarter-end reporting, SoundHound's acquisitions interrupted these processes. As described by CW2, the decision to close the Amelia Acquisition on the same day that it was announced disrupted financial reporting: "The acquisition date was August 8, so now you need to factor in eight days of financials from Amelia's fifteen entities in August in the acquisition instead of closing it out on the 31st of July." As CW2 put it, "that added another complexity to their financials."

## 2.    Amelia Suffered from Many of the Same Material Weaknesses in ICFR that SoundHound Assured the Market it Was Tackling Internally

86.    Prior to the Amelia Acquisition, Amelia—like SoundHound—also had material weaknesses in ICFR. Amelia had insufficient employees with accounting experience, lacked an automated process for closing financials at month-end or quarter-end, and failed to institute sufficient controls to segregate duties. These were identical issues to those SoundHound had experienced before purportedly implementing various Remediation Efforts.

87.    For example, Amelia did not have sufficient employees qualified for financial accounting. CW3 reported being hired specifically because "there weren't enough people in the US on hand to close the books each month."

88.    Like SoundHound, Amelia also did not have segregation of duties, which, in turn, impacted its expense process. According to CW2, Amelia's CFO Wilkinson was able to charge Amelia

$20,000 for a trip to India "with no receipts or anything attached to those invoices." Instead, his direct report "approved the invoice and paid him that."

89. According to CW3, Amelia also had a manual process for closing out months or quarters performed at inconsistent times. CW2 advised these manual processes were frequently months late: "I had never been part of [a year-end audit] that finished by March. It was any time between June and September, sometimes November."

### 3. Far From Merely Excluding Amelia from Its ICFR Assessment, SoundHound Changed Its ICFR to Leave Amelia Siloed and Weakened Its Internal Controls

90. After SoundHound acquired Amelia, it included Amelia's financials as part of its own Consolidated Financials. Without implementing at Amelia the changes purportedly already made at SoundHound as part of the Remediation Efforts, SoundHound's Consolidated Financials would be impacted by the same issues the Company purported to have already tackled. In fact, multiple CWs confirm that the Remediation Efforts purportedly implemented at SoundHound were not implemented at Amelia either. Worse still, SoundHound fired what few experienced accounting employees Amelia had. Rather than, as the Remediation Efforts promised, hiring employees "with expertise in internal controls," SoundHound had, in fact, *weakened* its ICFR.

91. For example, the Remediation Efforts clearly represented that SoundHound had "completed the implementation of an automated month and quarter-end accounting workflow tool." However, far from having an automated process, and unbeknownst to investors, Amelia did not even have a standard process to automate. CW3 disclosed that "[w]ith closing in accounting, you want to get it done by the 10th of the month, 15th at the latest, but there was no set date" at Amelia. Indeed, according to CW3, meeting these monthly and quarterly deadlines would have been challenging because, far from being automated, closing out Amelia's financials required one person familiar with the data to manually compile it. When that person was out on maternity leave, in order to generate the same reporting, someone else had to "look at those previous months' files" and "[f]igure it out." CW2 corroborates this, noting that Amelia's financials process was "manual." Specifically, "it was in Excel and it was [across] twelve to fifteen entities."

1    92.    Furthermore, just like SoundHound, Amelia also lacked effective segregation of duties
2    to review expenses.    Despite SoundHound's claim to have "completed a segregation of duties
3    assessment identifying key conflicts and mitigating controls," implemented "[i]mprovements . . . in tool
4    utilization to strengthen the segregation of duties," and "[d]eveloped policies and procedures for the
5    quarterly access review," CW1, CW2, and CW3 all confirmed that no changes were made to Amelia's
6    policies.    Therefore, Amelia's lack of segregation of duties persisted.

7    93.    After the acquisition, SoundHound did not integrate Amelia's organizational structure,
8    leaving it isolated.    In particular, Amelia's accounting organization remained isolated from the
9    Company's own team.    For example, CW3, an Amelia employee, also described how, after the merger,
10   Amelia's accounting continued unchanged.    "I didn't officially become a member of SoundHound's
11   team . . . My day-to-day just continued." Far from implementing the Remediation Efforts, "as far as
12   SoundHound's accounting or practices, I don't even think I met their team."    Similarly, CW2 described
13   how SoundHound's Controller "was never really speaking to any of us, having meetings, looking at
14   financials."

15   94.    This siloed structure marked a notable departure from SoundHound's standard practice.
16   According to CW1, Synq3 had been integrated into SoundHound, resulting in the Company laying off
17   approximately twenty SoundHound employees who were made redundant by bringing the organizations
18   together.    On the other hand, SoundHound "kept [Amelia] segmented where [Amelia employees] only
19   talked to us when they needed help with something."    CW1 bluntly put it: "With Synq3 we knew what
20   was happening," but "with Amelia, we had no idea what was happening."

21   95.    Compounding matters, rather than following through on the representation that
22   SoundHound had hired employees with "expertise in internal controls," CW2 described how at the end
23   of 2024, SoundHound laid off all Amelia's remaining accountants experienced with Amelia's financial
24   reporting, leaving only Paudel—who had only been hired in October—and offshored these
25   responsibilities to employees in India who did not have accounting degrees and "only know what you
26   teach them."    Despite running all of Amelia's finances, CW2 described Paudel as "really new" and "just
27   not experienced with financials."    CW2 was surprised that the Company relied solely on Paudel because
28   Paudel "had only been there for three months," and was "not familiar with where to get the documents,

where information lives, and who to ask for what." Thus, after the acquisition, Amelia had neither support from SoundHound's internal reporting team nor any personnel with experience in financial reporting.

96.     These ICFR weaknesses directly impacted SoundHound's reporting because, according to CW2, after Amelia and SoundHound generated their consolidated financial statements separately, and "at the end they merged them together." This was a particular challenge because, as CW2 recounted, "our consolidation process was really complicated too," given Amelia's fifteen separate entities.

**E.    The Public Learns that SoundHound Did Not Implement the Remediation Efforts that It Reported as Completed**

**1.    SoundHound Fails to Timely File its Form 10-K and Admits that the Promised Remediation Efforts Were Never Implemented During 2024**

97.     After spending 2024 repeatedly assuring investors that certain concrete Remediation Efforts had been implemented, once SoundHound was required to produce audited Consolidated Financials for the year, the Company was forced to admit these representations were empty.

98.     On March 4, 2025, SoundHound filed a notification of late filing on Form 12b-25 (the "**2024 Form NT**") with the SEC, signed by Mohajer, which reported that it would be unable to timely file an annual report on Form 10-K for the period ending December 31, 2024, and that the material weaknesses in ICFR that SoundHound purportedly had previously addressed with Remediation Efforts, in reality, "continue[d] to exist as of December 31, 2024." The 2024 Form NT stated, in relevant part:

> As previously disclosed, on January 3, 2024, SoundHound AI, Inc. (the "Company") completed the acquisition of Synq3, Inc. in a cash and stock transaction (the "SYNQ3 Acquisition"), and on August 7, 2024, the Company completed the acquisition of Amelia Holdings, Inc. in a cash and stock transaction (together with the SYNQ3 Acquisition, the "Acquisitions"). ***Due to the complexity of accounting for the Acquisitions, the Company requires additional time to prepare the financial statements and the accompanying notes disclosed in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2024 (the "Form 10-K")***. Accordingly, the Company has determined that it is unable to file the Form 10-K without unreasonable effort or expense. As previously disclosed, the Company has identified material weaknesses in its internal control over financial reporting. ***These material weaknesses continue to exist as of December 31, 2024***. The Company expects to file its Form 10-K within the fifteen-day period provided under Rule 12b-25, no later than by March 18, 2025.

99.     With this filing, the market learned that the Company had been unable to accurately account for its new acquisitions and that there were material ICFR weaknesses, causing a drop in the stock value. In an article published that day, *The Motley Fool* described how "SoundHound AI is getting hit with big sell-offs after the company revealed that it will be delaying the filing of its annual 10-K report."

100.     Then, on March 11, 2025, SoundHound filed an annual report on Form 10-K for the annual period ended December 31, 2024 (the "**2024 Form 10-K**"), signed by Mohajer and Sharan and accompanied by SOX certifications from both. In the 2024 Form 10-K, SoundHound made further disclosures concerning the Company's lack of effective controls in 2024 and its inability to account for corporate acquisitions, stating, in relevant part:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934, as amended). Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2024. In making this assessment, our management used the criteria established in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of a company's annual or interim financial statements may not be prevented or detected on a timely basis. The Company did not maintain an effective control environment as it lacked sufficient oversight of activities related to its internal control over financial reporting due to a lack of appropriate level of experience and training commensurate with its financial reporting requirements. ***Further, due to rapid business growth, changes to existing controls or the implementation of new controls have not been sufficient to respond to changes to the risks of material misstatement to financial reporting, which resulted in the Company, including the SYNQ3 and Amelia entities which were acquired during 2024, not designing and maintaining effective controls related to substantially all accounts and disclosures. These material weaknesses contributed to the following additional material weaknesses as of December 31, 2024:***
>
> - ***The Company did not design and maintain effective controls related to the identification of and accounting for certain non-routine, unusual or complex transactions, including the accounting for complex financing transactions and acquisitions***.
> - ***The Company did not design and maintain effective controls to verify appropriate segregation of duties, including assessment of incompatible duties, identification of instances where incompatible duties were assigned to an individual, and addressing conflicts on a timely basis.***

- ***The Company did not design and maintain effective controls over certain information technology (IT) general controls over information systems that are relevant to the preparation of the Company's financial statements. Specifically, the Company did not design and maintain: (i) user access controls to ensure appropriate segregation of duties and to adequately restrict user and privileged access to appropriate personnel; (ii) program change management controls to ensure that program and data changes are identified, tested, authorized and implemented appropriately; and (iii) computer operations controls to ensure that processing and transfer of data, and data backups and recovery are monitored.***

101.     This disclosure made clear that, despite its specific claims of completed Remediation Efforts, those controls had not been implemented.  For example, while the 2023 Form 10-K and subsequent filings claimed that SoundHound had "[c]ompleted a segregation of duties assessment identifying key conflicts and mitigating controls," the 2024 Form 10-K admitted that SoundHound "did not design and maintain effective controls to verify appropriate segregation of duties, including assessment of incompatible duties."  Similarly, while the Q1 2024 Form 10-Q and subsequent filings claimed that SoundHound had implemented improvements "in tool utilization to strengthen the segregation of duties," the 2024 Form 10-K admitted that "the Company did not design and maintain (i) user access controls to ensure appropriate segregation of duties[.]"

### 2.     SoundHound Admits It Misstated Its Q3 2024 Financial Statements as a Result of Errors Accounting for the Amelia Acquisition

102.     The material weaknesses in SoundHound's ICFR introduced errors in the Consolidated Financials it reported.  As the 2024 Form 10-K disclosed, it had led to significant misstatements in the Q3 2024 Form 10-Q accounting for the Amelia acquisition.

103.     The 2024 Form 10-K stated, in relevant part, that, as a result of the foregoing material weaknesses related to the Company's ability to account for corporate acquisitions:

> During the year ended December 31, 2024, we recorded measurement period adjustments to increase the cash consideration by $12.8 thousand, to decrease the accounts receivable by $0.2 million, increase the accrued liabilities by $0.9 million due to additional payroll taxes identified, to decrease the non-current income tax liabilities by $1.8 million due to the change of pre-acquisition tax exposures subsequent to the acquisition. As a result of the adjusted acquisition-date fair value of cash consideration, assets acquired and liabilities assumed, we recorded a decrease of $0.7 million to the goodwill recognized. The measurement period adjustments were recorded in the consolidated financial statements as of and for the year ended December 31, 2024 and were made to reflect facts and circumstances that existed as of the Amelia Acquisition Date. ***In addition to the measurement period adjustments, we also recorded adjustments to correct certain errors***

26

*in the preliminary purchase price allocation that existed as of the [Amelia Acquisition Date] during the year ended December 31, 2024, which decreased the contingent earnout consideration by $5.3 million, decreased the accounts payable by $3.7 million, decreased the accrued liabilities by $1.2 million, increased deferred revenue by $0.3 million and increased the deferred tax liabilities by $0.7 million. As a result of the adjusted acquisition-date fair value of contingent earnout consideration recognized, assets acquired and liabilities assumed, we recorded a decrease of $9.3 million to the goodwill recognized.* The identified error related to the contingent earnout consideration had an immaterial impact to the change in fair value from the acquisition date through September 30, 2024, which would have been recorded in change in fair value of contingent acquisition liabilities in the consolidated statements of operations and comprehensive loss.

104.    The 2024 Form 10-K made clear that these errors were separate and apart from the typical adjustments made after an acquisition. ASC 805-10-25-15 defines "measurement period adjustments" as the adjustments made to numbers reported provisionally when the acquisition was first closed. GAAP permits that such adjustments can be made during the measurement period, which is no more than one year. ASC 805-10-25-13. However, SoundHound plainly stated that these errors were not measurement period adjustments: they were "***in addition to*** the measurement period adjustments" and were errors in accounting caused by weaknesses in ICFR, which now included Amelia's ICFR.

105.    Some of the information misstated involved no subjective analysis whatsoever. For example, accounts payable is the amount that a business already owes for goods and services purchased on credit. These are fixed numbers recorded on invoices presented by the business's vendors. Failures in the recording, approval, payment, or resolution of issues do not involve valuation.

106.    CW2 understood these errors as stemming from the lack of experienced employees and the inadequate controls. "I'm not surprised they filed late or if there was a misstatement because there's nobody really experienced in financials that was left," CW2 remarked. As CW2 explained, "there's a whole schedule for [calculating Amelia's goodwill for 2024]" and "I don't think anyone was looking at these things because there wasn't enough people." CW2 concluded, based on its timing that "the auditors found that." The other adjustments were similarly caused by the reduction in experienced staff. For "all those adjustments," CW continued "I don't think anyone was reviewing accruals . . . they probably rushed through the close of 2024," given how long it took in the past with experienced staff.

107.    In sum, SoundHound not only admitted that it had failed to implement specific controls it had described as "completed" in earlier disclosures, but also that those specific controls had led to the

misstatement of its financial statements by *millions*.  SoundHound had acquired Amelia for $80 million, meaning that the goodwill from the Amelia Acquisition was overstated by *nine percent* of the transaction's value.  These corrections revealed that the Consolidated Financials previously reported in SoundHound's Q3 2024 Form 10-Q were materially misstated.

### DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

108.    As provided more fully below, Defendants made materially false and misleading statements during the Class Period on the topics of: (i) Remediation Efforts purportedly completed by SoundHound; and (ii) SoundHound's Consolidated Financials, based on Amelia's purchase accounting. Plaintiffs assert that all statements set forth below in bold and italicized text are materially false and misleading for the reasons stated therein. Statements that are not bolded and italicized are included for context.

**A.    SoundHound's Completed Remediation Efforts**

109.    The Class Period begins on March 1, 2024, when SoundHound filed the 2023 Form 10-K.  The 2023 Form 10-K stated, in relevant part:

**Remediation Efforts for the Material Weaknesses**

We are in the process of designing and implementing controls and taking other actions to remediate the material weaknesses described above. Specifically, during the quarter ended December 31, 2023, we implemented measures designed to improve our internal control over financial reporting to remediate the material weaknesses, including the following:

. . .

•    ***Completed a segregation of duties assessment identifying key conflicts and mitigating controls.***

110.    The statement identified in bold and italicized text in the paragraph above was materially false and misleading when made, or otherwise omitted to state material facts necessary to make it not misleading, because, as detailed more fully above, SoundHound failed to disclose that the Company (i) had not completed an assessment identifying incompatible duties, and (ii) had not completed an assessment identifying mitigating controls.  Indeed, the Company itself admitted at the end of the Class Period that it had not performed these actions.  To the extent this statement was not technically untrue,

it gave the false impression that the mitigating controls that were identified would be implemented, but far from segregating duties, the CEO was personally involved in approving all financial matters. Similarly, the foregoing statement gave the false impression that the specific, verifiable steps that had been implemented were designed to meaningfully mitigate the stated weakness in ICFR and/or that the stated weaknesses did not compromise SoundHound's ability to accurately account for non-routine transactions, including acquisitions.

111.    In addition, the 2023 Form 10-K included the 2023 SOX Certifications signed by Mohajer and Sharan.  Each certified, in relevant part:

> The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and ***have:***
>
> (a) ***Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared[.]***

112.    The statement identified in bold and italicized text in the paragraph above was materially false and misleading when made, or otherwise omitted to state material facts necessary to make it not misleading, for all the reasons set forth in ¶110.

113.    On May 31, 2024, SoundHound filed the Q1 2024 Form 10-Q.  The Q1 2024 Form 10-Q stated, in relevant part:

> **Management's Plan to Remediate the Material Weaknesses**
> The following remediation actions are currently being implemented and are in progress:
>
> . . .
>
> •    ***Completed a segregation of duties assessment identifying key conflicts and mitigating controls.***
>
> . . .
>
> •    Initiated the design and implementation of a Segregation of Duties automated tool for our Enterprise Resource Planning (ERP) system. Additionally, we have initiated the design and implementation of similar controls for the remaining financially relevant

applications. ***Improvements have been implemented in tool utilization to strengthen the segregation of duties.***

114.    The statements identified in bold and italicized text in the paragraph above were materially false and misleading when made, or otherwise omitted to state material facts necessary to make them not misleading, because, as detailed more fully above, SoundHound failed to disclose that the Company (i) had not completed an assessment identifying incompatible duties, (ii) had not identified mitigating controls, and (iii) had not implemented tool improvements to strengthen segregation of duties.  Indeed, the Company itself admitted at the end of the Class Period that it had not performed these actions.  To the extent these statements were not technically untrue, they gave the false impression that the mitigating controls that were identified would be implemented, yet far from segregating duties, the CEO was personally involved in approving all financial matters.  Similarly, the foregoing statements gave the false impression that the specific, verifiable steps that had been implemented were designed to meaningfully mitigate the stated weakness in ICFR and/or that the stated weaknesses did not compromise SoundHound's ability to accurately account for non-routine transactions, including acquisitions.

115.    In addition, the Q1 2024 Form 10-Q included the Q1 2024 SOX Certifications signed by Mohajer and Sharan.  Each certification stated, in relevant part:

116.    Each certified, in relevant part:

The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and ***have:***

(a) ***Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared[.]***

117.    The statement identified in bold and italicized text in the paragraph above was materially false and misleading when made, or otherwise omitted to state material facts necessary to make it not misleading, for all the reasons set forth in ¶114.

AMENDED CLASS ACTION COMPLAINT: Case No. 3:25-cv-02915-RFL

118.    On August 9, 2024, SoundHound filed the Q2 2024 Form 10-Q.  The Q2 2024 Form 10-Q stated, in relevant part:

**Management's Plan to Remediate the Material Weaknesses**
The following remediation actions are currently being implemented and are in progress:

. . .

•       ***Completed a segregation of duties assessment identifying key conflicts and mitigating controls.***

. . .

•       Initiated the design and implementation of a Segregation of Duties automated tool for our Enterprise Resource Planning (ERP) system. Additionally, we have initiated the design and implementation of similar controls for the remaining financially relevant applications. ***Improvements have been implemented in tool utilization to strengthen the segregation of duties.***

119.    The statements identified in bold and italicized text in the paragraph above were materially false and misleading when made, or otherwise omitted to state material facts necessary to make it not misleading, because, as detailed more fully above, SoundHound failed to disclose that the Company (i) had not completed an assessment identifying incompatible duties, (ii) had not identified mitigating controls, and (iii) had not implemented tool improvements to strengthen segregation of duties.  Indeed, the Company itself admitted at the end of the Class Period that it had not performed these actions.  To the extent these statements were not technically untrue, they gave the false impression that mitigating controls that were identified would be implemented, yet far from segregating duties, the CEO was personally involved in approving all financial matters.  Similarly, the foregoing statements gave the false impression that the specific, verifiable steps that had been implemented were designed to meaningfully mitigate the stated weakness in ICFR and/or that the stated weaknesses did not compromise SoundHound's ability to accurately account for non-routine transactions, including acquisitions.

120.    In addition, filed with the Q2 2024 Form 10-Q were the Q2 2024 SOX Certifications, signed by Mohajer and Sharan.  Each certified, in relevant part:

The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-

31

15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and **_have:_**

(a) **_Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared[.]_**

121.    The statement identified in bold and italicized text in the paragraph above was materially false and misleading when made, or otherwise omitted to state material facts necessary to make it not misleading, for all the reasons set forth in ¶119.

122.    On November 12, 2024, SoundHound filed the Q3 2024 Form 10-Q, signed by and including SOX Certifications from Mohajer and Sharan.  The Q3 2024 Form 10-Q stated, in relevant part:

> **Management's Plan to Remediate the Material Weaknesses**
> The following remediation actions are currently being implemented and are in progress:
>
> . . .
>
> • **_Completed a segregation of duties assessment identifying key conflicts and mitigating controls._**
>
> . . .
>
> • Initiated the design and implementation of a Segregation of Duties automated tool for our Enterprise Resource Planning (ERP) system. Additionally, we have initiated the design and implementation of similar controls for the remaining financially relevant applications. **_Improvements have been implemented in tool utilization to strengthen the segregation of duties_**
>
> . . .
>
> • **_Completed the implementation of an automated month and quarter-end accounting close workflow tool to facilitate the review and support of key financial close process controls_**
>
> • **_The Company hired personnel with expertise in risk assessment and internal controls._**

123.    The statements identified in bold and italicized text in the paragraph above were materially false and misleading when made, or otherwise omitted to state material facts necessary to

make it not misleading, because, as detailed more fully above, SoundHound failed to disclose that the Company (i) had not completed an assessment identifying incompatible duties, (ii) had not identified mitigating controls for segregating duties, (iii) had not implemented tool improvements to strengthen segregation of duties, (iv) had not automated month and quarter-end accounting close processes but instead, relied on inexperienced Amelia employees to perform such processes manually in an Excel file, which SoundHound, in turn, incorporated into its Consolidated Financials with no further scrutiny,. Indeed, the Company itself admitted at the end of the Class Period that it had not performed the assessment identifying incompatible duties or mitigating controls for segregating duties and had not implemented tool improvements to strengthen segregation of duties.  To the extent these statements were not technically untrue, they gave the false impression that mitigating controls that were identified would be implemented, yet far from segregating duties, the CEO was personally involved in approving all financial matters.  Similarly, the foregoing statement gave the false impression that the specific, verifiable steps that had been implemented were designed to meaningfully mitigate the stated weakness in ICFR and/or that the stated weaknesses did not compromise SoundHound's ability to accurately account for non-routine transactions, including acquisitions.

124.    The Q3 2024 Form 10-Q also stated, in relevant part:

**Changes in Internal Control over Financial Reporting*:***

***There were no changes in the Company's internal control over financial reporting (as defined in Rule 13a-15(f) of the Exchange Act) during the quarter ended September 30, 2024 that materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting***

125.    The statement identified in bold and italicized text in the paragraph above was materially false and misleading when made, or otherwise omitted to state material facts necessary to make it not misleading, because, as detailed more fully above, SoundHound failed to disclose that (i) unlike its previous acquisitions, declined to integrate Amelia's financial reporting function into its own and, instead, kept it siloed; (ii) far from merely excluding Amelia from SoundHound's assessment of ICFR, it fired the only remaining Amelia personnel experienced with its financial reporting and replaced them with an employee and foreign contract workers with no such experience; and (iii) ; (iii) had not automated month and quarter-end accounting close processes but instead, relied on inexperienced

Amelia employees to perform such processes manually in an Excel file, which SoundHound, in turn, incorporated into its Consolidated Financials with no further scrutiny; and, thus, (iv) the acquisition of Amelia during the reporting period introduced additional material weaknesses in SoundHound's already ineffective ICFR which negatively impacted its consolidated financial statements. Indeed, the Company itself admitted at the end of the Class Period that the material weaknesses in its ICFR "***continue[d] to exist as of December 31, 2024***."

126. In addition, filed with the Q3 2024 Form 10-Q were the Q3 2024 SOX Certifications, signed by Mohajer and Sharan. Each certified, in relevant part:

> The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and ***have:***
>
> (a) ***Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared[.]***
>
> . . .
>
> (d) ***Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;***

127. The statements identified in bold and italicized text in the paragraph above were materially false and misleading when made, or otherwise omitted to state material facts necessary to make it not misleading, for all the reasons set forth in ¶¶123, 125.

### B. Accounting for Amelia

128. On November 12, 2024, SoundHound filed the Q3 2024 Form 10-Q. The section therein titled "Condensed Consolidated Balance Sheets" contained the following table:

| | September 30, 2024 |
| --- | --- |
| | (unaudited) |

## ASSETS

| | |
|---|---:|
| Current assets: | |
| Cash and cash equivalents | 135,606 |
| Accounts receivable, net of allowances of $ 1,874  and $ 203  as of September 30, 2024 and December 31, 2023, respectively | 13,570 |
| Contract assets and unbilled receivable, net of allowance for credit losses of $ 118  and $ 17  of September 30, 2024 and December 31, 2023, respectively | 24,639 |
| Other current assets | 7,394 |
| Total current assets | 181,209 |
| Restricted cash equivalents, non-current | 811 |
| Right-of-use assets | 3,860 |
| Property and equipment, net | 1,541 |
| *Goodwill* | *111,730* |
| Intangible assets, net | 182,579 |
| Deferred tax asset | 30 |
| Contract assets and unbilled receivable, non-current, net of allowance for credit losses of $ 195  and $ 177  of September 30, 2024 and December 31, 2023, respectively | 14,596 |
| Other non-current assets | 3,298 |
| *Total assets* | *499,654* |

## LIABILITIES AND STOCKHOLDERS' EQUITY

| | |
|---|---:|
| Current liabilities: | |
| *Accounts payable* | *17,758* |
| *Accrued liabilities* | *22,599* |
| Operating lease liabilities | 1,832 |
| Finance lease liabilities | 74 |
| Income tax liability | 2,677 |
| *Deferred revenue* | *20,096* |
| Other current liabilities | 5,142 |
| *Total current liabilities* | *70,178* |
| Operating lease liabilities, net of current portion | 2,241 |
| Deferred revenue, net of current portion | 7,570 |
| Long-term debt | 39,694 |
| *Contingent acquisition liabilities (Note 17)* | *74,450* |
| *Income tax liability, net of current portion* | *5,004* |
| Other non-current liabilities | 4,530 |
| *Total liabilities* | *203,667* |
| Commitments and contingencies (Note 7) | |

AMENDED CLASS ACTION COMPLAINT: Case No. 3:25-cv-02915-RFL

Stockholders' equity:

| | |
|---|---:|
| Series A Preferred Stock, $ 0.0001 par value; 1,000,000 shares authorized; 0 and 475,005 shares issued and outstanding, aggregate liquidation preference of $ 0 and $ 16,227 as of September 30, 2024 and December 31, 2023, respectively | — |
| Class A Common Stock, $ 0.0001 par value; 455,000,000 shares authorized; 336,481,401 and 216,943,349 shares issued and outstanding as of September 30, 2024 and December 31, 2023, respectively | 33 |
| Class B Common Stock, $ 0.0001 par value; 44,000,000 shares authorized; 32,735,408 and 37,485,408 shares issued and outstanding as of September 30, 2024 and December 31, 2023, respectively | 3 |
| Additional paid-in capital | 980,150 |
| Accumulated deficit | (684,461) |
| Accumulated other comprehensive income | 262 |
| Total stockholders' equity | 295,987 |
| **Total liabilities and stockholders' equity** | **499,654** |

129.    The Notes to Condensed Consolidated Financial Statements, in a section titled "*Amelia Acquisition*," stated, in relevant part: "*As of the Amelia Acquisition Date, the Contingent Amelia Earnout Consideration had an estimated fair value of $71.6 million.*"

130.    The same section contained a chart titled "Preliminary purchase price allocation," with all fair values listed in thousands:

| | Preliminary: August 6, 2024 |
|---|---:|
| Cash paid | 8,407 |
| Equity consideration | 15,291 |
| Equity consideration in escrow | 8,628 |
| ***Contingent earnout consideration*** | ***71,560*** |
| Purchase price | 103,886 |
| | |
| Assets acquired: | |
| Cash and cash equivalents | 1,128 |
| Accounts receivable | 8,239 |
| Other current assets | 1,822 |
| Contract asset - current | 4,090 |
| Property and equipment | 348 |
| Right-of-use assets | 227 |
| Other assets | 1,741 |
| Intangible assets | 174,500 |

AMENDED CLASS ACTION COMPLAINT: Case No. 3:25-cv-02915-RFL

| | |
|---|---:|
| Total identified assets acquired | 192,095 |
| | |
| Liabilities assumed: | |
| *Accounts payable* | *14,839* |
| *Accrued liabilities* | *11,420* |
| Income tax liabilities | 582 |
| Short-term debt | 70,000 |
| Operating lease liability, current | 211 |
| Financing lease liability, current | 37 |
| Other current liabilities | 3,885 |
| *Deferred revenue* | *23,144* |
| Deferred revenue, non-current | 4,295 |
| Long-term debt | 51,511 |
| *Deferred tax liabilities* | *11,105* |
| Operating lease liability, non-current | 16 |
| Other liabilities, non-current | 34 |
| Income tax liability, net of current portion | 2,821 |
| *Total liabilities assumed* | *193,900* |
| | |
| Fair value of identifiable net liabilities assumed | (1,805) |
| *Goodwill acquired on acquisition* | *105,691* |

131.    The statements identified in bold and italicized in the paragraphs above was materially false or misleading when made or otherwise omitted to state material facts necessary to make them not misleading, because, as the Company itself later admitted, SoundHound misstated: (i) the contingent earnout consideration of the transaction, (ii) Amelia's liabilities, including accounts payable, accrued liabilities, deferred revenue, and deferred income tax liability, and therefore (iii) the Goodwill acquired in the Amelia acquisition.

132.    On January 28, 2025, SoundHound filed a registration statement on Form S-3 with the SEC (the "**January 2025 Form S-3**"), signed by Mohajer and Sharan. The January 2025 Form S-3 contained a section titled "Unaudited Pro Forma Condensed Consolidated Balance Sheet," which contained an identical set of disclosures of SoundHound's as-reported historical figures as those included in the Q3 2024 Form 10-Q, described above (¶128).

133. The statements were materially false or misleading when made or otherwise omitted to state material facts to make them not misleading for the same reasons set forth in ¶131.

## **THE TRUTH EMERGES**

134. As detailed more fully above (¶¶97-107), investors learned through a series of partial disclosures about the true facts concealed by Defendants' misstatements. Each of these disclosures revealed, for the first time, new facts about Defendants' fraud that were previously unknown to the market. Investors had been in the dark about these facts, and, thus, as the news was released and investors were able to consider the ramifications for SoundHound, the price of the Company's securities dropped precipitously, thereby damaging investors who had invested in those securities.

135. As detailed more fully above (¶ 98), before market open on March 4, 2025, SoundHound disclosed in the 2024 Form NT that it would be unable to timely file the 2024 Form 10-K due to the complexity of accounting for the Acquisitions. The disclosure also informed the market that the material weaknesses previously disclosed and supposedly remediated, continued to exist as of December 31, 2024. On this news, SoundHound's stock price fell $0.61 per share, or 5.86%, from a closing price of $10.32 per share on March 3, 2025, to a close at $9.72 per share on March 4, 2025.

136. Analysts and investors drew a link between this decline and the disclosure of the delay of the 10-K. During trading on the day, *Yahoo Finance* covered the drop in an article titled "SoundHound AI Shares Drop Over 10% as Company Delays Annual Report Filing," noting that the drop had reached 10.1% by 11:46 a.m. "after the company announced a delay in filing its annual report for 2024." On the same day, *Barron's* similarly covered the news in an article titled "SoundHound AI Delays 10-K Filing. The Stock Is Falling Hard." Also on the same day, *The Motley Fool* published an article describing how "SoundHound AI is getting hit with big sell-offs after the company revealed that it will be delaying the filing of its annual 10-K report," because "[t]he delay is raising concerns that the company might have to restate its previously reported results with wider-than-expected losses." Also on the same day, Investor Stone Fox Capital published an article in *Seeking Alpha* noting that the "delayed 10-K filing raises red flags."

137. As detailed more fully above (¶¶100, 102), before market open on March 11, 2025, SoundHound filed its overdue 2024 Form 10-K. The 2024 Form 10-K further and more fully disclosed

38

the Company's lack of effective controls, including that Remediation Efforts previously described as "completed" had not been implemented, the material weaknesses were impairing its ability to account for corporate acquisitions and, for the first time, revealed revisions to the value of the Company and of Amelia's financial performance. On this news, SoundHound's stock price fell $0.03 per share, or 0.35%, from a closing price of $8.57 per share on March 10, 2025, to a close at $8.54 per share on March 11, 2025.

## ADDITIONAL FACTS PROBATIVE OF SCIENTER

138.    As detailed more fully above, the Individual Defendants received information reflecting the true facts regarding SoundHound and its operations and business practices and had control over and/or received the Company's materially misleading statements before they were issued to the investing public. Accordingly, the Individual Defendants acted with scienter because at the time they issued public documents and other statements in SoundHound's name, they knew, or were severely reckless in not knowing, that such statements were materially false and misleading.

139.    Indeed, the ongoing fraud described herein could not have been perpetrated without the knowledge and/or severe recklessness and complicity of personnel at the highest level of SoundHound, including the Individual Defendants. The Individual Defendants knew such statements would be disseminated to the investing public, knew that persons were likely to rely upon those misrepresentations and omissions, and knowingly or recklessly participated in the dissemination of such statements and documents to the investing public. Thus, the Individual Defendants were active and culpable participants in the fraudulent schemes alleged herein.

140.    These facts, in conjunction with the additional indicia of scienter alleged below, collectively support a strong inference that, throughout the Class Period, Defendants knew or, at a minimum, recklessly disregarded, that their statements were materially false and misleading.

### A. Mohajer and Sharan Were Personally Involved in the ICFR Remediation Efforts

141.    Throughout the Class Period, Mohajer and Sharan repeatedly admitted that they were personally involved in the design of SoundHound's ICFR and the efforts to identify and remediate the material weaknesses in ICFR.

142.    Prior to the Class Period, Mohajer had verbally announced the upcoming disclosure of weakness in ICFR directly to investors, as described further above (¶73).

143.    Shortly thereafter, the Company made filings with the SEC, signed and accompanied by SOX Certification by Mohajer and Sharan, confirming that Mohajer and Sharan had personally participated in a review of ICFR and concluded they contained weaknesses, as described further above (¶73). SoundHound's subsequent SEC filings noted that they both continued reviewing ICFR for weaknesses, including during the Class Period, as described further above (¶¶75, 78, 80).

144.    Thus, Mohajer and Sharan had personal access to information regarding internal controls and were accessing this information every quarter, discussing and making assessments of their effectiveness. Moreover, Defendants' pre-Class Period experience with the very same material weaknesses over ICFR that would be disclosed to have continued to exist during the Class Period is probative of scienter.

### B.    Mohajer Made Himself the Centerpiece of SoundHound's Purported ICFR

145.    Mohajer was an active, constant participant in SoundHound's ICFR, and thus would have been aware of the evident weaknesses in SoundHound's ICFR as well as the progress of the purported Remediation Efforts or lack thereof.

146.    As Mohajer described to *Forbes*, he drew inspiration from Nvidia CEO's "hands-on nature," "all-in on business," to inform his own habits, "start[ing] his day before the crack of dawn, usually before 5 a.m."

147.    Mohajer applied this work ethic to his management of the Company's finances, placing himself at the center of SoundHound's ICFR. As CW1 related, "all approval of everything through finance has to go through the CEO to get his approval." This included such close management of invoice approvals that no one else within finance could proceed without him. As CW1 explained: "anything from our vendor being paid off, finance had to wait for him to look over." This was prominent enough to be apparent to SoundHound's vendors. As CW1 recalled, "I remember them saying that to me too, 'Keyvan has to give approval for this invoice.'"

148.    This ICFR bottleneck had a direct impact on CW1, who reported that "I was always waiting for [Mohajer] to pay it and then I'm trying to fix the relationship with the vendor. . . [i]t would

happen again the next month and the next month." As just one representative example, CW1 reported that "there were definitely a lot of missed payments to our [call center] vendor in Mexico."

### C.    SoundHound and Individual Defendants Cashed in on Their Misstatements Shortly Before Revealing the Truth

149.    Defendants were motivated to engage in a fraudulent course of conduct so that they could sell shares of SoundHound common stock at artificially inflated prices during the Class Period, including shares that they personally held, and maximize their receipt of more shares of SoundHound common stock during the Class Period. SoundHound, Mohajer, and Sharan each capitalized on insider knowledge to engage in multiple stock sales when SoundHound's shares were trading at artificially inflated prices.

150.    SoundHound capitalized on the insider knowledge of its controlling persons by selling hundreds of millions of dollars of common stock during the Class Period when the Company's shares were trading at artificially inflated prices. These equity raises were pursued to generate the working capital required to stay ahead of the Company's formidable cash burn and fund its acquisition of companies that could generate the revenue it required to enter profitability. As Sharan put it in an October 18, 2024 interview with *OPTO*, "we've been losing money, and we needed capital to support us."

151.    First, on April 9, 2024, the Company entered an equity distribution agreement with underwriters to execute an "at the market" offering to sell up to $150 million of shares of SoundHound's Class A common stock. On the same day, SoundHound filed a prospectus supplement on Form 424(b) stating that the first $55 million raised would be used for "general corporate purposes and working capital," which it noted could include "investing in or acquiring synergistic or complementary businesses," and that any further proceeds would be used to pre-pay SoundHound's existing term loan. By the end of 2024, SoundHound sold through the entire offering, selling a total of 31,694,198 shares of Class A common stock, at a weighted-average price of $4.73 per share, raising $150.0 million of gross proceeds.

152.    Next, by November 8, 2024, the Company entered into another equity distribution agreement with underwriters to execute an "at the market" offering to sell up to $120 million of shares

of SoundHound's Class A common stock.  On November 8, 2024, SoundHound filed a prospectus supplement on Form 424(b) stating that the use of these proceeds was to pre-pay debt assumed by the Company as part of the Amelia Acquisition.  By the end of 2024, SoundHound sold through the entire offering, selling a total of 16,224,989 shares of Class A common stock, at a weighted-average price of $7.40 per share, raising $120.0 million of gross proceeds.

153.    On January 28, 2025, SoundHound entered a second equity distribution agreement with underwriters to execute an "at the market" offering to sell up to $250 million of shares of SoundHound's Class A common stock.  The January 2025 S-3 stated that these proceeds would be used for "general corporate purposes and working capital," which it noted could include "investing in or acquiring synergistic or complementary businesses."  This issuance was timed to maximize SoundHound's gain. The issuance came after year-end reporting and auditing would have been underway, and a mere ***thirty-four days*** before admitting to the market that it had not implemented the Remediation Efforts described as complete.   During the three months ended March 31, 2025, the Company sold 4,248,900 shares of Class A common stock under the Second Equity Distribution Agreement, at an average price of $ 15.94 per share and raised $ 67.7 million of gross proceeds.

154.    Mohajer also personally capitalized on his insider knowledge by engaging in multiple stock sales when SoundHound's shares were trading at artificially inflated prices.  As reflected in the shading in the chart below, Mohajer sold 1,530,481 shares and reaped proceeds of ***$20.37 million***:

| Date | Shares | Price | Proceeds (Cost) |
|---|---|---|---|
| 3/12/2024 | (379) | $6.16 | $2,334.64 |
| 3/19/2024 | (48,837) | $8.3656 | $408,550.81 |
| 3/22/2024 | (31,665) | $6.0778 | $192,453.54 |
| 6/20/2024 | (67,994) | $4.0399 | $274,688.96 |
| 6/24/2024 | (116,504) | $3.9471 | $459,852.94 |
| 8/1/2024 | 1,500,000 | $0 | -- |
| 9/20/2024 | (90,641) | $4.8795 | $442,282.76 |
| 9/23/2024 | (63,544) | $4.9162 | $312,395.01 |
| 12/6/2024 | 368,041 | $2.1777 | ($801,482.89) |
| 12/6/2024 | (368,041) | $15.0009 | $5,520,946.24 |
| 12/9/2024 | 465,394 | $2.1777 | ($1,013,488.51) |
| 12/9/2024 | (465,394) | $15.0412 | $7,000,084.23 |
| 12/20/2024 | (121,194) | $20.3042 | $2,460,747.21 |
| 12/24/2024 | (26,418) | 19.4611 | $514,123.34 |
| 12/24/2024 | (127,105) | 20.3384 | $2,585,112.33 |

AMENDED CLASS ACTION COMPLAINT: Case No. 3:25-cv-02915-RFL

| 12/24/2024 | (2,765) | 21.0662 | $58,248.04 |

155.    None of the acquisitions set forth in the chart above negates the size or amount of the dispositions.  The acquisitions on August 1, 2024, and December 6, 2024 represent shares acquired through the exercise of options to purchase shares that were immediately sold at a substantial profit compared to the deeply discounted exercise price.  The acquisition on August 1, 2024 represents unvested restricted stock units awarded to Mohajer at **no cost** as part of his compensation plan. The award began to vest on September 1, 2024, and would continue to vest in regular monthly installments over a three-year period, pursuant to the Company's incentive compensation plan.  As such, these acquisitions required no investment decisions from Mohajer.

156.    In contrast, all sales set forth in the chart above were made at times calculated to maximize Mohajer's gains.  Each such sale was made soon after Mohajer or Sharan propped up the stock price by issuing false and misleading statements about the Company's ICFR, but before negative news was released that corrected that inflation.  Indeed, nearly *all* of Mohajer's proceeds were made in December 2024—approximately $18.14 million, or 89% of the total—within a narrow window for Mohajer to sell before the truth would emerge, as it was before the audited year-end reporting that would cause the truth to reach the public.  Finally, any sales made to satisfy tax obligations upon the distribution or exercise of other shares do not minimize the suspicious nature of the sales.  Fewer shares need to be sold to cover such liabilities when the stock price is inflated.

157.    SEC Rule 10b5-1 enables company insiders to sell a predetermined number of shares at a predetermined time and price based on a contract with their broker, called a "10b5-1 Plan."  On March 20, 2024, weeks after the start of the Class Period, when Defendants began inflating SoundHound's stock price by disseminating false and misleading statements to the market, Mohajer adopted a 10b5-1 Plan (the "**March 2024 10b5-1 Plan**"), permitting sales of up to 2,400,000 shares of his 14,139,064 shares of Class B common stock, up to 833,435 shares of Class A common stock, and up to 833,435 shares of Class A common stock.  The March 2024 10b5-1 Plan permitted trading starting on June 19, 2024, which thus enabled Mohajer to take advantage of the inflated price during the Class Period. Mohajer adopted a new 10b5-1 Plan on August 30, 2024 (the "**August 2024 10b5-1 Plan**"), permitting sales of up to 2,400,000 shares of his 14,139,064 shares of Class B common stock and up to *all* of his

461,026 shares of Class A common stock. In other words, less than a month after the strategic Amelia Acquisition, Mohajer was prepared to sell 16.97% of his Class B common stock and *100%* of his Class A common stock, 19.59% of his holdings at the time. The August 2024 10b5-1 Plan permitted trading between December 1, 2024 and February 28, 2025—a window of time where SoundHound would be working to finalize its 2024 numbers, but before the Company could have released the 2024 Form 10-K.

158.    The Class Period transactions by Mohajer described above represent a notable departure from Mohajer's transactions in the comparable period leading up to the Class Period:

| Date | Shares | Price | Proceeds (Cost) |
|------|--------|-------|-----------------|
| 6/20/2023 | 192,099 | $3.5671 | $ 460,509.04 |
| 6/21/2023 | 32,522 | $3.6609 | $ 119,059.79 |
| 8/3/2023 | 600,000 | 0 | -- |
| 9/15/2023 | 53,642 | $2.07 | $ 111,038.94 |
| 12/15/2023 | 70,098 | $2.20 | $ 154,215.60 |

159.    In other words, in the comparable period leading up to the Class Period, Mohajer only sold 384,361 shares, for proceeds of approximately $845 thousand – ***23% of the shares sold and 4.18% of the proceeds*** during the Class Period. In other words, Mohajer sold ***more than four times as many shares*** for ***nearly twenty-five times the profit***.

160.    Sharan also capitalized on his insider knowledge by engaging in multiple stock sales when SoundHound's shares were trading at artificially inflated prices. As reflected in the shading in the chart below, Sharan sold 144,675 shares and reaped proceeds of ***$1.67 million***:

| Date | Shares | Price | Proceeds (Cost) |
|------|--------|-------|-----------------|
| 3/15/2024 | 1,590 | $8.9100 | $14,166.90 |
| 3/19/2024 | 23,212 | $8.3656 | $194,182.31 |
| 6/20/2024 | 22,384 | $4.0399 | $90,429.12 |
| 6/27/2024 | 121,506 | $0 | -- |
| 8/1/2024 | 750,000 | $0 | -- |
| 9/20/2024 | 39,728 | $4.8795 | $193,852.78 |
| 12/20/2024 | 57,761 | $20.3042 | $1,172,790.90 |

161.    None of the acquisitions set forth in the chart negates the size or amount of the dispositions. The acquisition on August 1, 2024, represents unvested restricted stock units awarded to Sharan at ***no cost*** as part of his compensation plan. The award began to vest on September 1, 2024, and would continue to vest in regular monthly installments over a three-year period, pursuant to the

44

Company's incentive compensation plan. The acquisition on June 27, 2024, was a conversion of previously held Series A Preferred Stock. As such, these acquisitions required no investment decisions from Sharan.

162. In contrast, all sales set forth in the chart above were made at times calculated to maximize Sharan's gains. Each such sale was made soon after Mohajer or Sharan propped up the stock price by issuing false and misleading statements about the Company's ICFR, but before negative news was released that corrected that inflation. Indeed, nearly *all* of Sharan's proceeds were made in December 2024 – $1.17 million – a narrow window for Sharan to sell before the truth would emerge, as it was before the audited year-end reporting that would cause the truth to reach the public. Finally, any sales made to satisfy tax obligations upon the distribution or exercise of other shares do not minimize the suspicious nature of the sales. Fewer shares need to be sold to cover such liabilities when the stock price is inflated.

163. The Class Period transactions by Sharan described above are a notable departure from Sharan's transactions in the comparable period leading up to the Class Period:

| Date | Shares | Price | Proceeds (Cost) |
|---|---|---|---|
| 6/21/2023 | 16,188 | 3.6609 | $ 59,262.65 |
| 8/3/2023 | 350,000 | 0 | -- |
| 8/21/2023 | 22,636 | 0 | -- |
| 9/15/2023 | 22,535 | 2.0700 | $ 46,647.45 |
| 12/15/2023 | 23,094 | 2.2000 | $ 50,806.80 |

164. Thus, in the comparable period leading up to the Class Period, Sharan only sold 61,817 shares, for proceeds of $156,716.89 – *43% of the shares sold and 9% of the proceeds* during the Class Period. In other words, Sharan sold *more than twice times as many shares* for *more than ten times the profit*.

**D.    SoundHound Reduced its Outlay on the Amelia Acquisition by Using Inflated Stock as Consideration**

165. By 2024, SoundHound had recognized that it was unable to drive the revenues it needed through organic growth, following layoffs, pay cuts, and struggles to stay afloat. SoundHound moved to a strategy of purchasing growth through critical acquisitions.

AMENDED CLASS ACTION COMPLAINT: Case No. 3:25-cv-02915-RFL

166.    Given SoundHound's cashflow issues, it paid for its largest acquisition, Amelia, largely through equity.  Thus, inflating SoundHound's stock through false and misleading statements through the Class Period effectively lowered the price of the Amelia Acquisition to SoundHound.

167.    SoundHound's acquisition Amelia for $80 million by issuing 3,809,520 shares of SoundHound Class A common stock to sellers, as well as an additional 2,149,530 shares in escrow to secure indemnification for the sellers, and $8.4 million of cash to cover seller transaction expenses Thus, the lion's share of the acquisition was the $71.6 million of equity used to purchase the Company.

168.    Reducing the outlay on the Amelia Acquisition was critical, given that the Company would also take on Amelia's debts, totaling $125.1 million.  Given SoundHound's previous financial issues, this represented a significant risk

**E.    Amelia Was a Critical Acquisition at the Core of SoundHound's Business and Future Prospects**

169.    As described, SoundHound's pivot to acquiring revenues was critical for its success, and Amelia was the largest and most strategic of those acquisitions.

170.    In fact, in the Q3 2024 Form 10-Q, the Company touted how Amelia would "allow the Company to enter new industries such as healthcare, insurance, financial services, and retail, expanding its market reach."

171.    The strategic nature of the acquisition was represented in SoundHound's revenue guidance after the merger.  SoundHound informed the market that it expected to see revenues of $150 million in 2025, of which $45 million would come from Amelia, meaning the Company expected almost one-third of its revenues to come from Amelia.  In the short term, Amelia's impact was even bigger: after the Amelia Acquisition closed, SoundHound's Q3 2024 Form 10-Q disclosed that Amelia's revenues represented ***62%*** of SoundHound's consolidated total revenues for the three months ended September 30, 2024.

172.    Defendants also touted the Amelia Acquisition for its impact on future growth.  Looking back on the acquisitions in a July 18, 2025 interview with *OPTO*, Sharan stated that "[h]istorically, up until the beginning of [2024], we were growing 40-60% consistently, fully organically. . . . Last year we went out and we acquired companies that has inflected our growth to over 100%."

173.     Furthermore, by acquiring Amelia, SoundHound took on a significant amount of debt. On June 10, 2024, SoundHound issued a press release announcing that it had prepaid its outstanding $100 million in debt in full, leaving the Company with a cash balance of approximately $180 million and no outstanding debt.  However, after the acquisition, the Company held approximately $160 million and $39 million in debt.

174.     Given the scale of this investment, it is absurd to suggest Defendants ignored Amelia's finances and ICFR on the heels of disclosing SoundHound's own material pre-Class Period weaknesses over ICFR and while supervising and certifying SoundHound's ICFR.  Accordingly, Defendants either knew of or were deliberately reckless to Amelia's weaknesses in ICFR.

**F.     Defendant's Decision Not to Restate Financials Bolsters the Inference of Scienter**

175.     As described above, Defendants spent the Class Period attempting to minimize the serious weaknesses in ICFR to reassure investors about their ability to produce accurate financial statements.  Defendants' decision not to restate the Q3 2024 Form 10-Q financial statement bolsters scienter, as it violated GAAP in an attempt to cast these large accounting discrepancies as immaterial.

176.     As discussed above (¶¶103-107), the 2024 Form 10-K disclosed errors in accounting for the Amelia Acquisition in the Q3 2024 Form 10-Q, which in turn altered the Company's consolidated financial statements.   These errors were reported separately from the normal measuring period adjustments and were admitted to be caused by material weaknesses of ICFR.

177.     When a material error is discovered in previous financial statements, including those caused by materially weak ICFR, a company must report the error.  For errors that were immaterial in the past but have aggregated to a material error in the present, the issuer must disclose a revision restatement (commonly known as a "Little r restatement"), which requires updating the current financial statement with correct numbers and disclaiming the inaccuracy of previous statements.  For errors that were material at the time, the issuer must perform a re-issuance restatement (commonly known as a "Big R Restatement").  This is a costly task that requires restating and reissuing any previous financial statement containing the errors, filing them with the SEC on Form 10-K/A (for annual filings) and Form 10-Q/A (for quarterly filings).   Restatements also incur serious reputational costs, and a Big R Restatement can often cause substantial impacts for the value of the issuer's securities.

178.    The SEC provides guidance on materiality through Staff Accounting Bulletin ("**SAB**") Topics 1.M and 1.N.  Topic 1.M notes that there is a "rule[] of thumb" used by issuers and auditors that if "the misstatement or omission of an item [] falls under a 5% threshold [it] is not material."  However, the SAB goes on to note that *even smaller* misstatements may be considered material in light of the "total mix" of information, including "qualitative" factors, and notes that previous guidance from the SEC has "rang[ed] from one to ten percent."

179.    Here, many of the corrected items were *well above* that five percent rule of thumb, some even exceeding the most generous ten percent used at times by the SEC in the past.  SoundHound's goodwill, which was $102.46m after correction, was overstated by $9.27m, or 9.05%.  SoundHound's long-term income tax liability, which was $5.8m after correction, was understated by $715,000, or 12.5%.

180.    If Defendants had followed the appropriate steps for a restatement, the Company would have had to show a side-by-side comparison of the misstated and corrected numbers, making it easy for investors to understand the scale of the misstatement.  Instead, Defendants disposed of the errors in a single sentence within the filing, as if the errors were immaterial.

181.    Avoiding a restatement was an attempt to minimize the scale of the errors to investors, who view a restatement as an admission of serious accounting failures.  Furthermore, the SEC requires that a restatement trigger disclosure requirements on Form 8-K ("**Item 4.02**"), including information on the discussions between the audit committee and the registrant's independent accountant regarding the errors, and would require the independent accountant to file a separate letter addressed to the SEC verifying the accuracy of the registrant's disclosures under Item 4.02.  Although SoundHound ignored these requirements to minimize its disclosures and deflect attention, there *were* serious accounting failures, as evidenced by the fact that these errors were large enough that GAAP *required* a restatement.

182.    The fact that SoundHound and the Individual Defendants attempted to minimize how badly they had misstated accounting for the Amelia Acquisition—and violated GAAP to do so—further demonstrates their scienter, continuing their pattern of misleading investors to reassure them that their ICFR failures were not as serious as the truth showed.

AMENDED CLASS ACTION COMPLAINT: Case No. 3:25-cv-02915-RFL

**LOSS CAUSATION**

183.   At all relevant times, SoundHound securities traded in an open, well-developed, and efficient market that promptly digested new information regarding the Company from all reasonably accessible public sources and reflected such information in the price of SoundHound securities.

184.   As described above, throughout the Class Period, Defendants made false and misleading statements that misrepresented and/or failed to disclose the adverse facts detailed herein. Defendants' false and misleading statements caused SoundHound securities to trade at artificially inflated prices throughout the Class Period and, thus, operated as a fraud or deceit on Plaintiffs and other members of the Class who purchased or otherwise acquired such securities before such the inflation was removed.

185.   As detailed herein, the price of SoundHound securities fell precipitously on high volume in response to disclosures made on March 3, 2025, and March 11, 2025.  The price of SoundHound securities fell in response to each such disclosure by revealing information that removed part of the inflation introduced by Defendants' previous misstatements and omissions, causing real economic loss to Plaintiffs and other members of the Class who purchased SoundHound securities during the Class Period at inflated prices.

186.   Each decline in the price of SoundHound securities referenced above was a direct and proximate result of Defendants' misstatements or omissions being revealed to the market and/or the materialization of risks concealed by the fraud.  The timing and magnitude of each such price decline negates any inference that the losses suffered by Plaintiffs and other members of the Class were caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to the fraud alleged herein.

187.   Accordingly, Defendants' wrongful conduct directly and proximately caused Plaintiffs and other members of the Class to suffer economic losses, *i.e.*, damages under the federal securities laws.

**PRESUMPTION OF RELIANCE**

188.   Plaintiffs and the Class are entitled to a presumption of reliance under the fraud-on-the-market doctrine established in *Basic v. Levinson*, 485 U.S. 224 (1998).  Such a presumption is appropriate because, among other things:

AMENDED CLASS ACTION COMPLAINT: Case No. 3:25-cv-02915-RFL

1    (a)    during the Class Period, Defendants made public representations that contained

2    untrue statements of material fact or failed to disclose material facts necessary to make the statements

3    that were made not misleading;

4    (b)    the misrepresentations and/or omissions were material;

5    (c)    the Company's securities traded in an efficient market;

6    (d)    the misrepresentations alleged would tend to induce a reasonable investor to

7    misjudge the value of the Company's securities; and

8    (e)    Plaintiffs and other members of the Class purchased SoundHound securities

9    between the time Defendants misrepresented or failed to disclose material facts necessary to make the

10    statements that were made not misleading and the time the true facts were disclosed, without knowledge

11    of the misrepresented and/or omitted facts.

12    189.    At all relevant times, the market for SoundHound securities was efficient for the

13    following reasons, among others:

14    (a)    SoundHound's stock met the requirements for listing on the NASDAQ, a highly

15    efficient and automated market;

16    (b)    as a regulated issuer, SoundHound filed periodic public reports with the SEC;

17    (c)    throughout the Class Period, SoundHound stock were highly liquid, with an

18    average daily trading volume of 43.19 million shares ;

19    (d)    SoundHound regularly communicated with public investors via established

20    market communication mechanisms, including through regular disseminations of press releases on the

21    major newswire services and through other wide-ranging public disclosures, such as communications

22    with the financial press, securities analysts, and other similar reporting services;

23    (e)    SoundHound was followed by securities analysts employed by brokerage firm(s)

24    who wrote reports that were distributed to the sales force and certain customers of their respective

25    brokerage firm(s) and that were publicly available and entered the public marketplace; and

26    (f)    unexpected company-specific news was reflected and incorporated into the price

27    for SoundHound's stock.

28    190.    As a result of the foregoing, the market for SoundHound securities promptly digested

50

current information regarding the Company from publicly available sources and reflected such information in SoundHound's securities prices. Under these circumstances, all purchasers of SoundHound securities during the Class Period suffered similar injury through their purchase of SoundHound securities at artificially inflated prices, and the presumption of reliance applies.

191. In addition, a Class-wide presumption of reliance is also appropriate under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims center, in large part, upon Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated by law to disclose—positive proof of reliance is not a prerequisite to recovery.

## **NO SAFE HARBOR**

192. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged to be false or misleading herein.

193. None of the statements alleged herein to be false or misleading are forward-looking statements. Such statements addressed facts and conditions existing at the time the statements were made. Furthermore, none of the historic or present-tense statements alleged herein to be false or misleading were assumptions underlying or relating to any plan, projection, or statement of future economic performance, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

194. To the extent certain of the statements alleged to be false may be characterized as forward-looking, they were neither identified as "forward-looking statements" when made nor accompanied by any meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Any purported cautionary language warned only of theoretical future risks at times when the risks were not merely hypothetical. Moreover, the purported cautionary language failed to adjust over time, using the same theoretical tone even after concrete changes of circumstance. In addition, Defendants are liable for any forward-looking statements because at the time each statement was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-

looking statement was authorized or approved by an executive officer of SoundHound who had actual knowledge that the statement was materially false or misleading.

## CLASS ACTION ALLEGATIONS

195.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class.  Excluded from the Class are Defendants; members of the immediate families of the Individual Defendants; the Company's subsidiaries and affiliates; any person who is or was an officer or director of the Company or any of the Company's subsidiaries or affiliates during the Class Period; any entity in which any Defendant has a controlling interest; and the legal representatives, heirs, successors, and assigns of any such excluded person or entity.

196.    The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of March 6, 2025, the Company had 366,426,264 shares of Class A common stock outstanding.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

197.    Plaintiffs' claims are typical of the claims of members of the Class.  All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

198.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

199.    Common questions of law and fact that exist as to all members of the Class predominate over any questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include:

(a)    whether the acts alleged herein violated the federal securities laws and/or SEC rules promulgated thereunder;

1    (b)    whether Defendants' statements during the Class Period misrepresented material

2    facts or omitted material facts necessary to make the statements that were made, in the circumstances

3    under which they were made, not misleading;

4    (c)    whether Defendants made such statements;

5    (d)    whether Defendants acted with the requisite level of scienter;

6    (e)    whether the Individual Defendants were controlling persons of SoundHound;

7    (f)    whether reliance may be presumed; and

8    (g)    whether and to what extent the material misstatements and omissions alleged

9    herein artificially inflated the market price of SoundHound's securities;

10    (h)    whether the members of the Class have sustained damages as a result of the

11    conduct complained of herein and, if so, the proper measure of damages.

12    200.    A class action is superior to all other available methods for the fair and efficient

13    adjudication of this controversy because, among other things, joinder of all members of the Class is

14    impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively

15    small, the expense and burden of individual litigation make it impossible for members of the Class to

16    redress the wrongs done to them individually.  There will be no difficulty in the management of this

17    action as a class action.

## CLAIMS FOR RELIEF

### COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

22    201.    Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs as if

23    fully set forth herein.

24    202.    This Count is brought against Defendants pursuant to Section 10(b) of the Exchange Act,

25    codified at 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, codified at 17 C.F.R.

26    § 240.10b-5.

27    203.    Throughout the Class Period, Defendants, individually and in concert, directly or

28    indirectly, by use of the means or instrumentalities of interstate commerce, including but not limited to

1  the mails and the internet, and/or the facilities of NASDAQ, engaged in a plan, scheme, conspiracy and

2  course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions,

3  practices and courses of business which operated as a fraud and deceit upon Lead Plaintiff and the other

4  members of the Class; made various untrue statements of material facts and omitted to state material

5  facts necessary in order to make the statements made, in light of the circumstances under which they

6  were made, not misleading; and employed devices, schemes and artifices to defraud in connection with

7  the purchase and sale of securities.

8      204.    As alleged herein, Defendants made or otherwise caused SoundHound to issue the

9  materially false or misleading statements specified above.  Specifically, the Individual Defendants

10  participated directly or indirectly in the preparation, approval and/or issuance of public disclosures

11  specified above that contained untrue statements of material fact and/or omitted material facts necessary

12  to make the statements therein not misleading.  Such scheme was intended to, and did, as alleged herein:

13  (i) deceive the investing public, including Plaintiffs and other Class members; (ii) artificially inflate and

14  maintain the market price of SoundHound securities; and (iii) cause Plaintiffs and other members of the

15  Class to purchase or otherwise acquire SoundHound common stock at artificially inflated prices.

16      205.    As set forth above, the Individual Defendants knew or were reckless in not knowing that

17  such statements, when made, were false or misleading, in that they contained material

18  misrepresentations or otherwise failed to disclose material facts necessary in order to make the

19  statements made, in light of the circumstances under which they were made, not misleading.

20      206.    SoundHound is liable for the acts of its executives, directors, officers, and agents,

21  including the Individual Defendants, at common law and under the doctrine of *respondeat superior*

22  because all the wrongful acts and omissions complained of herein were carried out within the scope of

23  such person's employment.  The scienter of SoundHound's executives, directors, officers, and agents,

24  including the Individual Defendants, is similarly imputed to SoundHound under established agency

25  principles.

26      207.    As a result of the foregoing, the market price for SoundHound securities was artificially

27  inflated during the Class Period.  Plaintiffs and other members of the Class relied on the integrity of the

28  market price for SoundHound securities during the Class Period and paid prices for such securities that

1  were artificially inflated as a result of the false and misleading statements described herein. Plaintiffs

2  and members of the Class would not have purchased such securities at the prices they paid, or at all, if

3  they had been aware that the market prices of such securities was artificially inflated by Defendants'

4  false and misleading statements.

5      208.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the

6  other members of the Class have suffered damages in connection with their purchases of ImmunityBio

7  common stock during the Class Period.

8      209.    By reason of the foregoing, Defendants are liable to Lead Plaintiff and members of the

9  Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

10                                    **COUNT II**

11  **(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

12      210.    Plaintiffs repeat, and reallege each and every allegation in the foregoing paragraphs as if

13  fully set forth herein.

14      211.    This Count is brought against the Individual Defendants under Section 20(a) of the

15  Exchange Act, codified at 15 U.S.C. § 78t(a).

16      212.    As alleged above, Defendants, and each of them, violated Section 10(b) of the Exchange

17  Act and SEC Rule 10b-5 promulgated thereunder by making materially false and misleading statements

18  and omitted material information in connection with the purchase and sale of the Company's common

19  stock and by participating in a fraudulent scheme and course of business or conduct throughout the

20  Class Period.

21      213.    Throughout the Class Period, the Individual Defendants had direct and supervisory

22  involvement in the day-to-day operations of SoundHound and, therefore, are presumed to have had the

23  power to control or influence the particular transactions giving rise to the securities violations alleged

24  herein, and exercised the same.

25      214.    As officers and/or directors of a publicly owned company, the Individual Defendants

26  also had a duty to disseminate accurate and truthful information with respect to SoundHound's business,

27  operations, financial condition, and prospects. In this capacity, the Individual Defendants were provided

28  with or had unlimited access to copies of the Company's reports, press releases, public filings, and other

statements alleged to be false or misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

215. Thus, by virtue of their positions as senior officers of SoundHound, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the false and misleading statements alleged herein to give rise to the primary violations alleged herein. Indeed, the Individual Defendants exercised their power and authority to cause SoundHound to engage in the wrongful acts alleged herein or personally participate in the unlawful conduct alleged.

216. By reason of the foregoing, the Individual Defendants are liable to Plaintiffs and members of the Class for violations of Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against Defendants as follows:

A. Declaring that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as class representatives;

B. Awarding Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with pre-judgment interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorneys' fees and costs incurred by consulting and testifying experts; and

D. Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury of all issues so triable.

AMENDED CLASS ACTION COMPLAINT: Case No. 3:25-cv-02915-RFL

1    Dated:  October 1, 2025                          Respectfully submitted,

2                                                     **POMERANTZ LLP**

3                                                     */s/ Justin D. D'Aloia*
                                                      ───────────────────────
4                                                     Jeremy A. Lieberman (*pro hac vice* )
                                                      Justin D'Aloia (*pro hac vice*)
5                                                     Guy Yedwab (*pro hac vice* pending)
                                                      600 Third Avenue, 20th Floor
6                                                     New York, New York 10016
                                                      Telephone: (212) 661-1100
7                                                     jalieberman@pomlaw.com
                                                      jdaloia@pomlaw.com
8                                                     gyedwab@pomlaw.com

9
                                                      Jennifer Pafiti (SBN 282790)
10                                                    1100 Glendon Avenue, 15th Floor
                                                      Los Angeles, California 90024
11                                                    Telephone: (310) 405-7190
                                                      jpafiti@pomlaw.com
12

13                                                    *Counsel for Lead Plaintiffs and Lead Counsel for*
                                                      *the Proposed Class*
14

15                                                    **KEHOE LAW FIRM, P.C.**
                                                      Michael K. Harnoff (*pro hac vice* forthcoming)
16                                                    2001 Market Street, Suite 2500
                                                      Philadelphia, Pennsylvania 19103
17                                                    Telephone: (954) 916-1202
                                                      myarnoff@kehoelawfirm.com
18

19                                                    *Additional Counsel for Lead Plaintiffs*

20                                                    **LEVI & KORSINSKY, LLP**
                                                      Adam M. Apton (SBD 316506)
21                                                    1160 Battery Street East, Suite 100
                                                      San Francisco, CA  94111
22                                                    Tel: (415) 373-1671
                                                      shopkins@zlk.com
23                                                    gpotrepka@zlk.com
                                                      membleton@zlk.com
24

25                                                    *Counsel for Plaintiff Jean Luzincourt*

26

27

28

AMENDED CLASS ACTION COMPLAINT: Case No. 3:25-cv-02915-RFL

1

## **PROOF OF SERVICE**

2

I hereby certify that on October 1, 2025, a copy of the foregoing was filed electronically and

3

served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail

4

to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept

5

electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through

6

the Court's CM/ECF System.

7

8

9
                                      */s/ Justin D. D'Aloia*
                                        Justin D. D'Aloia

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED CLASS ACTION COMPLAINT: Case No. 3:25-cv-02915-RFL