**PLAINTIFFS' CHART SUMMARIZING INFORMATION REQUIRED
BY 15 U.S.C. §§ 78u-4(b)(1) and (2), PURSUANT TO COURT'S ORDER**

*Liles v. SoundHound AI, Inc.*, No. 3:25-cv-02915 (N.D. Cal.)

## PART ONE: MATERIALLY FALSE AND MISLEADING STATEMENTS AND/OR OMISSIONS CONCERNING SOUNDHOUND'S COMPLETED REMEDIATION EFFORTS

| Statement No. | The Speaker(s), Date(s), and Medium | False and/or Misleading Statements or Omissions | Reasons Why the Statements Were False and/or Misleading When Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| 1. | When: March 1, 2024 Where: The 2023 Form 10-K[1] Speakers: Mohajer, Sharan, SoundHound | SoundHound's 2023 Form 10-K stated, in relevant part: "**Remediation Efforts for the Material Weaknesses** We are in the process of designing and implementing controls and taking other actions to remediate the material weaknesses described above. Specifically, during the quarter ended December 31, 2023, we implemented measures designed to improve our internal control over financial reporting to remediate the material weaknesses, including the following: . . . • *Completed a segregation of duties assessment identifying key conflicts and mitigating controls.*" ¶109.[2] | These statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because SoundHound failed to disclose that the Company (i) had not completed an assessment identifying incompatible duties, and (ii) had not completed an assessment identifying mitigating controls. Indeed, the Company itself admitted at the end of the Class Period that it had not performed these actions. To the extent this statement was not technically untrue, it gave the false impression that the mitigating controls that were identified would be implemented, but far from segregating duties, the CEO was personally involved in approving all financial matters. Similarly, the foregoing statement gave the false impression that the specific, verifiable steps that had been implemented were designed to meaningfully mitigate the stated weakness in ICFR and/or that the | Mohajer and Sharan had access to, and regularly reviewed, SoundHound's ICFR, and, thus, either knew or were reckless in not knowing that the Remediation Efforts described as "completed" had not in fact been implemented. ¶¶141-44. From the outset of the Class Period, Mohajer and Sharan signed SEC filings in which they personally stated, and therefore acknowledged, that SoundHound's ICFR suffered from several material weaknesses and that the Company was implementing several Remediation Efforts to remediate those weaknesses. ¶ 75-82. Mohajer and Sharan also had a legal duty to regularly evaluate the effectiveness of SoundHound's ICFR. ¶¶31-36. And, indeed, Mohajer and Sharan admittedly performed such evaluations every quarter within the Class Period. ¶¶75 (Q3 2023 Form 10-Q), 79 (2023 Form 10-K), 80 (Q1 2024 Form 10-Q), 81 (Q2 2024 Form 10-Q), 82 (Q3 2024 Form 10-Q). SoundHound's SEC filings further indicated that management had "giv[en] full consideration to the material weaknesses" in light of the ongoing Remediation Efforts. ¶76. Taken together, these facts demonstrate that Mohajer and Sharan personally reviewed the effectiveness of SoundHound's ICFR at least every quarter throughout the Class Period, including the effectiveness of the Remediation Efforts taken to date. ¶144. Mohajer placed himself at the center of SoundHound's financial process and thus knew or was reckless in not knowing that the Remediation Efforts described as "completed" had not in fact been implemented. ¶¶145-48. CW1, who worked at SoundHound from June 2023 to May 2025, confirmed that "everything" in finance had to "go through the CEO to get his approval." ¶¶18, 84, 147. The self-imposed bottleneck caused substantial delays in approvals and disrupted payments to vendors. *Id.* While this gave Mohajer insight into SoundHound's overall financial status, this also demonstrates |

---

[1] Unless otherwise defined herein, all capitalized terms have the meaning set forth in the Amended Complaint (ECF No. 56) (the "AC") in the above-captioned matter. All emphasis is added unless otherwise noted.

[2] All paragraph citations herein correspond to the numbered paragraphs of AC.

| Statement No. | The Speaker(s), Date(s), and Medium | False and/or Misleading Statements or Omissions | Reasons Why the Statements Were False and/or Misleading When Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| | | | stated weaknesses did not compromise SoundHound's ability to accurately account for non-routine transactions, including acquisitions.  ¶110. | that Mohajer was at the center of one of the Remediation Efforts that was purported to have been completed but never was: the failure to segregate duties.  Segregation of duties calls for duties within financial processes not to be concentrated in the hands of one individual (¶36), but Mohajer placed himself at the center of SoundHound's financial approval process.  ¶147. Thus, Mohajer either knew or was reckless in not knowing that the ICFR he touted as being completed had not, in fact, been implemented.<br><br>Mohajer, Sharan, and SoundHound itself had powerful incentives to mislead the market about the progress of SoundHound's ICFR by capitalizing on the inflated value of the stock to make significant proceeds shortly before the truth emerged.  During the Class Period, Mohajer sold a sizeable number of shares, reaping $20.37 million in proceeds, nearly all of which—$18.14 million—were sold shortly before the market learned the truth about the Remediation Efforts.  ¶¶154-56.  The shares sold were four times as many as Mohajer sold in the comparable period immediately before the Class Period and generated more than ten times the proceeds. ¶¶158-59.  Sharan, too, sold a sizeable number of shares during the Class Period, reaping $1.67 million in proceeds, nearly all of which—$1.17 million—were sold shortly before the market learned the truth.  ¶¶160-62.  The shares sold were twice as many as Sharan sold in the comparable period immediately before the Class Period and generated more than ten times the proceeds.  ¶¶163-64.  SoundHound also capitalized on the inflated value of the stock.  The Company required capital raises to ensure it had sufficient capital to continue operating, and three times went to the market to raise capital, including one a mere thirty-four days before the truth emerged.  ¶¶151-53.  These capital raises were critical given the Company's cash burn and history of cash shortages.  ¶¶47-51, 150.  SoundHound also used the inflated value of its stock as consideration to purchase Amelia, a strategic acquisition critical to the future of the Company.  ¶¶165-68.<br><br>Furthermore, the inference of scienter is bolstered by Defendants' decision to cover up the scale of the misstatement by failing to restate the SoundHound's accounting for the Amelia Acquisition, as reported in its Q3 2024 Form 10-Q, in accordance with GAAP.  ¶¶175-82.  GAAP requires a restatement whenever a previously disclosed item is material.  ¶¶177-78.  Although the industry and SEC look to a 5% error as a "rule of thumb" threshold for materiality, SoundHound did not restate even though some items were misstated by 9 to 12%.  ¶¶178-79.  Avoiding the misstatement meant that SoundHound avoided filing a current report on Form 8-K, making additional disclosures, or alerting investors to a serious failure in accounting that would |

| Statement No. | The Speaker(s), Date(s), and Medium | False and/or Misleading Statements or Omissions | Reasons Why the Statements Were False and/or Misleading When Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| | | | | likely further damage the stock. ¶¶180-81. Thus, the inference of Defendants' scienter is bolstered by their attempt to cover up their serious failures of ICFR, continuing their pattern of misleading investors to reassure them that their ICFR failures were not as serious as they were in truth. ¶182. |
| 2. | When: March 1, 2024 Where: The 2023 Sox Certifications Speakers: Mohajer, Sharan, SoundHound | The 2023 SOX Certifications stated, in relevant part: "The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have: *(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared[.]*" ¶109. | These statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because SoundHound failed to disclose that the Company (i) had not completed an assessment identifying incompatible duties, and (ii) had not completed an assessment identifying mitigating controls. Indeed, the Company itself admitted at the end of the Class Period that it had not performed these actions. To the extent this statement was not technically untrue, it gave the false impression that the mitigating controls that were identified would be implemented, but far from segregating duties, the CEO was personally involved in approving all financial matters. Similarly, the foregoing statement gave the false impression that the specific, verifiable steps that had been implemented were designed to meaningfully mitigate the stated weakness in ICFR and/or that the stated weaknesses did not compromise SoundHound's ability to accurately account for non-routine transactions, including acquisitions. ¶112. | Mohajer and Sharan had access to, and regularly reviewed, SoundHound's ICFR, and, thus, either knew or were reckless in not knowing that the Remediation Efforts described as "completed" had not in fact been implemented. ¶¶141-44. From the outset of the Class Period, Mohajer and Sharan signed SEC filings in which they personally stated, and therefore acknowledged, that SoundHound's ICFR suffered from several material weaknesses and that the Company was implementing several Remediation Efforts to remediate those weaknesses. ¶ 75-82. Mohajer and Sharan also had a legal duty to regularly evaluate the effectiveness of SoundHound's ICFR. ¶¶31-36. And, indeed, Mohajer and Sharan admittedly performed such evaluations every quarter within the Class Period. ¶¶75 (Q3 2023 Form 10-Q), 79 (2023 Form 10-K), 80 (Q1 2024 Form 10-Q), 81 (Q2 2024 Form 10-Q), 82 (Q3 2024 Form 10-Q). SoundHound's SEC filings further indicated that management had "giv[en] full consideration to the material weaknesses" in light of the ongoing Remediation Efforts. ¶76. Taken together, these facts demonstrate that Mohajer and Sharan personally reviewed the effectiveness of SoundHound's ICFR at least every quarter throughout the Class Period, including the effectiveness of the Remediation Efforts taken to date. ¶144. Mohajer placed himself at the center of SoundHound's financial process and thus knew or was reckless in not knowing that the Remediation Efforts described as "completed" had not in fact been implemented. ¶¶145-48. CW1, who worked at SoundHound from June 2023 to May 2025, confirmed that "everything" in finance had to "go through the CEO to get his approval." ¶¶18, 84, 147. The self-imposed bottleneck caused substantial delays in approvals and disrupted payments to vendors. *Id.* While this gave Mohajer insight into SoundHound's overall financial status, this also demonstrates that Mohajer was at the center of one of the Remediation Efforts that was purported to have been completed but never was: the failure to segregate duties. Segregation of duties calls for duties within financial processes not to be concentrated in the hands of one individual (¶36), but Mohajer placed himself at the center of SoundHound's financial approval process. ¶147. Thus, Mohajer either knew or was reckless in not knowing that the ICFR he touted as being completed had not, in fact, been implemented. |

| Statement No. | The Speaker(s), Date(s), and Medium | False and/or Misleading Statements or Omissions | Reasons Why the Statements Were False and/or Misleading When Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| | | | | Mohajer, Sharan, and SoundHound itself had powerful incentives to mislead the market about the progress of SoundHound's ICFR by capitalizing on the inflated value of the stock to make significant proceeds shortly before the truth emerged.  During the Class Period, Mohajer sold a sizeable number of shares, reaping $20.37 million in proceeds, nearly all of which—$18.14 million—were sold shortly before the market learned the truth about the Remediation Efforts.  ¶¶154-56.  The shares sold were four times as many as Mohajer sold in the comparable period immediately before the Class Period and generated more than ten times the proceeds. ¶¶158-59.  Sharan, too, sold a sizeable number of shares during the Class Period, reaping $1.67 million in proceeds, nearly all of which—$1.17 million—were sold shortly before the market learned the truth.  ¶¶160-62.  The shares sold were twice as many as Sharan sold in the comparable period immediately before the Class Period and generated more than ten times the proceeds. ¶¶163-64.  SoundHound also capitalized on the inflated value of the stock.  The Company required capital raises to ensure it had sufficient capital to continue operating, and three times went to the market to raise capital, including one a mere thirty-four days before the truth emerged.  ¶¶151-53.  These capital raises were critical given the Company's cash burn and history of cash shortages.  ¶¶47-51, 150.  SoundHound also used the inflated value of its stock as consideration to purchase Amelia, a strategic acquisition critical to the future of the Company.  ¶¶165-68. <br><br> Furthermore, the inference of scienter is bolstered by Defendants' decision to cover up the scale of the misstatement by failing to restate the SoundHound's accounting for the Amelia Acquisition, as reported in its Q3 2024 Form 10-Q, in accordance with GAAP.  ¶¶175-82.  GAAP requires a restatement whenever a previously disclosed item is material.  ¶¶177-78.  Although the industry and SEC look to a 5% error as a "rule of thumb" threshold for materiality, SoundHound did not restate even though some items were misstated by 9 to 12%.  ¶¶178-79.  Avoiding the misstatement meant that SoundHound avoided filing a current report on Form 8-K, making additional disclosures, or alerting investors to a serious failure in accounting that would likely further damage the stock.  ¶¶180-81.  Thus, the inference of Defendants' scienter is bolstered by their attempt to cover up their serious failures of ICFR, continuing their pattern of misleading investors to reassure them that their ICFR failures were not as serious as they were in truth.  ¶182. |
| 3. | When: May 31, 2024 <br> Where: The Q1 2024 Form 10-Q | SoundHound's Q1 2024 Form 10-Q stated, in relevant part: | These statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements | Mohajer and Sharan had access to, and regularly reviewed, SoundHound's ICFR, and, thus, either knew or were reckless in not knowing that the Remediation Efforts described as "completed" had not in fact been implemented.  ¶¶141-44.  From the outset of the Class Period, Mohajer and |

| Statement No. | The Speaker(s), Date(s), and Medium | False and/or Misleading Statements or Omissions | Reasons Why the Statements Were False and/or Misleading When Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| | Speakers: Mohajer, Sharan, SoundHound | "**Management's Plan to Remediate the Material Weaknesses** The following remediation actions are currently being implemented and are in progress: . . . • *Completed a segregation of duties assessment identifying key conflicts and* mitigating *controls.* . . . • Initiated the design and implementation of a Segregation of Duties automated tool for our Enterprise Resource Planning (ERP) system. Additionally, we have initiated the design and implementation of similar controls for the remaining financially relevant applications. *Improvements have been implemented in tool utilization to strengthen the segregation of duties.*" ¶113. | not misleading because SoundHound failed to disclose that the Company (i) had not completed an assessment identifying incompatible duties, (ii) had not identified mitigating controls, and (iii) had not implemented tool improvements to strengthen segregation of duties. Indeed, the Company itself admitted at the end of the Class Period that it had not performed these actions. To the extent these statements were not technically untrue, they gave the false impression that the mitigating controls that were identified would be implemented, yet far from segregating duties, the CEO was personally involved in approving all financial matters. Similarly, the foregoing statements gave the false impression that the specific, verifiable steps that had been implemented were designed to meaningfully mitigate the stated weakness in ICFR and/or that the stated weaknesses did not compromise SoundHound's ability to accurately account for non-routine transactions, including acquisitions. ¶114. | Sharan signed SEC filings in which they personally stated, and therefore acknowledged, that SoundHound's ICFR suffered from several material weaknesses and that the Company was implementing several Remediation Efforts to remediate those weaknesses. ¶ 75-82. Mohajer and Sharan also had a legal duty to regularly evaluate the effectiveness of SoundHound's ICFR. ¶¶31-36. And, indeed, Mohajer and Sharan admittedly performed such evaluations every quarter within the Class Period. ¶¶75 (Q3 2023 Form 10-Q), 79 (2023 Form 10-K), 80 (Q1 2024 Form 10-Q), 81 (Q2 2024 Form 10-Q), 82 (Q3 2024 Form 10-Q). SoundHound's SEC filings further indicated that management had "giv[en] full consideration to the material weaknesses" in light of the ongoing Remediation Efforts. ¶76. Taken together, these facts demonstrate that Mohajer and Sharan personally reviewed the effectiveness of SoundHound's ICFR at least every quarter throughout the Class Period, including the effectiveness of the Remediation Efforts taken to date. ¶144. Mohajer placed himself at the center of SoundHound's financial process and thus knew or was reckless in not knowing that the Remediation Efforts described as "completed" had not in fact been implemented. ¶¶145-48. CW1, who worked at SoundHound from June 2023 to May 2025, confirmed that "everything" in finance had to "go through the CEO to get his approval." ¶¶18, 84, 147. The self-imposed bottleneck caused substantial delays in approvals and disrupted payments to vendors. *Id*. While this gave Mohajer insight into SoundHound's overall financial status, this also demonstrates that Mohajer was at the center of one of the Remediation Efforts that was purported to have been completed but never was: the failure to segregate duties. Segregation of duties calls for duties within financial processes not to be concentrated in the hands of one individual (¶36), but Mohajer placed himself at the center of SoundHound's financial approval process. ¶147. Thus, Mohajer either knew or was reckless in not knowing that the ICFR he touted as being completed had not, in fact, been implemented. Mohajer, Sharan, and SoundHound itself had powerful incentives to mislead the market about the progress of SoundHound's ICFR by capitalizing on the inflated value of the stock to make significant proceeds shortly before the truth emerged. During the Class Period, Mohajer sold a sizeable number of shares, reaping $20.37 million in proceeds, nearly all of which—$18.14 million—were sold shortly before the market learned the truth about the Remediation Efforts. ¶¶154-56. The shares sold were four times as many as Mohajer sold in the comparable period immediately before the Class Period and generated more than ten times the proceeds. ¶¶158-59. Sharan, too, sold |

| Statement No. | The Speaker(s), Date(s), and Medium | False and/or Misleading Statements or Omissions | Reasons Why the Statements Were False and/or Misleading When Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| | | | | a sizeable number of shares during the Class Period, reaping $1.67 million in proceeds, nearly all of which—$1.17 million—were sold shortly before the market learned the truth. ¶¶160-62. The shares sold were twice as many as Sharan sold in the comparable period immediately before the Class Period and generated more than ten times the proceeds. ¶¶163-64. SoundHound also capitalized on the inflated value of the stock. The Company required capital raises to ensure it had sufficient capital to continue operating, and three times went to the market to raise capital, including one a mere thirty-four days before the truth emerged. ¶¶151-53. These capital raises were critical given the Company's cash burn and history of cash shortages. ¶¶47-51, 150. SoundHound also used the inflated value of its stock as consideration to purchase Amelia, a strategic acquisition critical to the future of the Company. ¶¶165-68.<br><br>Furthermore, the inference of scienter is bolstered by Defendants' decision to cover up the scale of the misstatement by failing to restate the SoundHound's accounting for the Amelia Acquisition, as reported in its Q3 2024 Form 10-Q, in accordance with GAAP. ¶¶175-82. GAAP requires a restatement whenever a previously disclosed item is material. ¶¶177-78. Although the industry and SEC look to a 5% error as a "rule of thumb" threshold for materiality, SoundHound did not restate even though some items were misstated by 9 to 12%. ¶¶178-79. Avoiding the misstatement meant that SoundHound avoided filing a current report on Form 8-K, making additional disclosures, or alerting investors to a serious failure in accounting that would likely further damage the stock. ¶¶180-81. Thus, the inference of Defendants' scienter is bolstered by their attempt to cover up their serious failures of ICFR, continuing their pattern of misleading investors to reassure them that their ICFR failures were not as serious as they were in truth. ¶182. |
| 4. | When: May 31, 2024 Where: The Q1 2024 SOX Certifications Speakers: Mohajer, Sharan, SoundHound | The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have: | These statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because SoundHound failed to disclose that the Company (i) had not completed an assessment identifying incompatible duties, (ii) had not identified mitigating controls, and (iii) had not implemented tool improvements to strengthen segregation of duties. Indeed, the | Mohajer and Sharan had access to, and regularly reviewed, SoundHound's ICFR, and, thus, either knew or were reckless in not knowing that the Remediation Efforts described as "completed" had not in fact been implemented. ¶¶141-44. From the outset of the Class Period, Mohajer and Sharan signed SEC filings in which they personally stated, and therefore acknowledged, that SoundHound's ICFR suffered from several material weaknesses and that the Company was implementing several Remediation Efforts to remediate those weaknesses. ¶ 75-82. Mohajer and Sharan also had a legal duty to regularly evaluate the effectiveness of SoundHound's ICFR. ¶¶31-36. And, indeed, Mohajer and Sharan admittedly performed such evaluations every quarter within the Class Period. ¶¶75 (Q3 2023 Form 10-Q), 79 (2023 Form 10-K), 80 (Q1 2024 Form 10-Q), 81 (Q2 2024 Form 10-Q), 82 (Q3 2024 Form 10-Q). SoundHound's SEC filings further |

| Statement No. | The Speaker(s), Date(s), and Medium | False and/or Misleading Statements or Omissions | Reasons Why the Statements Were False and/or Misleading When Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| | | *(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared[.]"* ¶¶115-16. | Company itself admitted at the end of the Class Period that it had not performed these actions. To the extent these statements were not technically untrue, they gave the false impression that the mitigating controls that were identified would be implemented, yet far from segregating duties, the CEO was personally involved in approving all financial matters. Similarly, the foregoing statements gave the false impression that the specific, verifiable steps that had been implemented were designed to meaningfully mitigate the stated weakness in ICFR and/or that the stated weaknesses did not compromise SoundHound's ability to accurately account for non-routine transactions, including acquisitions. ¶¶114, 117. | indicated that management had "giv[en] full consideration to the material weaknesses" in light of the ongoing Remediation Efforts. ¶76. Taken together, these facts demonstrate that Mohajer and Sharan personally reviewed the effectiveness of SoundHound's ICFR at least every quarter throughout the Class Period, including the effectiveness of the Remediation Efforts taken to date. ¶144.<br><br>Mohajer placed himself at the center of SoundHound's financial process and thus knew or was reckless in not knowing that the Remediation Efforts described as "completed" had not in fact been implemented. ¶¶145-48. CW1, who worked at SoundHound from June 2023 to May 2025, confirmed that "everything" in finance had to "go through the CEO to get his approval." ¶¶18, 84, 147. The self-imposed bottleneck caused substantial delays in approvals and disrupted payments to vendors. *Id.* While this gave Mohajer insight into SoundHound's overall financial status, this also demonstrates that Mohajer was at the center of one of the Remediation Efforts that was purported to have been completed but never was: the failure to segregate duties. Segregation of duties calls for duties within financial processes not to be concentrated in the hands of one individual (¶36), but Mohajer placed himself at the center of SoundHound's financial approval process. ¶147. Thus, Mohajer either knew or was reckless in not knowing that the ICFR he touted as being completed had not, in fact, been implemented.<br><br>Mohajer, Sharan, and SoundHound itself had powerful incentives to mislead the market about the progress of SoundHound's ICFR by capitalizing on the inflated value of the stock to make significant proceeds shortly before the truth emerged. During the Class Period, Mohajer sold a sizeable number of shares, reaping $20.37 million in proceeds, nearly all of which—$18.14 million—were sold shortly before the market learned the truth about the Remediation Efforts. ¶¶154-56. The shares sold were four times as many as Mohajer sold in the comparable period immediately before the Class Period and generated more than ten times the proceeds. ¶¶158-59. Sharan, too, sold a sizeable number of shares during the Class Period, reaping $1.67 million in proceeds, nearly all of which—$1.17 million—were sold shortly before the market learned the truth. ¶¶160-62. The shares sold were twice as many as Sharan sold in the comparable period immediately before the Class Period and generated more than ten times the proceeds. ¶¶163-64. SoundHound also capitalized on the inflated value of the stock. The Company required capital raises to ensure it had sufficient capital to continue operating, and three times went to the market to raise capital, including one a mere thirty-four days before the truth emerged. ¶¶151-53. These capital raises were |

| Statement No. | The Speaker(s), Date(s), and Medium | False and/or Misleading Statements or Omissions | Reasons Why the Statements Were False and/or Misleading When Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| | | | | critical given the Company's cash burn and history of cash shortages. ¶¶47-51, 150. SoundHound also used the inflated value of its stock as consideration to purchase Amelia, a strategic acquisition critical to the future of the Company. ¶¶165-68.<br><br>Furthermore, the inference of scienter is bolstered by Defendants' decision to cover up the scale of the misstatement by failing to restate the SoundHound's accounting for the Amelia Acquisition, as reported in its Q3 2024 Form 10-Q, in accordance with GAAP. ¶¶175-82. GAAP requires a restatement whenever a previously disclosed item is material. ¶¶177-78. Although the industry and SEC look to a 5% error as a "rule of thumb" threshold for materiality, SoundHound did not restate even though some items were misstated by 9 to 12%. ¶¶178-79. Avoiding the misstatement meant that SoundHound avoided filing a current report on Form 8-K, making additional disclosures, or alerting investors to a serious failure in accounting that would likely further damage the stock. ¶¶180-81. Thus, the inference of Defendants' scienter is bolstered by their attempt to cover up their serious failures of ICFR, continuing their pattern of misleading investors to reassure them that their ICFR failures were not as serious as they were in truth. ¶182. |
| 5. | When: August 9, 2024<br>Where: The Q2 2024 Form 1-Q<br>Speakers: Mohajer, Sharan, SoundHound | SoundHound's Q2 2024 Form 10-Q stated, in relevant part:<br><br>"**Management's Plan to Remediate the Material Weaknesses**<br><br>The following remediation actions are currently being implemented and are in progress:<br><br>. . .<br><br>•    *Completed a segregation of duties assessment identifying key conflicts and mitigating controls.*<br><br>. . . | These statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because SoundHound failed to disclose that the Company (i) had not completed an assessment identifying incompatible duties, (ii) had not identified mitigating controls, and (iii) had not implemented tool improvements to strengthen segregation of duties. Indeed, the Company itself admitted at the end of the Class Period that it had not performed these actions. To the extent these statements were not technically untrue, they gave the false impression that mitigating controls that were identified would be implemented, yet far from segregating duties, the CEO was | Mohajer and Sharan had access to, and regularly reviewed, SoundHound's ICFR, and, thus, either knew or were reckless in not knowing that the Remediation Efforts described as "completed" had not in fact been implemented. ¶¶141-44. From the outset of the Class Period, Mohajer and Sharan signed SEC filings in which they personally stated, and therefore acknowledged, that SoundHound's ICFR suffered from several material weaknesses and that the Company was implementing several Remediation Efforts to remediate those weaknesses. ¶ 75-82. Mohajer and Sharan also had a legal duty to regularly evaluate the effectiveness of SoundHound's ICFR. ¶¶31-36. And, indeed, Mohajer and Sharan admittedly performed such evaluations every quarter within the Class Period. ¶¶75 (Q3 2023 Form 10-Q), 79 (2023 Form 10-K), 80 (Q1 2024 Form 10-Q), 81 (Q2 2024 Form 10-Q), 82 (Q3 2024 Form 10-Q). SoundHound's SEC filings further indicated that management had "giv[en] full consideration to the material weaknesses" in light of the ongoing Remediation Efforts. ¶76. Taken together, these facts demonstrate that Mohajer and Sharan personally reviewed the effectiveness of SoundHound's ICFR at least every quarter throughout the Class Period, including the effectiveness of the Remediation Efforts taken to date. ¶144.<br><br>Mohajer placed himself at the center of SoundHound's financial process and thus knew or was reckless in not knowing that the Remediation Efforts |

| Statement No. | The Speaker(s), Date(s), and Medium | False and/or Misleading Statements or Omissions | Reasons Why the Statements Were False and/or Misleading When Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| | | • Initiated the design and implementation of a Segregation of Duties automated tool for our Enterprise Resource Planning (ERP) system. Additionally, we have initiated the design and implementation of similar controls for the remaining financially relevant applications. *Improvements have been implemented in tool utilization to strengthen the segregation of duties.*" ¶118. | personally involved in approving all financial matters.  Similarly, the foregoing statements gave the false impression that the specific, verifiable steps that had been implemented were designed to meaningfully mitigate the stated weakness in ICFR and/or that the stated weaknesses did not compromise SoundHound's ability to accurately account for non-routine transactions, including acquisitions.  ¶119. | described as "completed" had not in fact been implemented.  ¶¶145-48.  CW1, who worked at SoundHound from June 2023 to May 2025, confirmed that "everything" in finance had to "go through the CEO to get his approval." ¶¶18, 84, 147.  The self-imposed bottleneck caused substantial delays in approvals and disrupted payments to vendors.  *Id.*  While this gave Mohajer insight into SoundHound's overall financial status, this also demonstrates that Mohajer was at the center of one of the Remediation Efforts that was purported to have been completed but never was: the failure to segregate duties.  Segregation of duties calls for duties within financial processes not to be concentrated in the hands of one individual (¶36), but Mohajer placed himself at the center of SoundHound's financial approval process.  ¶147.  Thus, Mohajer either knew or was reckless in not knowing that the ICFR he touted as being completed had not, in fact, been implemented.<br><br>Mohajer, Sharan, and SoundHound itself had powerful incentives to mislead the market about the progress of SoundHound's ICFR by capitalizing on the inflated value of the stock to make significant proceeds shortly before the truth emerged.  During the Class Period, Mohajer sold a sizeable number of shares, reaping $20.37 million in proceeds, nearly all of which—$18.14 million—were sold shortly before the market learned the truth about the Remediation Efforts.  ¶¶154-56.  The shares sold were four times as many as Mohajer sold in the comparable period immediately before the Class Period and generated more than ten times the proceeds. ¶¶158-59.  Sharan, too, sold a sizeable number of shares during the Class Period, reaping $1.67 million in proceeds, nearly all of which—$1.17 million—were sold shortly before the market learned the truth.  ¶¶160-62.  The shares sold were twice as many as Sharan sold in the comparable period immediately before the Class Period and generated more than ten times the proceeds.  ¶¶163-64.  SoundHound also capitalized on the inflated value of the stock.  The Company required capital raises to ensure it had sufficient capital to continue operating, and three times went to the market to raise capital, including one a mere thirty-four days before the truth emerged.  ¶¶151-53.  These capital raises were critical given the Company's cash burn and history of cash shortages.  ¶¶47-51, 150.  SoundHound also used the inflated value of its stock as consideration to purchase Amelia, a strategic acquisition critical to the future of the Company.  ¶¶165-68.<br><br>Furthermore, the inference of scienter is bolstered by Defendants' decision to cover up the scale of the misstatement by failing to restate the SoundHound's accounting for the Amelia Acquisition, as reported in its Q3 2024 Form 10-Q, in accordance with GAAP.  ¶¶175-82.  GAAP requires a restatement |

| Statement No. | The Speaker(s), Date(s), and Medium | False and/or Misleading Statements or Omissions | Reasons Why the Statements Were False and/or Misleading When Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| | | | | whenever a previously disclosed item is material.  ¶¶177-78.  Although the industry and SEC look to a 5% error as a "rule of thumb" threshold for materiality, SoundHound did not restate even though some items were misstated by 9 to 12%.  ¶¶178-79.  Avoiding the misstatement meant that SoundHound avoided filing a current report on Form 8-K, making additional disclosures, or alerting investors to a serious failure in accounting that would likely further damage the stock.  ¶¶180-81.  Thus, the inference of Defendants' scienter is bolstered by their attempt to cover up their serious failures of ICFR, continuing their pattern of misleading investors to reassure them that their ICFR failures were not as serious as they were in truth.  ¶182. |
| 6. | When: August 9, 2024<br>Where: The Q2 2024 SOX Certifications<br>Speakers: Mohajer, Sharan, SoundHound | The Q2 2024 SOX Certifications stated, in relevant part:<br><br>The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:<br><br>*(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared[.]*"  ¶120. | These statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because SoundHound failed to disclose that the Company (i) had not completed an assessment identifying incompatible duties, (ii) had not identified mitigating controls, and (iii) had not implemented tool improvements to strengthen segregation of duties.  Indeed, the Company itself admitted at the end of the Class Period that it had not performed these actions.  To the extent these statements were not technically untrue, they gave the false impression that mitigating controls that were identified would be implemented, yet far from segregating duties, the CEO was personally involved in approving all financial matters.  Similarly, the foregoing statements gave the false impression that the specific, verifiable steps that had been implemented were designed to meaningfully mitigate the stated weakness in ICFR and/or that the stated weaknesses did not | Mohajer and Sharan had access to, and regularly reviewed, SoundHound's ICFR, and, thus, either knew or were reckless in not knowing that the Remediation Efforts described as "completed" had not in fact been implemented.  ¶¶141-44.  From the outset of the Class Period, Mohajer and Sharan signed SEC filings in which they personally stated, and therefore acknowledged, that SoundHound's ICFR suffered from several material weaknesses and that the Company was implementing several Remediation Efforts to remediate those weaknesses.  ¶ 75-82.  Mohajer and Sharan also had a legal duty to regularly evaluate the effectiveness of SoundHound's ICFR.  ¶¶31-36.  And, indeed, Mohajer and Sharan admittedly performed such evaluations every quarter within the Class Period.  ¶¶75 (Q3 2023 Form 10-Q), 79 (2023 Form 10-K), 80 (Q1 2024 Form 10-Q), 81 (Q2 2024 Form 10-Q), 82 (Q3 2024 Form 10-Q).  SoundHound's SEC filings further indicated that management had "giv[en] full consideration to the material weaknesses" in light of the ongoing Remediation Efforts.  ¶76.  Taken together, these facts demonstrate that Mohajer and Sharan personally reviewed the effectiveness of SoundHound's ICFR at least every quarter throughout the Class Period, including the effectiveness of the Remediation Efforts taken to date.  ¶144.<br><br>Mohajer placed himself at the center of SoundHound's financial process and thus knew or was reckless in not knowing that the Remediation Efforts described as "completed" had not in fact been implemented.  ¶¶145-48.  CW1, who worked at SoundHound from June 2023 to May 2025, confirmed that "everything" in finance had to "go through the CEO to get his approval."  ¶¶18, 84, 147.  The self-imposed bottleneck caused substantial delays in approvals and disrupted payments to vendors.  *Id.*  While this gave Mohajer insight into SoundHound's overall financial status, this also demonstrates that Mohajer was at the center of one of the Remediation Efforts that was purported to have been completed but never was: the failure to segregate duties.  Segregation of duties calls for duties within financial processes not to |

10

| Statement No. | The Speaker(s), Date(s), and Medium | False and/or Misleading Statements or Omissions | Reasons Why the Statements Were False and/or Misleading When Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| | | | compromise SoundHound's ability to accurately account for non-routine transactions, including acquisitions. ¶¶119, 121. | be concentrated in the hands of one individual (¶36), but Mohajer placed himself at the center of SoundHound's financial approval process. ¶147. Thus, Mohajer either knew or was reckless in not knowing that the ICFR he touted as being completed had not, in fact, been implemented.<br><br>Mohajer, Sharan, and SoundHound itself had powerful incentives to mislead the market about the progress of SoundHound's ICFR by capitalizing on the inflated value of the stock to make significant proceeds shortly before the truth emerged.  During the Class Period, Mohajer sold a sizeable number of shares, reaping $20.37 million in proceeds, nearly all of which—$18.14 million—were sold shortly before the market learned the truth about the Remediation Efforts.  ¶¶154-56.  The shares sold were four times as many as Mohajer sold in the comparable period immediately before the Class Period and generated more than ten times the proceeds. ¶¶158-59.  Sharan, too, sold a sizeable number of shares during the Class Period, reaping $1.67 million in proceeds, nearly all of which—$1.17 million—were sold shortly before the market learned the truth.  ¶¶160-62.  The shares sold were twice as many as Sharan sold in the comparable period immediately before the Class Period and generated more than ten times the proceeds.  ¶¶163-64.  SoundHound also capitalized on the inflated value of the stock.  The Company required capital raises to ensure it had sufficient capital to continue operating, and three times went to the market to raise capital, including one a mere thirty-four days before the truth emerged.  ¶¶151-53.  These capital raises were critical given the Company's cash burn and history of cash shortages.  ¶¶47-51, 150.  SoundHound also used the inflated value of its stock as consideration to purchase Amelia, a strategic acquisition critical to the future of the Company.  ¶¶165-68.<br><br>Furthermore, the inference of scienter is bolstered by Defendants' decision to cover up the scale of the misstatement by failing to restate the SoundHound's accounting for the Amelia Acquisition, as reported in its Q3 2024 Form 10-Q, in accordance with GAAP.  ¶¶175-82.  GAAP requires a restatement whenever a previously disclosed item is material.  ¶¶177-78.  Although the industry and SEC look to a 5% error as a "rule of thumb" threshold for materiality, SoundHound did not restate even though some items were misstated by 9 to 12%.  ¶¶178-79.  Avoiding the misstatement meant that SoundHound avoided filing a current report on Form 8-K, making additional disclosures, or alerting investors to a serious failure in accounting that would likely further damage the stock.  ¶¶180-81.  Thus, the inference of Defendants' scienter is bolstered by their attempt to cover up their serious |

| Statement No. | The Speaker(s), Date(s), and Medium | False and/or Misleading Statements or Omissions | Reasons Why the Statements Were False and/or Misleading When Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| | | | | failures of ICFR, continuing their pattern of misleading investors to reassure them that their ICFR failures were not as serious as they were in truth.  ¶182. |
| 7. | <u>When</u>: November 12, 2024 <br> <u>Where</u>: The Q3 2024 Form 10-Q <br> <u>Speakers</u>: Mohajer, Sharan, SoundHound | SoundHound's Q3 2024 Form 10-Q stated, in relevant part, <br><br> "**Management's Plan to Remediate the Material Weaknesses** <br> The following remediation actions are currently being implemented and are in progress: <br><br> . . . <br><br> •     *Completed a segregation of duties assessment identifying key conflicts and mitigating controls.* <br><br> . . . <br><br> •     Initiated the design and implementation of a Segregation of Duties automated tool for our Enterprise Resource Planning (ERP) system. Additionally, we have initiated the design and implementation of similar controls for the remaining financially relevant applications. *Improvements have been implemented in tool utilization to strengthen the segregation of duties* <br><br> . . . | These statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because SoundHound failed to disclose that the Company (i) had not completed an assessment identifying incompatible duties, (ii) had not identified mitigating controls for segregating duties, (iii) had not implemented tool improvements to strengthen segregation of duties, (iv) had not automated month and quarter-end accounting close processes but instead, relied on inexperienced Amelia employees to perform such processes manually in an Excel file, which SoundHound, in turn, incorporated into its Consolidated Financials with no further scrutiny,.  Indeed, the Company itself admitted at the end of the Class Period that it had not performed the assessment identifying incompatible duties or mitigating controls for segregating duties and had not implemented tool improvements to strengthen segregation of duties.  To the extent these statements were not technically untrue, they gave the false impression that mitigating controls that were identified would be implemented, yet far from segregating duties, the CEO was personally involved in approving all financial matters.  Similarly, the foregoing statement gave the false | Mohajer and Sharan had access to, and regularly reviewed, SoundHound's ICFR, and, thus, either knew or were reckless in not knowing that the Remediation Efforts described as "completed" had not in fact been implemented.  ¶¶141-44.  From the outset of the Class Period, Mohajer and Sharan signed SEC filings in which they personally stated, and therefore acknowledged, that SoundHound's ICFR suffered from several material weaknesses and that the Company was implementing several Remediation Efforts to remediate those weaknesses.  ¶ 75-82.  Mohajer and Sharan also had a legal duty to regularly evaluate the effectiveness of SoundHound's ICFR.  ¶¶31-36.  And, indeed, Mohajer and Sharan admittedly performed such evaluations every quarter within the Class Period.  ¶¶75 (Q3 2023 Form 10-Q), 79 (2023 Form 10-K), 80 (Q1 2024 Form 10-Q), 81 (Q2 2024 Form 10-Q), 82 (Q3 2024 Form 10-Q).  SoundHound's SEC filings further indicated that management had "giv[en] full consideration to the material weaknesses" in light of the ongoing Remediation Efforts.  ¶76.  Taken together, these facts demonstrate that Mohajer and Sharan personally reviewed the effectiveness of SoundHound's ICFR at least every quarter throughout the Class Period, including the effectiveness of the Remediation Efforts taken to date.  ¶144. <br><br> Mohajer placed himself at the center of SoundHound's financial process and thus knew or was reckless in not knowing that the Remediation Efforts described as "completed" had not in fact been implemented.  ¶¶145-48.  CW1, who worked at SoundHound from June 2023 to May 2025, confirmed that "everything" in finance had to "go through the CEO to get his approval."  ¶¶18, 84, 147.  The self-imposed bottleneck caused substantial delays in approvals and disrupted payments to vendors.  *Id*.  While this gave Mohajer insight into SoundHound's overall financial status, this also demonstrates that Mohajer was at the center of one of the Remediation Efforts that was purported to have been completed but never was: the failure to segregate duties.  Segregation of duties calls for duties within financial processes not to be concentrated in the hands of one individual (¶36), but Mohajer placed himself at the center of SoundHound's financial approval process.  ¶147.  Thus, Mohajer either knew or was reckless in not knowing that the ICFR he touted as being completed had not, in fact, been implemented. <br><br> Mohajer, Sharan, and SoundHound itself had powerful incentives to mislead the market about the progress of SoundHound's ICFR by capitalizing on the inflated value of the stock to make significant proceeds shortly before the |

| Statement No. | The Speaker(s), Date(s), and Medium | False and/or Misleading Statements or Omissions | Reasons Why the Statements Were False and/or Misleading When Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| | | • **Completed the implementation of an automated month and quarter-end accounting close workflow tool to facilitate the review and support of key financial close process controls** <br><br> • **The Company hired personnel with expertise in risk assessment and internal controls.**" ¶122. | impression that the specific, verifiable steps that had been implemented were designed to meaningfully mitigate the stated weakness in ICFR and/or that the stated weaknesses did not compromise SoundHound's ability to accurately account for non-routine transactions, including acquisitions. ¶123. | truth emerged. During the Class Period, Mohajer sold a sizeable number of shares, reaping $20.37 million in proceeds, nearly all of which—$18.14 million—were sold shortly before the market learned the truth about the Remediation Efforts. ¶¶154-56. The shares sold were four times as many as Mohajer sold in the comparable period immediately before the Class Period and generated more than ten times the proceeds. ¶¶158-59. Sharan, too, sold a sizeable number of shares during the Class Period, reaping $1.67 million in proceeds, nearly all of which—$1.17 million—were sold shortly before the market learned the truth. ¶¶160-62. The shares sold were twice as many as Sharan sold in the comparable period immediately before the Class Period and generated more than ten times the proceeds. ¶¶163-64. SoundHound also capitalized on the inflated value of the stock. The Company required capital raises to ensure it had sufficient capital to continue operating, and three times went to the market to raise capital, including one a mere thirty-four days before the truth emerged. ¶¶151-53. These capital raises were critical given the Company's cash burn and history of cash shortages. ¶¶47-51, 150. <br><br> Furthermore, the inference of scienter is bolstered by Defendants' decision to cover up the scale of the misstatement by failing to restate the SoundHound's accounting for the Amelia Acquisition, as reported in its Q3 2024 Form 10-Q, in accordance with GAAP. ¶¶175-82. GAAP requires a restatement whenever a previously disclosed item is material. ¶¶177-78. Although the industry and SEC look to a 5% error as a "rule of thumb" threshold for materiality, SoundHound did not restate even though some items were misstated by 9 to 12%. ¶¶178-79. Avoiding the misstatement meant that SoundHound avoided filing a current report on Form 8-K, making additional disclosures, or alerting investors to a serious failure in accounting that would likely further damage the stock. ¶¶180-81. Thus, the inference of Defendants' scienter is bolstered by their attempt to cover up their serious failures of ICFR, continuing their pattern of misleading investors to reassure them that their ICFR failures were not as serious as they were in truth. ¶182. |
| 8. | **When:** November 12, 2024 <br> **Where:** The Q3 2024 Form 10-Q <br> **Speakers:** Mohajer, Sharan, SoundHound | SoundHound's Q3 2024 Form 10-Q also stated, in relevant part: <br><br> **"Changes in Internal Control over Financial Reporting:** <br><br> *There were no changes in the Company's internal control* | These statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because SoundHound failed to disclose that (i) unlike its previous acquisitions, declined to integrate Amelia's financial reporting function into its | Mohajer and Sharan had a legal duty to monitor and assess any material changes to SoundHound's ICFR, including any material changes due to recent acquisitions, even if the acquired business is temporarily excluded from management's periodic evaluation of the effectiveness of ICFR. ¶¶31-36, 67-70. SoundHound's SEC filings also purported to follow the SEC guidance that required disclosure of material changes to ICFR following an acquisition, and Mohajer and Sharan—who signed the filings—were therefore aware of their duty to understand and disclose the impact recent acquisitions on SoundHound's ICFR. ¶¶32-33, 71-72. Mohajer and Sharan |

| Statement No. | The Speaker(s), Date(s), and Medium | False and/or Misleading Statements or Omissions | Reasons Why the Statements Were False and/or Misleading When Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| | | *over financial reporting (as defined in Rule 13a-15(f) of the Exchange Act) during the quarter ended September 30, 2024 that materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.*" ¶124 | own and, instead, kept it siloed; (ii) far from merely excluding Amelia from SoundHound's assessment of ICFR, it fired the only remaining Amelia personnel experienced with its financial reporting and replaced them with an employee and foreign contract workers with no such experience; and (iii) had not automated month and quarter-end accounting close processes but instead, relied on inexperienced Amelia employees to perform such processes manually in an Excel file, which SoundHound, in turn, incorporated into its Consolidated Financials with no further scrutiny; and, thus, (iv) the acquisition of Amelia during the reporting period introduced additional material weaknesses in SoundHound's already ineffective ICFR which negatively impacted its consolidated financial statements.  Indeed, the Company itself admitted at the end of the Class Period that the material weaknesses in its ICFR "continue[d] to exist as of December 31, 2024." ¶125. | purported to comply with this obligation after the Synq3 Acquisition, and certified that they fulfilled their duty to review any changes to SoundHound's ICFR during the quarter in which the Synq3 Acquisition was completed. ~~therefore~~ Thus, they knew that its Synq3's reporting function was integrated into SoundHound's accounting department.  ¶¶71, 94.  In addition, Mohajer and Sharan purported to comply with this obligation after the Amelia Acquisition, and certified that they fulfilled their duty to review any changes to SoundHound's ICFR during the quarter in which the Amelia Acquisition was completed.  ¶¶82, 124, 126.  Thus, they either knew or were reckless in not knowing that the decision to silo Amelia represented a material change to SoundHound's ICFR.  ¶¶68-72.

Mohajer placed himself at the center of SoundHound's financial processes and thus knew or was reckless in not knowing that the layoffs of experienced staff at Amelia represented a change in ICFR that would require disclosure.  ¶¶145-48.  CW1, who worked at SoundHound from June 2023 to May 2025, confirmed that "everything" in finance had to "go through the CEO to get his approval."  ¶¶18, 84, 147.  Thus, Mohajer either knew of or, more likely, approved, the decision to lay off all Amelia's accountants experienced with financial reporting and replace them with one employee who was "really new," "not experienced with financials" and unfamiliar with how to access Amelia's financial information, supported only by offshore contractors who did not have accounting degrees.  ¶¶94-95.  Mohajer knew that hiring experienced staff was an important step to remediate SoundHound's own disclosed weaknesses in ICFR, ¶82, and therefore would know these layoffs represented a change in ICFR that required disclosure.

Mohajer, Sharan, and SoundHound itself had powerful incentives to mislead the market about the progress of SoundHound's ICFR by capitalizing on the inflated value of the stock to make significant proceeds shortly before the truth emerged.  During the Class Period, Mohajer sold a sizeable number of shares, reaping $20.37 million in proceeds, nearly all of which—$18.14 million—were sold shortly before the market learned the truth about the Remediation Efforts.  ¶¶154-56.  The shares sold were four times as many as Mohajer sold in the comparable period immediately before the Class Period and generated more than ten times the proceeds. ¶¶158-59.  Sharan, too, sold a sizeable number of shares during the Class Period, reaping $1.67 million in proceeds, nearly all of which—$1.17 million—were sold shortly before the market learned the truth.  ¶¶160-62.  The shares sold were twice as many as Sharan sold in the comparable period immediately before the Class Period and ~~and~~ generated more than ten times the proceeds.  ¶¶163-64. |

| Statement No. | The Speaker(s), Date(s), and Medium | False and/or Misleading Statements or Omissions | Reasons Why the Statements Were False and/or Misleading When Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| | | | | SoundHound also capitalized on the inflated value of the stock.  The Company required capital raises to ensure it had sufficient capital to continue operating, and three times went to the market to raise capital, including one a mere thirty-four days before the truth emerged.  ¶¶151-53.  These capital raises were critical given the Company's cash burn and history of cash shortages.  ¶¶47-51, 150.<br><br>It is reasonable to infer that Mohajer and Sharan knew about the decision to silo Amelia with new staff that lacked the experience and training as those that were removed because Amelia was a critical acquisition at the core of SoundHound's business and future prospects.  At the time of the Amelia Acquisition, Amelia's revenues represented 62% of SoundHound's total consolidated revenues for the quarter in which the acquisition closed came from Amelia. ¶171.  Similarly, at the time, Amelia was forecast to comprise one-third of SoundHound's future revenue, and nearly a year after the Amelia Acquisition, Sharan described Amelia and other recently completed acquisitions as increasing the Company's growth to "over 100%."  ¶¶171-72.  Mohajer and Sharan knew that hiring experienced staff was an important step to remediate SoundHound's own disclosed weaknesses in ICFR, ¶82, and therefore it is reasonable to infer that they would pay attention to the change in ICFR represented by reducing eliminating all experienced financial reporting resources at a large strategic acquisition whose financial information flows through into its own Consolidated Financials.<br><br>Furthermore, the inference of scienter is bolstered by Defendants' decision to cover up the scale of the misstatement by failing to restate the SoundHound's accounting for the Amelia Acquisition, as reported in its Q3 2024 Form 10-Q, in accordance with GAAP.  ¶¶175-82.  GAAP requires a restatement whenever a previously disclosed item is material.  ¶¶177-78.  Although the industry and SEC look to a 5% error as a "rule of thumb" threshold for materiality, SoundHound did not restate even though some items were misstated by 9 to 12%.  ¶¶178-79.  Avoiding the misstatement meant that SoundHound avoided filing a current report on Form 8-K, making additional disclosures, or alerting investors to a serious failure in accounting that would likely further damage the stock.  ¶¶180-81.  Thus, the inference of Defendants' scienter is bolstered by their attempt to cover up their serious failures of ICFR, continuing their pattern of misleading investors to reassure them that their ICFR failures were not as serious as they were in truth.  ¶182. |
| 9. | When: November 12, 2024 | The Q3 2024 SOX Certifications stated, in relevant part: | These statements were materially false and misleading when made, or omitted to state material facts | Mohajer and Sharan had a legal duty to monitor and assess any material changes to SoundHound's ICFR, including any material changes due to recent acquisitions, even if the acquired business is temporarily excluded |

| Statement No. | The Speaker(s), Date(s), and Medium | False and/or Misleading Statements or Omissions | Reasons Why the Statements Were False and/or Misleading When Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| | Where: The Q3 2024 SOX Certifications Speakers: Mohajer, Sharan, SoundHound | "The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:<br><br>*(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared[.]*<br><br>. . .<br><br>*(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal* | necessary to make the statements not misleading because SoundHound failed to disclose that (i) unlike its previous acquisitions, declined to integrate Amelia's financial reporting function into its own and, instead, kept it siloed; (ii) far from merely excluding Amelia from SoundHound's assessment of ICFR, it fired the only remaining Amelia personnel experienced with its financial reporting and replaced them with an employee and foreign contract workers with no such experience; and (iii) had not automated month and quarter-end accounting close processes but instead, relied on inexperienced Amelia employees to perform such processes manually in an Excel file, which SoundHound, in turn, incorporated into its Consolidated Financials with no further scrutiny; and, thus, (iv) the acquisition of Amelia during the reporting period introduced additional material weaknesses in SoundHound's already ineffective ICFR which negatively impacted its consolidated financial statements.  Indeed, the Company itself admitted at the end of the Class Period that the material weaknesses in its ICFR "continue[d] to exist as of December 31, 2024."  ¶¶123, 125, 127. | from management's periodic evaluation of the effectiveness of ICFR.  ¶¶31-36, 67-70.  SoundHound's SEC filings also purported to follow the SEC guidance that required disclosure of material changes to ICFR following an acquisition, and Mohajer and Sharan—who signed the filings—were therefore aware of their duty to understand and disclose the impact of recent acquisitions on SoundHound's ICFR.  ¶¶32-33, 71-72.  Mohajer and Sharan purported to comply with this obligation after the Synq3 Acquisition, and certified that they fulfilled their duty to review any changes to SoundHound's ICFR during the quarter in which the Synq3 Acquisition was completed. therefore Thus, they knew that its Synq3's reporting function was integrated into SoundHound's accounting department.  ¶¶71, 94.  In addition, Mohajer and Sharan purported to comply with this obligation after the Amelia Acquisition, and certified that they fulfilled their duty to review any changes to SoundHound's ICFR during the quarter in which the Amelia Acquisition was completed.  ¶¶82, 124, 126.  Thus, they either knew or were reckless in not knowing that the decision to silo Amelia represented a material change to SoundHound's ICFR.  ¶¶68-72.<br><br>Mohajer placed himself at the center of SoundHound's financial processes and thus knew or was reckless in not knowing that the layoffs of experienced staff at Amelia represented a change in ICFR that would require disclosure.  ¶¶145-48.  CW1, who worked at SoundHound from June 2023 to May 2025, confirmed that "everything" in finance had to "go through the CEO to get his approval."  ¶¶18, 84, 147.  Thus, Mohajer either knew of or, more likely, approved, the decision to lay off all Amelia's accountants experienced with financial reporting and replace them with one employee who was "really new," "not experienced with financials" and unfamiliar with how to access Amelia's financial information, supported only by offshore contractors who did not have accounting degrees.  ¶¶94-95.  Mohajer knew that hiring experienced staff was an important step to remediate SoundHound's own disclosed weaknesses in ICFR, ¶82, and therefore would know these layoffs represented a change in ICFR that required disclosure.<br><br>Mohajer, Sharan, and SoundHound itself had powerful incentives to mislead the market about the progress of SoundHound's ICFR by capitalizing on the inflated value of the stock to make significant proceeds shortly before the truth emerged.  During the Class Period, Mohajer sold a sizeable number of shares, reaping $20.37 million in proceeds, nearly all of which—$18.14 million—were sold shortly before the market learned the truth about the Remediation Efforts.  ¶¶154-56.  The shares sold were four times as many as Mohajer sold in the comparable period immediately before the Class Period |

| Statement No. | The Speaker(s), Date(s), and Medium | False and/or Misleading Statements or Omissions | Reasons Why the Statements Were False and/or Misleading When Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| | | *control over financial reporting;*" ¶126. | | and generated more than ten times the proceeds. ¶¶158-59.  Sharan, too, sold a sizeable number of shares during the Class Period, reaping $1.67 million in proceeds, nearly all of which—$1.17 million—were sold shortly before the market learned the truth.  ¶¶160-62.  The shares sold were twice as many as Sharan sold in the comparable period immediately before the Class Period and and generated more than ten times the proceeds.  ¶¶163-64.  SoundHound also capitalized on the inflated value of the stock.  The Company required capital raises to ensure it had sufficient capital to continue operating, and three times went to the market to raise capital, including one a mere thirty-four days before the truth emerged.  ¶¶151-53.  These capital raises were critical given the Company's cash burn and history of cash shortages.  ¶¶47-51, 150.<br><br>It is reasonable to infer that Mohajer and Sharan knew about the decision to silo Amelia with new staff that lacked the experience and training as those that were removed because Amelia was a critical acquisition at the core of SoundHound's business and future prospects.  At the time of the Amelia Acquisition, Amelia's revenues represented 62% of SoundHound's total consolidated revenues for the quarter in which the acquisition closed came from Amelia.  ¶171.  Similarly, at the time, Amelia was forecast to comprise one-third of SoundHound's future revenue, and nearly a year after the Amelia Acquisition, Sharan described Amelia and other recently completed acquisitions as increasing the Company's growth to "over 100%."  ¶¶171-72.  Mohajer and Sharan knew that hiring experienced staff was an important step to remediate SoundHound's own disclosed weaknesses in ICFR, ¶82, and therefore it is reasonable to infer that they would pay attention to the change in ICFR by reducing eliminating all experienced financial reporting resources at a large strategic acquisition whose financial information flows through into its own Consolidated Financials that would likely be subject to public scrutiny.<br><br>Furthermore, the inference of scienter is bolstered by Defendants' decision to cover up the scale of the misstatement by failing to restate the SoundHound's accounting for the Amelia Acquisition, as reported in its Q3 2024 Form 10-Q, in accordance with GAAP.  ¶¶175-82.  GAAP requires a restatement whenever a previously disclosed item is material.  ¶¶177-78.  Although the industry and SEC look to a 5% error as a "rule of thumb" threshold for materiality, SoundHound did not restate even though some items were misstated by 9 to 12%.  ¶¶178-79.  Avoiding the misstatement meant that SoundHound avoided filing a current report on Form 8-K, making additional disclosures, or alerting investors to a serious failure in accounting that would |

| Statement No. | The Speaker(s), Date(s), and Medium | False and/or Misleading Statements or Omissions | Reasons Why the Statements Were False and/or Misleading When Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| | | | | likely further damage the stock.  ¶¶180-81.  Thus, the inference of Defendants' scienter is bolstered by their attempt to cover up their serious failures of ICFR, continuing their pattern of misleading investors to reassure them that their ICFR failures were not as serious as they were in truth.  ¶182. |

**PART TWO: MATERIALLY FALSE AND MISLEADING STATEMENTS AND/OR OMISSIONS CONCERNING SOUNDHOUND'S ACCOUNTING FOR AMELIA**

| Statement No. | The Speaker(s), Date(s), and Medium | False and/or Misleading Statements or Omissions | Reasons Why the Statements Were False and/or Misleading When Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| 10. | **When**: November 12, 2024 **Where**: The Q3 2024 Form 10-Q **Speakers**: Mohajer, Sharan, SoundHound | SoundHound's Q3 2024 Form 10-Q's section titled Condensed Consolidated Balance Sheets contained a table, which included the following line-items alleged to be false: <br><br> *Goodwill* — *111,730* <br> *Total assets* — *499,654* <br> *Accounts payable* — *17,758* <br> *Accrued liabilities* — *22,599* <br> *Deferred revenue* — *20,096* <br> *Total current liabilities* — *70,178* <br> *Contingent acquisition liabilities (Note 17)* — *74,450* <br> *Income tax liability, net of current portion* — *5,004* <br> *Total liabilities* — *203,667* <br> *Total liabilities and stockholders' equity* — *499,654* <br> ¶128.[3] | These statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, as the Company itself later admitted, SoundHound misstated: (i) the contingent earnout consideration of the transaction, (ii) Amelia's liabilities, including accounts payable, accrued liabilities, deferred revenue, and deferred income tax liability, and therefore (iii) the Goodwill acquired in the Amelia acquisition. ¶131. | Mohajer placed himself at the center of SoundHound's financial process and thus knew or was reckless in not knowing that Amelia's finances were unlikely to be accurately produced. ¶¶145-48. CW1, who worked at SoundHound from June 2023 to May 2025, confirmed that "everything" in finance had to "go through the CEO to get his approval." ¶¶18, 84, 147. Thus, Mohajer either knew of or, more likely, approved, the decision to lay off all Amelia's accountants experienced with financial reporting and replace them with one employee who was "really new," "not experienced with financials" and unfamiliar with how to access Amelia's financial information, supported only by offshore contractors who did not have accounting degrees. ¶95. As a result, Mohajer either knew the accounting of the Amelia Acquisition was unlikely to be accurately produced or was reckless in blindly accepting its accounting. <br><br> It is reasonable to infer that Mohajer and Sharan knew about the decision to silo Amelia with new staff that lacked the experience and training as those that were removed because Amelia was a critical acquisition at the core of SoundHound's business and future prospects. At the time of the Amelia Acquisition, Amelia's revenues represented 62% of SoundHound's total consolidated revenues for the quarter in which the acquisition closed came from Amelia. ¶171. Similarly, at the time, Amelia was forecast to comprise one-third of SoundHound's future revenue, and nearly a year after the Amelia Acquisition, Sharan described Amelia and other recently completed acquisitions as increasing the Company's growth to "over 100%." ¶¶171-72. <br><br> Furthermore, the inference of scienter is bolstered by Defendants' decision to cover up the scale of the misstatement by failing to restate the SoundHound's accounting for the Amelia Acquisition, as reported in its Q3 2024 Form 10-Q, in accordance with GAAP. ¶¶175-82. GAAP requires a restatement whenever a previously disclosed item is material. ¶¶177-78. Although the industry and SEC look to a 5% error as a "rule of thumb" threshold for materiality, SoundHound did not restate even though some items were misstated by 9 to 12%. ¶¶178-79. Avoiding the misstatement meant that SoundHound avoided filing a current report on Form 8-K, making additional |

---

[3] The full chart is reproduced in the Amended Complaint at ¶128.

| Statement No. | The Speaker(s), Date(s), and Medium | False and/or Misleading Statements or Omissions | Reasons Why the Statements Were False and/or Misleading When Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| | | | | disclosures, or alerting investors to a serious failure in accounting that would likely further damage the stock.  ¶¶180-81.  Thus, the inference of Defendants' scienter is bolstered by their attempt to cover up their serious failures of ICFR, continuing their pattern of misleading investors to reassure them that their ICFR failures were not as serious as they were in truth.  ¶182. |
| 11. | When: November 12, 2024 Where: The Q3 2024 Form 10-Q Speakers: Mohajer, Sharan, SoundHound | SoundHound's Q3 2024 Form 10-Q also stated, in relevant part: "*As of the Amelia Acquisition Date, the Contingent Amelia Earnout Consideration had an estimated fair value of $71.6 million.*"  ¶129. | These statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, as the Company itself later admitted, SoundHound misstated: (i) the contingent earnout consideration of the transaction, (ii) Amelia's liabilities, including accounts payable, accrued liabilities, deferred revenue, and deferred income tax liability, and therefore (iii) the Goodwill acquired in the Amelia acquisition.  ¶131. | Mohajer placed himself at the center of SoundHound's financial process and thus knew or was reckless in not knowing that Amelia's finances were unlikely to be accurately produced.  ¶¶145-48.  CW1, who worked at SoundHound from June 2023 to May 2025, confirmed that "everything" in finance had to "go through the CEO to get his approval."  ¶¶18, 84, 147.  Thus, Mohajer either knew of or, more likely, approved, the decision to lay off all Amelia's accountants experienced with financial reporting and replace them with one employee who was "really new," "not experienced with financials" and unfamiliar with how to access Amelia's financial information, supported only by offshore contractors who did not have accounting degrees.  ¶95.  As a result, Mohajer either knew the accounting of the Amelia Acquisition was unlikely to be accurately produced or was reckless in blindly accepting its accounting.

It is reasonable to infer that Mohajer and Sharan knew about the decision to silo Amelia with new staff that lacked the experience and training as those that were removed because Amelia was a critical acquisition at the core of SoundHound's business and future prospects.  At the time of the Amelia Acquisition, Amelia's revenues represented 62% of SoundHound's total consolidated revenues for the quarter in which the acquisition closed came from Amelia.  ¶171.  Similarly, at the time, Amelia was forecast to comprise one-third of SoundHound's future revenue, and nearly a year after the Amelia Acquisition, Sharan described Amelia and other recently completed acquisitions as increasing the Company's growth to "over 100%."  ¶¶171-72.

Furthermore, the inference of scienter is bolstered by Defendants' decision to cover up the scale of the misstatement by failing to restate the SoundHound's accounting for the Amelia Acquisition, as reported in its Q3 2024 Form 10-Q, in accordance with GAAP.  ¶¶175-82.  GAAP requires a restatement whenever a previously disclosed item is material.  ¶¶177-78.  Although the industry and SEC look to a 5% error as a "rule of thumb" threshold for materiality, SoundHound did not restate even though some items were misstated by 9 to 12%.  ¶¶178-79.  Avoiding the misstatement meant that SoundHound avoided filing a current report on Form 8-K, making additional disclosures, or alerting investors to a serious failure in accounting that would likely further damage the stock.  ¶¶180-81.  Thus, the inference of |

| Statement No. | The Speaker(s), Date(s), and Medium | False and/or Misleading Statements or Omissions | Reasons Why the Statements Were False and/or Misleading When Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| | | | | Defendants' scienter is bolstered by their attempt to cover up their serious failures of ICFR, continuing their pattern of misleading investors to reassure them that their ICFR failures were not as serious as they were in truth. ¶182. |
| 12. | When: November 12, 2024 Where: The Q3 2024 Form 10-Q Speakers: Mohajer, Sharan, SoundHound | SoundHound's Q3 2024 Form 10-Q included a table showing "Preliminary purchase price allocation," which included the following line-items alleged to be false: <br><br> *Contingent earnout consideration* 71,560 <br> *Accounts payable* 14,839 <br> *Accrued liabilities* 11,420 <br> *Deferred revenue* 23,144 <br> *Deferred tax liabilities* 11,105 <br> *Total liabilities assumed* 193,900 <br> *Goodwill acquired on acquisition* 105,691 <br><br> ¶130.[4] | These statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, as the Company itself later admitted, SoundHound misstated: (i) the contingent earnout consideration of the transaction, (ii) Amelia's liabilities, including accounts payable, accrued liabilities, deferred revenue, and deferred income tax liability, and therefore (iii) the Goodwill acquired in the Amelia acquisition. ¶131. | Mohajer placed himself at the center of SoundHound's financial process and thus knew or was reckless in not knowing that Amelia's finances were unlikely to be accurately produced. ¶¶145-48. CW1, who worked at SoundHound from June 2023 to May 2025, confirmed that "everything" in finance had to "go through the CEO to get his approval." ¶¶18, 84, 147. Thus, Mohajer either knew of or, more likely, approved, the decision to lay off all Amelia's accountants experienced with financial reporting and replace them with one employee who was "really new," "not experienced with financials" and unfamiliar with how to access Amelia's financial information, supported only by offshore contractors who did not have accounting degrees. ¶95. As a result, Mohajer either knew the accounting of the Amelia Acquisition was unlikely to be accurately produced or was reckless in blindly accepting its accounting. <br><br> It is reasonable to infer that Mohajer and Sharan knew about the decision to silo Amelia with new staff that lacked the experience and training as those that were removed because Amelia was a critical acquisition at the core of SoundHound's business and future prospects. At the time of the Amelia Acquisition, Amelia's revenues represented 62% of SoundHound's total consolidated revenues for the quarter in which the acquisition closed came from Amelia. ¶171. Similarly, at the time, Amelia was forecast to comprise one-third of SoundHound's future revenue, and nearly a year after the Amelia Acquisition, Sharan described Amelia and other recently completed acquisitions as increasing the Company's growth to "over 100%." ¶¶171-72. <br><br> Furthermore, the inference of scienter is bolstered by Defendants' decision to cover up the scale of the misstatement by failing to restate the SoundHound's accounting for the Amelia Acquisition, as reported in its Q3 2024 Form 10-Q, in accordance with GAAP. ¶¶175-82. GAAP requires a restatement whenever a previously disclosed item is material. ¶¶177-78. Although the industry and SEC look to a 5% error as a "rule of thumb" threshold for materiality, SoundHound did not restate even though some items were misstated by 9 to 12%. ¶¶178-79. Avoiding the misstatement meant that SoundHound avoided filing a current report on Form 8-K, making additional disclosures, or alerting investors to a serious failure in accounting that would likely further damage the stock. ¶¶180-81. Thus, the inference of |

[4] The full chart is reproduced in the Amended Complaint at ¶130.

| Statement No. | The Speaker(s), Date(s), and Medium | False and/or Misleading Statements or Omissions | Reasons Why the Statements Were False and/or Misleading When Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| | | | | Defendants' scienter is bolstered by their attempt to cover up their serious failures of ICFR, continuing their pattern of misleading investors to reassure them that their ICFR failures were not as serious as they were in truth. ¶182. |
| 13. | When: January 28, 2025 Where: The January 2025 Form S-3 Speakers: Mohajer, Sharan, SoundHound | SoundHound's Q3 2024 Form 10-Q included an Unaudited Pro Forma Condensed Consolidated Balance Sheet, which included the following line-items alleged to be false: <br><br>*Goodwill* 111,730 <br>*Total assets* 499,654 <br>*Accounts payable* 17,758 <br>*Accrued liabilities* 22,599 <br>*Deferred revenue* 20,096 <br>*Total current liabilities* 70,178 <br>*Contingent acquisition liabilities (Note 17)* 74,450 <br>*Income tax liability, net of current portion* 5,004 <br>*Total liabilities* 203,667 <br>*Total liabilities and stockholders' equity* 499,654 <br>¶132.[5] | These statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, as the Company itself later admitted, SoundHound misstated: (i) the contingent earnout consideration of the transaction, (ii) Amelia's liabilities, including accounts payable, accrued liabilities, deferred revenue, and deferred income tax liability, and therefore (iii) the Goodwill acquired in the Amelia acquisition. ¶131. | Mohajer placed himself at the center of SoundHound's financial process and thus knew or was reckless in not knowing that Amelia's finances were unlikely to be accurately produced. ¶¶145-48. CW1, who worked at SoundHound from June 2023 to May 2025, confirmed that "everything" in finance had to "go through the CEO to get his approval." ¶¶18, 84, 147. Thus, Mohajer either knew of or, more likely, approved, the decision to lay off all Amelia's accountants experienced with financial reporting and replace them with one employee who was "really new," "not experienced with financials" and unfamiliar with how to access Amelia's financial information, supported only by offshore contractors who did not have accounting degrees. ¶95. As a result, Mohajer either knew the accounting of the Amelia Acquisition was unlikely to be accurately produced or was reckless in blindly accepting its accounting. <br><br>It is reasonable to infer that Mohajer and Sharan knew about the decision to silo Amelia with new staff that lacked the experience and training as those that were removed because Amelia was a critical acquisition at the core of SoundHound's business and future prospects. At the time of the Amelia Acquisition, Amelia's revenues represented 62% of SoundHound's total consolidated revenues for the quarter in which the acquisition closed came from Amelia. ¶171. Similarly, at the time, Amelia was forecast to comprise one-third of SoundHound's future revenue, and nearly a year after the Amelia Acquisition, Sharan described Amelia and other recently completed acquisitions as increasing the Company's growth to "over 100%." ¶¶171-72. <br><br>Furthermore, the inference of scienter is bolstered by Defendants' decision to cover up the scale of the misstatement by failing to restate the SoundHound's accounting for the Amelia Acquisition, as reported in its Q3 2024 Form 10-Q, in accordance with GAAP. ¶¶175-82. GAAP requires a restatement whenever a previously disclosed item is material. ¶¶177-78. Although the industry and SEC look to a 5% error as a "rule of thumb" threshold for materiality, SoundHound did not restate even though some items were misstated by 9 to 12%. ¶¶178-79. Avoiding the misstatement meant that SoundHound avoided filing a current report on Form 8-K, making additional disclosures, or alerting investors to a serious failure in accounting that would likely further damage the stock. ¶¶180-81. Thus, the inference of |

[5] The full chart is reproduced in the Amended Complaint at ¶128.

| Statement No. | The Speaker(s), Date(s), and Medium | False and/or Misleading Statements or Omissions | Reasons Why the Statements Were False and/or Misleading When Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| | | | | Defendants' scienter is bolstered by their attempt to cover up their serious failures of ICFR, continuing their pattern of misleading investors to reassure them that their ICFR failures were not as serious as they were in truth.  ¶182. |