UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ST. JOHN FAMILY TRUST, et al., <br><br> Plaintiffs, <br><br> v. <br><br> SOUNDHOUND AI, INC., et al., <br><br> Defendants. | Case No.  25-cv-02915-RFL <br><br><br> **ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS WITH LEAVE TO AMEND AND DENYING MOTION TO STRIKE** <br><br> Re: Dkt. Nos. 61, 65 |

SoundHound is a technology company that sells products combining artificial intelligence and voice recognition.  Throughout 2024, it disclosed in its SEC filings weaknesses in its internal controls and specific efforts that it had already undertaken to remediate those weaknesses.  Then, on March 4, 2025, it filed a Form 12b-25 in which it announced a delay in the filing of its 2024 10-K.  The company stated that it needed more time to account for the "complexity of accounting" for recent acquisitions, including its August 2024 acquisition of a company called Amelia, and stated that it was continuing to experience internal control weaknesses more generally.  A week later, SoundHound filed its 2024 10-K in which it restated certain financials and appeared to change its story about the progress of its internal control remediation efforts to date.

Plaintiffs subsequently brought this securities class action against SoundHound, its CEO Keyvan Mohajer, and its CFO Nitesh Sharan, to recover under Sections 10(b) and 20(a) of the '34 Act and SEC Rule 10b-5 for the fraud that Plaintiffs allege SoundHound revealed through its March 2025 filings.  (*See* Amended Class Action Complaint (the "AC") at Dkt. No. 56.)  They base their claims both on the information disclosed in the March 2025 filings and on information obtained from three confidential witnesses (the "CWs").  Defendants now move to dismiss.  (*See*

1

Dkt. No. 61 (the "Motion").)  For the reasons set forth below, the Motion is **GRANTED IN PART AND DENIED IN PART WITH LEAVE TO AMEND**.  This Order assumes that the reader is familiar with the facts of the case, the applicable legal standards, and the parties' arguments.[1]

## I.    ANALYSIS

### A.    Section 10(b) and Rule 10b-5

"To assert a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege:  (1) a material misrepresentation or omission by the defendant [(falsity)]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 764 (9th Cir. 2023) (citation and quotation marks omitted).  Defendants argue that Plaintiffs do not satisfy the falsity, materiality, scienter, or loss causation requirements.[2]

#### 1.    Representations 1-6:  Internal Controls

The first group of representations concerns SoundHound's internal controls.

##### a.    Falsity

###### i.    Representation 1 (Statements 1, 3, 5, and 7)

SoundHound represented that, as part of the process of remediating internal control weaknesses, it had "[c]ompleted a segregation of duties assessment identifying key conflicts and mitigating controls."  (*See* Dkt. Nos. 62-2 at 123, 62-3 at 57, 62-4 at 62-63, 62-5 at 66.)[3]  This

---

[1] All citations to page numbers in filings on the docket refer to ECF page numbers.

[2] Plaintiffs base their claims on 13 statements issued by Defendants.  Statements 1-9 are excerpts from SoundHound's disclosures, some of which contain multiple representations.  For clarity, this Order analyzes each *representation* within Statements 1-9 separately.  Statements 10-13, however, comprise financial disclosures, and clarity is better served by analyzing those disclosures as a whole rather than analyzing each line item separately.

[3] The Court may consider SEC filings in evaluating the Motion.  *See Alpha Venture Cap. Partners LP v. Pourhassan*, 30 F.4th 920, 924 (9th Cir. 2022).

representation is sufficiently alleged to have been false when made because it was expressly contradicted in the 2024 10-K: "The Company did not [by December 31, 2024,] design and maintain effective controls to verify appropriate segregation of duties, including assessment of incompatible duties, identification of instances where incompatible duties were assigned to an individual, and addressing conflicts on a timely basis." (Dkt. No. 62-8 at 35.)

Defendants dispute that this language contradicts Representation 1 because, in their view, it merely explains that internal controls weaknesses persisted at the end of 2024. That reading ignores the express disclosure that the company did not effect an "assessment of incompatible duties." It also does not matter that the company had previously stated in its Q3 2023 10-Q, before the class period began, that no such assessment had been completed. (*See* Dkt. No. 62-1 at 57.) After issuing that 2023 disclosure, the company represented throughout 2024 in Statements 1, 3, 5, and 7 that it *had* completed an assessment of segregation of duties.

SoundHound protests that it stated throughout its 2024 filings that "material weaknesses will not be considered remediated until management completes the design and implementation of the [specific] measures described[,] the controls operate for a sufficient period of time, and management has concluded, through testing, that the controls are effective." (*See* Dkt. Nos. 62-2 at 123, 62-3 at 57, 62-4 at 63, 62-5 at 67.) That representation, however, does not negate the falsity of representing that an assessment was completed when it was not. For the same reason, describing the remediation measures as "in progress" does not defeat allegations of falsity with respect to a measure that was represented as having already been completed. (*See* Dkt. Nos. 62-3 at 57, 62-4 at 62, 62-5 at 66.)

### ii.      Representation 2 (Statements 3, 5, and 7)

SoundHound represented that, as part of the process of remediating internal control weaknesses, it had "[i]nitiated the design and implementation of a Segregation of Duties automated tool for [its] Enterprise Resource Planning (ERP) system," it had "initiated the design and implementation of similar controls for the remaining financially relevant applications," and "[i]mprovements ha[d] been implemented in tool utilization to strengthen the segregation of

duties." (*See* Dkt. Nos. 62-3 at 57, 62-4 at 62-63, 62-5 at 66-67.)  This representation is not sufficiently alleged to have been false when made.  Nothing identified by Plaintiffs in the Form 12b-25 or 2024 10-K, and nothing described by the CWs, contradicts prior statements about the company's implementation of an automated tool to assist in segregating duties.  SoundHound did represent in the 2024 10-K that by the end of 2024, the company "did not design and maintain effective controls over certain information technology," including "user access controls to ensure appropriate segregation of duties." (*See* Dkt. No. 62-8 at 35.)  But it is not clear whether, for example, SoundHound nevertheless implemented an automated tool to assist with segregation of duties that falls outside the scope of such "user access controls."

### iii.    Representation 3 (Statement 7)

SoundHound represented that, as part of the process of remediating internal control weaknesses, it had "[c]ompleted the implementation of an automated month and quarter-end accounting close workflow tool to facilitate the review and support of key financial close process controls." (*See* Dkt. No. 62-5 at 66-67.)  This representation, which was made after SoundHound acquired Amelia, is sufficiently alleged to have been false when made because it is contradicted by CW2 and CW3's descriptions of Amelia's accounting processes.

A plaintiff may rely on CWs in alleging falsity.  *See Glazer*, 63 F.4th at 765-66.  To do so, they

> must pass two hurdles . . . .  First, the confidential witnesses whose statements are introduced to establish [falsity] must be described with sufficient particularity to establish their reliability and personal knowledge.  Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of [falsity].

*See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009) (citations omitted).  The allegations about CW2 and CW3 satisfy these hurdles.  Both worked in the accounting department at Amelia during the class period, including after SoundHound acquired the company, so they satisfy the first hurdle.  Defendants do argue that these CWs did not work in positions where they would possess information about internal controls, but their work in the

accounting department could reasonably have been expected to provide them with information about Amelia's internal controls. *See Cutler v. Kirchner*, 696 F. App'x 809, 811-12 (9th Cir. 2017) ("'Internal control over financial reporting' is a defined term in the SEC's regulations, describing a particular set of accounting processes." (citation omitted)). As for the second hurdle, while SoundHound represented after the Amelia acquisition that it had "[c]ompleted the implementation of an automated month and quarter-end accounting close workflow tool to facilitate the review and support of key financial close process controls" (*see* Dkt. No. 62-5 at 66-67), CW2 and CW3 explained that Amelia performed these accounting functions manually and that SoundHound left Amelia's original accounting processes in place after the acquisition. (*See* AC ¶¶ 89, 91, 93.)

### iv.    Representation 4 (Statement 7)

SoundHound represented that, as part of the process of remediating internal control weaknesses, it had "hired personnel with expertise in risk assessment and internal controls." (*See* Dkt. No. 62-5 at 66-67.) This representation is not sufficiently alleged to have been false when made. Nothing identified by Plaintiffs in the Form 12b-25 or 2024 10-K contradicts that statement. While CW2 and CW3 recounted certain hiring and layoff occurrences at Amelia following its acquisition by SoundHound, both described Amelia's accounting department as separate from the rest of SoundHound. (*See* AC ¶ 93.) Accordingly, their comments about hiring and layoffs at Amelia do not mean that SoundHound failed to hire experts in risk assessment and internal controls in connection with other components of its business.

### v.    Representation 5 (Statement 8)

In the Q3 2024 10-Q, SoundHound represented that "[t]here were no changes in the Company's internal control over financial reporting (as defined in Rule 13a-15(f) of the Exchange Act) during the quarter ended September 30, 2024 that materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting." (*See* Dkt. No. 62-5 at 67.) This representation is sufficiently alleged to have been false when made because it is contradicted in the 2024 10-K. SoundHound acquired Amelia during Q3

2024, and in the 2024 10-K, the company acknowledged internal control weaknesses stemming from the acquisition:

> Further, due to rapid business growth, changes to existing controls or the implementation of new controls have not been sufficient to respond to changes to the risks of material misstatement to financial reporting, which resulted in the Company, including the SYNQ3 and Amelia entities which were acquired during 2024, not designing and maintaining effective controls related to substantially all accounts and disclosures.

(Dkt. No. 62-8 at 35.)  Also, as discussed above, CW2 and CW3 described internal control weaknesses within Amelia's accounting processes that persisted after the acquisition.

### vi.    Representation 6 (Statement 9)

In the Q3 2024 10-Q, Mohajer and Sharan represented in their SOX certifications that they had disclosed in that filing "any change in [SoundHound's] internal control over financial reporting that occurred during [SoundHound's] most recent fiscal quarter ([SoundHound's] fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, [SoundHound's] internal control over financial reporting."  (*See* Dkt. No. 62-5 at 74-75.)  This representation is sufficiently alleged to have been false when made because it is contradicted by CW2 and CW3's descriptions of internal control weaknesses within Amelia's accounting processes.  As discussed above, for example, both described the use of manual, not automatic, accounting operations at month- and quarter-end.  That is a change in internal controls that SoundHound experienced in Q3 2024 because SoundHound acquired Amelia in August of that year, but SoundHound did not disclose this alleged internal control weakness in the Q3 2024 10-Q.  To the contrary, as discussed above, Plaintiffs sufficiently allege that SoundHound falsely represented in that filing that it had implemented an automated tool concerning month- and quarter-end accounting.

Defendants argue that representations in SOX certifications are not sufficiently alleged to be false in the absence of allegations about what the certifying executives actually knew at the time they issued the certifications.  Allegations of actual knowledge may be required when SOX

6

certifications are accompanied by a caveat that the representations are certified only "to the extent of [the declarants'] knowledge on the date of execution." *See Wanca v. Super Micro Comput., Inc.*, No. 15-cv-04049-EJD, 2018 WL 3145649, at *6 (N.D. Cal. June 27, 2018). Representations appearing before the representations in question in Mohajer and Sharan's SOX certifications in the Q3 2024 10-Q do contain similar qualifying language as to other portions of the 10-Q. However, no such qualifying language accompanies the representations in question, which each certifying officer made without qualification as one of the officers "responsible for establishing and maintaining . . . internal control over financial reporting." (*See* Dkt. No. 62-5 at 74-75.)

* * *

In sum, Plaintiffs sufficiently allege the falsity of Representations 1, 3, 5, and 6.

### b.    Materiality

Defendants do not argue that Plaintiffs fail to sufficiently allege the materiality of Representations 1, 3, 5, and 6.

### c.    Scienter

"In most cases, the most straightforward way to raise [an inference of scienter] for a corporate defendant will be to plead it for an individual defendant." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014) (citation omitted). Accordingly, Plaintiffs seek to plead SoundHound's scienter based on the scienter of Mohajer and Sharan. Plaintiffs' allegations must satisfy the high bar of a "strong inference" of scienter that applies to securities claims. *See Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020) (describing pleading standard for scienter). In evaluating scienter, this Order must "consider whether the total of plaintiffs' allegations . . . are sufficient to create a strong inference" of scienter. *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002). With respect to Representations 1, 3, 5, and 6, a holistic analysis of Plaintiffs' allegations permits a strong inference of scienter.

In their SOX certifications issued during the class period, Mohajer and Sharan certified, among other things, that they were "responsible for establishing and maintaining disclosure

controls and procedures . . . and internal control over financial reporting," had "[d]esigned . . . or caused . . . to be designed" internal controls for reliable financial reporting, and had "[e]valuated the effectiveness of [SoundHound's] disclosure controls and procedures." (*See* Dkt. Nos. 62-2 at 145-46, 62-3 at 64-65, 62-4 at 67-68, 62-5 at 74-75.)  Relatedly, in the 2024 10-Qs, SoundHound enumerated its various internal control remedial measures under the heading:  "*Management's* Plan to Remediate the Material Weaknesses." (*See* Dkt. Nos. 62-3 at 57, 62-4 at 62-63, 62-5 at 66-67 (bold emphasis omitted) (italics emphasis added).)  In light of the SOX certifications about Mohajer and Sharan's personal role in establishing, maintaining, designing, and evaluating the company's internal controls, it is reasonable to infer that "Management" refers to, or at least includes, those two executives in particular.[4]  SoundHound is not alleged to be a multinational conglomerate or an entity in which Mohajer and Sharam were separated by numerous layers of management from the team performing the actual remediation.  (*See also* AC ¶¶ 58-59 (noting entry of "bigger" companies into the voice AI market).)  Indeed, the AC describes SoundHound as having a sufficiently flat management structure such that Mohajer was still personally approving vendor invoices according to CW1, based on his work with the finance team and information he received from an outside vendor.[5]  (*See id.* ¶¶ 84, 147.)

Accordingly, it is reasonable to infer that "Management's Plan to Remediate" the company's internal control weaknesses was *Mohajer and Sharan's* plan.  Moreover, each filing's discussion of the company's remediation efforts concluded by cautioning that "material weaknesses will not be considered remediated until *management completes* the design and implementation of the measures described above, the controls operate for a sufficient period of

---

[4] When asked about it at oral argument, Defendants did not dispute the reasonableness of this inference.

[5] These CW1 allegations satisfy the two hurdles under *Zucco Partners*.  CW1 allegedly worked at SoundHound as a Merchant Operations Manager and Senior Manager of Operations Support Systems during the class period (*see* AC ¶ 18), so it is reasonable to infer that he interacted with the finance department as part of his duties, and his statements in question about Mohajer speak to Mohajer's scienter.

time, and *management has concluded*, through testing, that the controls are effective." (*See* Dkt. Nos. 62-3 at 57, 62-4 at 62-63, 62-5 at 66-67 (emphasis added).)  That supports a strong inference of active involvement by Mohajer and Sharan in remediating internal control weaknesses.

The frequency with which Mohajer and Sharan described their plan to remediate internal control weaknesses to investors in financial disclosures—in the Q3 2023 10-Q, the 2023 10-K, and all three 2024 10-Qs—also suggests a high degree of importance to them in addressing problems with the company's internal controls.[6]  This conclusion is bolstered by the Forms 12b-25 filed in November 2023 (announcing the delayed filing of the Q3 2023 10-Q), March 2024 (announcing the delayed filing of the 2023 10-K), and March 2025 (announcing the delayed filing of the 2024 10-K).  Each of these filings, signed by Mohajer, disclosed that the company suffered from internal control weaknesses.  (*See* AC ¶¶ 74, 78, 98.)

SoundHound protests that a strong inference of scienter may not be based on SOX certifications.  It is true that "Sarbanes–Oxley certifications are not sufficient, without more, to raise a strong inference of scienter." *Zucco Partners*, 552 F.3d at 1004 (citation omitted).  As described above, though, Plaintiffs have more. *See also Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1028 n.22 (N.D. Cal. 2020) ("[S]pecific allegations related to [SOX] certifications may be part of a totality giving rise to a compelling inference of scienter." (citation omitted)).  They sufficiently allege that Mohajer and Sharan were responsible for SoundHound's internal controls (including the design of effective controls), implemented a plan to remediate internal controls deficiencies, played an active role in that remediation effort, and considered the company's internal control weaknesses to be important.  Taken together, those allegations permit a strong

---

[6] The Q3 2023 10-Q and the 2023 10-K do not refer to the company's attempts to address internal control weaknesses as "Management's Plan" and instead title those endeavors as "Remediation Efforts for the Material Weaknesses." (*See* Dkt. Nos. 62-1 at 58, 62-2 at 123.) Those discussions substantively mirror the discussions of "Management's Plan" in the 2024 10-Qs.  The two filings also include similar SOX certifications from Mohajer and Sharan to those included in the 2024 10-Qs about their roles in establishing, maintaining, designing, and evaluating the company's internal controls.  (*See* Dkt. Nos. 62-1 at 63-64, 62-2 at 145-46.)

inference of scienter that the two knew that Representations 1, 3, 5, and 6 were false when made because those representations describe the executives' plan to remediate internal control weaknesses and the disclosure of material changes to the company's internal controls.

### d.    Loss Causation

"[L]oss causation is the causal connection between the [defendant's] material misrepresentation and the [plaintiff's] loss. . . . Stated in the affirmative, the complaint must allege that the defendant's share price fell significantly after the truth became known." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1062 (9th Cir. 2008) (citations and quotation marks omitted).

Defendants argue that any drop in stock price stemming from the March 4 filing of the Form 12b-25 in which SoundHound disclosed that it would delay filing its 2024 10-K is irrelevant because the Form 12b-25 did not reveal any new information (*i.e.*, did not disclose a hidden truth). The substance of the filing states as follows:

> As previously disclosed, on January 3, 2024, SoundHound AI, Inc. (the "Company") completed the acquisition of Synq3, Inc. in a cash and stock transaction (the "SYNQ3 Acquisition"), and on August 7, 2024, the Company completed the acquisition of Amelia Holdings, Inc. in a cash and stock transaction (together with the SYNQ3 Acquisition, the "Acquisitions"). Due to the complexity of accounting for the Acquisitions, the Company requires additional time to prepare the financial statements and the accompanying notes disclosed in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2024 (the "Form 10-K"). Accordingly, the Company has determined that it is unable to file the Form 10-K without unreasonable effort or expense. *As previously disclosed, the Company has identified material weaknesses in its internal control over financial reporting. These material weaknesses continue to exist as of December 31, 2024.* The Company expects to file its Form 10-K within the fifteen-day period provided under Rule 12b-25, no later than by March 18, 2025.

(Dkt. No. 62-7 at 3 (emphasis added).) This disclosure permits a reasonable inference that, at the time of the disclosure, the company's internal control weaknesses were severe enough to contribute to SoundHound needing to delay filing its 2024 10-K. And as explained above in the discussion of falsity, those forthcoming disclosures are sufficiently alleged to have been

revelations of the truth.  The March 4 disclosure does not, therefore, "speak to different things" than do the disclosures ultimately released in the late-filed 10-K.  (*See* Dkt. No. 67 at 13.)  Thus, while the alleged fraud was not directly revealed in the March 4 filing, the fraud is sufficiently alleged to have led to that filing, which in turn allegedly caused a drop in stock price.  That is enough at the pleading stage for the March 4 disclosure to constitute a corrective disclosure.  *See, e.g.*, *Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 140 (D. Conn. 2021) (announcement of delayed 10-Q filing sufficiently alleged to be corrective disclosure); *cf. Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 754 (9th Cir. 2018) ("A plaintiff may also prove loss causation by showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss." (citations omitted)).

The March 4 disclosure may also "form the basis for a viable loss causation theory [because] the [AC] alleges a subsequent corrective disclosure," *i.e.*, the March 11 disclosures in the 2024 10-K.  *See Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016) (citations and quotation marks omitted).  *Lloyd* is instructive.  There, the issuer, a lending institution, disclosed its receipt of a subpoena from the SEC, after which the company's stock price dropped by 22%. *See id.* at 1204.  Observers assumed the subpoena confirmed their prior suspicions about the credit worthiness of one of the issuer's debtors, given that the subpoena disclosure described the subpoena as requesting information about the company's lending practices.  *See id.* at 1204-05. When the company finally revealed that the borrower in question could not timely satisfy its loan obligations, the company's stock price "dropped only slightly" by six cents (about 0.85%).  *See id.* at 1205.  The Ninth Circuit held that this satisfied the loss causation requirement because the eventual disclosure of the debtor's credit worthiness, followed by a minimal drop in stock price, "indicate[d] that the earlier 22% drop reflected, at least in part, the market's concerns about the" debtor's loans in light of the earlier subpoena disclosure.  *See id.* at 1210-11.

This case is on all fours with *Lloyd*.  On March 4, SoundHound disclosed that it would delay the filing of its 2024 10-K, and the disclosure revealed concerns over, among other things,

the company's internal control weaknesses.  On this news, SoundHound's stock price dropped by over 5%.  Indeed, as alleged by Plaintiffs, multiple financial outlets "drew a link between this decline and the disclosure of the delay of the 10-K."  (*See* AC ¶ 136.)  When the company filed its 10-K a week later and confirmed what the prior disclosure suggested—that SoundHound's internal control weaknesses were quite serious and that SoundHound thus needed to elaborate on its remediation of those weaknesses—its stock price fell only modestly (three cents, or 0.35%). Under *Lloyd*, these facts sufficiently allege loss causation.  *See, e.g.*, *Zhu v. Taronis Techs. Inc.*, No. 19-cv-04529-PHX, 2020 WL 1703680, at *5-6 (D. Ariz. Apr. 8, 2020).  Otherwise, as *Lloyd* observed, issuers could avoid liability by disseminating suggestive disclosures, allowing the market to absorb that information into stock prices, and then later revealing the truth.  *See Lloyd*, 811 F.3d at 1210.

Defendants argue that *Lloyd* does not apply here because one of the financial publications cited by Plaintiffs wrongly predicted that the March 4 disclosure (and accompanying drop in price) augured a forthcoming restatement of "wider-than-expected losses."  (*See* Dkt. No. 67 at 13.)  However, the other three publications cited in the AC are not alleged to have made any such erroneous predictions, and *Seeking Alpha* specifically mentioned the delayed 10-K as "rais[ing] red flags," which is consistent with concerns about internal control weaknesses.  (*See* AC ¶ 136.)

Defendants also argue that any drop in stock price following the March 4 disclosure is "insignificant in context" because "SoundHound's stock price frequently declined by greater amounts" throughout the class period.  (*See* Motion at 21.)  Such a detailed factual analysis of SoundHound's stock price over the 12-month class period, which may require expert input, is not appropriate at the pleading stage.

Finally, Defendants argue that the minor drop in stock price after the March 11 filing of the 2024 10-K, followed by the sustained recovery of the stock price, defeats an inference of loss causation.  On March 10, SoundHound's stock closed at $8.57 per share.  The next day, after the company filed its 2024 10-K prior to the market opening, its stock closed at $8.54 per share.  The stock price then consistently closed above the pre-disclosure closing price of $8.57 through

March 27.  (*See* Dkt. No. 62-10 at 14.)[7]  According to Defendants, such a "quick and sustained price recovery after the modest [March 11] drop refutes the inference that the alleged concealment of [] particular fact[s] [that were revealed on March 11] caused any material drop in the stock price."  *See Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1198 (9th Cir. 2021) (citations omitted).  But the record does not show the recovery to be either quick or sustained.  The initial corrective disclosure occurred on March 4, and the price movements on which Defendants rely occurred after March 10.  Moreover, except for a brief rebound on March 14 to $10.34 per share, which occurred ten days after the initial corrective disclosure, SoundHound's stock price closed below the pre-corrective disclosure price of $10.32 per share every day until May 12, 2025.  (*See* Dkt. No. 62-10 at 14-15.)  As such, the stock price movement does not refute the inference of loss causation here.

In sum, Plaintiffs sufficiently plead loss causation.

### 2. Representation 7:  Information "Made Known" to Defendants (Statements 2, 4, 6, and 9)

In their SOX certifications, Mohajer and Sharan represented that they had "[d]esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under [their] supervision, to ensure that material information relating to [SoundHound], including its consolidated subsidiaries, is made known to [them] by others within those entities." (*See* Dkt. Nos. 62-2 at 145-46, 62-3 at 64-65, 62-4 at 67-68, 62-5 at 74-75.)  This representation is not sufficiently alleged to have been false when made because Plaintiffs do not allege that material information was not in fact being made known to Mohajer and Sharan through applicable controls and procedures, even if, as discussed above, those controls and procedures allegedly suffered other significant flaws such as a lack of automation or insufficient checks to ensure segregation of duties.

---

[7] Courts may consider a company's historic stock prices in evaluating a motion to dismiss.  *See, e.g.*, *Plumbers & Pipefitters Loc. Union #259 Pension Fund v. CareDx, Inc.*, No. 22-cv-03023-TLT, 2024 WL 5399664, at *8 (N.D. Cal. Sept. 18, 2024).

Because Plaintiffs do not sufficiently allege the falsity of Representation 7, this Order does not address whether Plaintiffs sufficiently allege materiality, scienter, or loss causation with respect to that representation.

### 3.    Statements 10-13:  Accounting Line Items Regarding Amelia Acquisition

#### a.    Falsity and Scienter

Plaintiffs have not sufficiently alleged falsity as to the restated line items in SoundHound's financial statements concerning the Amelia acquisition.  Ordinarily, restated line items are *per se* false.  *See Hemmer Grp. v. SouthWest Water Co.*, 527 F. App'x 623, 626 (9th Cir. 2013) ("By definition, a restatement corrects financial data that was false when made.").  Here, though, the restated line items are non-actionable statements of opinion.  Three different standards govern pleading the falsity of opinions:

> First, when a plaintiff relies on a theory of material misrepresentation, the plaintiff must allege both that the speaker did not hold the belief she professed and that the belief is objectively untrue.  Second, when a plaintiff relies on a theory that a statement of fact contained within an opinion statement is materially misleading, the plaintiff must allege that the supporting fact [the speaker] supplied [is] untrue.  Third, when a plaintiff relies on a theory of omission, the plaintiff must allege facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615-16 (9th Cir. 2017) (citations and quotation marks omitted).  The first standard applies here because Plaintiffs allege that the line items were false.

With respect to the line items reflecting goodwill obtained through the Amelia acquisition, the Ninth Circuit has accepted characterizing "statements regarding goodwill valuations [as] opinion statements because they are inherently subjective and involve management's opinion regarding fair value."  *See id.* at 613 (quotation marks omitted).  To sufficiently allege the falsity of these opinions about goodwill, Plaintiffs "must allege both that the speaker did not hold the belief she professed and that the belief is objectively untrue."  *See id.*

14

at 616 (citation and quotation marks omitted).  Plaintiffs offer no such allegations.

The remaining line items are also statements of opinion reflecting SoundHound's preliminary subjective estimates of the fair values of the assets and liabilities that it had acquired in the Amelia acquisition.[8]  "[T]he 'fair value' of [] assets acquired and liabilities assumed [] are not matters of objective fact."  *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011) (citation omitted); *accord Align*, 856 F.3d at 613 (citing approvingly to *Fait*).  SoundHound explained in the Q3 2024 10-Q (which covered the period in which SoundHound acquired Amelia) that it based these fair values on subjective estimates:

- "The Company allocates the fair value of the purchase price of an acquisition to the assets acquired and liabilities assumed, based on their *estimated* fair values as of the date of acquisition. . . .  Management's estimates of fair value are *based upon assumptions believed to be reasonable*, but the estimates and assumptions are inherently uncertain and subject to refinement."  (Dkt. No. 62-5 at 16 (emphasis added); *see also id.* at 64.)

- "As of the Amelia Acquisition Date, the Contingent Amelia Earnout Consideration had an *estimated* fair value of $71.6 million. . . .  The preliminary purchase price allocation has not been finalized as of September 30, 2024 primarily due to the final assessment of the fair values of the intangible assets, contingent tax liability assumed, and fair value of the contingent earnout consideration.  The fair value estimates of assets acquired and liabilities assumed is pending the completion of various items, *including obtaining further information regarding the identification and valuation of all assets acquired and liabilities assumed*."  (*Id.* at 21, 23 (emphasis added); *see also id.* at 60.)

These remaining line items were later adjusted "to correct certain errors in the preliminary

---

[8] The non-goodwill line items at issue are:  (1) total assets; (2) accounts payable; (3) accrued liabilities; (4) deferred revenue; (5) total current liabilities; (6) contingent acquisition liabilities regarding the Amelia acquisition; (7) income tax liability, net of current portion; (8) total liabilities; (9) total liabilities and stockholders' equity; (10) contingent earnout consideration regarding the Amelia acquisition; (11) deferred tax liabilities; and (12) total liabilities assumed through the Amelia acquisition.

purchase price allocation" stemming from the Amelia acquisition.  (*See* Dkt. No. 62-8 at 61.) "The preliminary purchase price allocation . . . allocated to the assets acquired and liabilities assumed based on their respective fair values . . . ."  (*See id.* at 97.)  Thus, the non-goodwill line items are statements of opinion, and Plaintiffs do not sufficiently allege the falsity of those opinions for the same reason they do not sufficiently allege the falsity of the goodwill line items.

Because Plaintiffs have not adequately alleged the falsity of Statements 10-13, this Order does not address scienter with respect to those Statements, as it is difficult to assess whether Defendants had the required mental state without plausible factual allegations as to how the statements were false in the first place.

<strong>b.  Materiality</strong>

Plaintiffs have likewise failed to sufficiently allege materiality as to Statements 10-13. "The materiality of [a] misrepresentation or an omission depends upon whether there is a substantial likelihood that [it] would have been viewed by the reasonable investor as having significantly altered the total mix of information made available for the purpose of decisionmaking by stockholders concerning their investments." *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1274 (9th Cir. 2017) (citation and quotation marks omitted).  "Allegations of improper accounting requiring a restatement does not, by itself, establish materiality.  A plaintiff must show with particularly how the [accounting irregularities] affected the company's financial statements and whether they were material in light of the company's overall financial position." *Hemmer*, 527 F. App'x at 626 (citations and quotation marks omitted).  "[A] court must consider both quantitative and qualitative factors in assessing an item's materiality . . . ." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 717 (2d Cir. 2011) (citations and quotation marks omitted); *accord SEC v. Leslie*, No. 07-cv-03444-JF, 2012 WL 116562, at *6 (N.D. Cal. Jan. 13, 2012).

Beginning with quantitative materiality, at the Court's request, Plaintiffs prepared a chart calculating the percentages by which each line item was restated.  (*See* Dkt. Nos. 72, 72-1.) Defendants do not dispute the accuracy of Plaintiffs' calculations.  These calculations reflect that

total liabilities had been *overstated* as of the end of Q3 2024 by 4.77%.  In contrast, total assets had been overstated by 1.89%.  On net, therefore, SoundHound's overall financial position *improved* by 2.88%.  Quantitatively, therefore, the financial restatements are presumptively immaterial because they restated the company's overall financial position by less than 5%.  *See* SEC Staff Accounting Bulletin No. 99 (Aug. 12, 1999); *see, e.g.*, *In re Lone Pine Res., Inc.*, No. 12-cv-04839-GBD, 2014 WL 1259653, at *4 (S.D.N.Y. Mar. 27, 2014).

Proceeding to qualitative materiality, as explained above, the restated financials stem from adjustments to how SoundHound accounted for the Amelia acquisition.  (*See* Dkt. No. 62-8 at 61.)  Plaintiffs sufficiently allege that reasonable investors would consider the Amelia acquisition important to SoundHound's ability to enter new markets and increase revenue.  (*See* AC ¶¶ 64, 66, 169-72.)  But it is not clear why collectively minor errors in accounting for the assets and liabilities acquired from Amelia would influence investors' perception of the acquisition's effect on meeting those goals.

Accordingly, Plaintiffs do not sufficiently allege materiality with respect to Statements 10-13.

### c.      Loss Causation

For similar reasons, Plaintiffs do not sufficiently allege loss causation as to Statements 10-13.  As explained above, on net, the financial restatements quantitatively *improved* SoundHound's overall financial position by 2.88%.  Disclosures that paint a company in a more positive light necessarily do not cause a loss.  *Cf. Yaroni v. Pintec Tech. Holdings Ltd.*, 600 F. Supp. 3d 385, 404 (S.D.N.Y. 2022) (dismissing '33 Act claim based on restatement resulting in increase in company's net cash because, among other things, "this is a *positive* restatement, suggesting *negative* causation" (emphasis in original)).

### B.      Section 20(a)

Defendants move to dismiss the Section 20(a) claim solely on the basis that no Section 10(b)/Rule 10b-5 claim has been stated.  Accordingly, the Section 20(a) claim survives dismissal to the extent that Plaintiffs have stated a claim under Section 10(b) and Rule 10b-5 and is

otherwise dismissed to the extent that Plaintiffs have not stated a claim under Section 10(b) and Rule 10b-5. *See, e.g.*, *In re Lucid Grp., Inc. Sec. Litig.*, No. 22-cv-02094-AMO, 2025 WL 1474494, at *10 (N.D. Cal. May 22, 2025).

## II.    CONCLUSION

For the foregoing reasons, the Motion is **GRANTED IN PART AND DENIED IN PART WITH LEAVE TO AMEND** as follows:

- Claims based on Representations 1, 3, 5, and 6 survive dismissal.
- The claims are otherwise **DISMISSED**.

Plaintiffs' motion to strike is **DENIED AS MOOT** because consideration of the information in question would not result in a different disposition of the Motion.[9]

If Plaintiffs wish to file an amended complaint correcting the deficiencies identified in this Order, they shall do so by **June 9, 2026**. The amended complaint may not add new claims or parties, or otherwise change the allegations except to correct the identified deficiencies, absent leave of the Court or stipulation by the parties pursuant to Federal Rule of Civil Procedure 15. Plaintiffs must include a new chart of alleged misstatements with the amended complaint, as required by the undersigned's Civil Standing Order, and that new chart may not include alleged misstatements that were not included in the prior chart, absent leave of Court or stipulation by the parties pursuant to Federal Rule of Civil Procedure 15.

**IT IS SO ORDERED.**

Dated: May 19, 2026

RITA F. LIN
United States District Judge

---

[9] Defendants are nonetheless cautioned against including lengthy summaries of factual information in declarations on a motion to dismiss, which unfairly circumvents page limits set for briefing.